**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| GREENSILL CAPITAL INC., | Case No.: 21-10561 (MEW) |
| Debtor.[1] | |

## DECLARATION OF MATTHEW TOCKS
### PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 AND IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Matthew Tocks, being duly sworn, hereby depose and state as follows:

1.      I am the Head of Restructuring (Americas) of Greensill Capital Inc., the debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Chapter 11 Case").  As described in greater detail below, the Debtor is an indirect wholly owned subsidiary of Greensill Capital Pty Limited, an Australian private company ("Greensill Parent" and, collectively with its affiliates and subsidiaries, including the Debtor, the "Company").

2.      I have served as the Head of Workout & Restructuring (Americas) of the Debtor from September 2020 to March 2021.  Prior to that time, I served in multiple origination, risk management, restructuring and corporate strategy roles at Ambac Assurance Corporation for 14 years (2006 to 2020).  I was also on the Board of Directors of the Peruvian lender Financiera Edyficar for three years (2006 to 2009).

3.      I submit this declaration (the "Declaration") pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"):  (a) in support of the Debtor's voluntary petition for relief under

---

[1]     The last four digits of the Debtor's federal tax identification number are 3971.  The Debtor's corporate headquarters are located at 2 Gansevoort Street, New York, New York 10014.

chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"); (b) to explain to the United States Bankruptcy Court for the Southern District of New York (the "Court") and other interested parties the circumstances that led the Debtor to seek relief under chapter 11; and (c) in support of the motions and applications for relief filed substantially concurrently herewith and discussed herein (collectively, the "First Day Pleadings").

4.    Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the Debtor's business operations, my review of relevant documents, information provided to me, and/or my opinion based upon my experience, knowledge, and information concerning the Company's and the Debtor's operations and financials. Unless otherwise indicated, the financial information contained in this Declaration is unaudited and subject to change.

5.    I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

6.    This Declaration is divided into four parts. Part I of this Declaration provides an overview of the Debtor's business and operations, including their corporate and capital structure. Part II describes the circumstances that led to the commencement of this Chapter 11 Case, and the Debtor's restructuring plans. Part III sets forth the relevant facts in support of each of the Debtor's First Day Pleadings. Part IV provides the information required by Local Bankruptcy Rule 1007-2.

## I.    THE DEBTOR'S BUSINESS AND OPERATIONS

### A.    The Chapter 11 Filing

7.    On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor

continues to manage and operate its businesses as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this case.

### B.    The Debtor's Corporate Organization

8.    The Debtor is a Delaware corporation formed on June 10, 2013, having its corporate headquarters at 2 Gansevoort Street, New York, NY 10014 (the "NY Office").  The Debtor is a direct, wholly owned subsidiary of Greensill Capital Management (UK) Limited ("GCMC"), which is a direct wholly owned subsidiary of Greensill Parent.[2]  A corporate organization chart is attached hereto as **Exhibit 1**.

9.    As a Delaware corporation, the Debtor is governed by a board of directors (the "Board").  As of the Petition Date, the Debtor's Board consisted of two members—Alexander (Lex) D. Greensill ("Mr. Greensill"), the Company's Chief Executive Officer, and Jill M. Frizzley (the "Independent Director").  The Independent Director was appointed by resolution dated March 20, 2021 to review actions related to the Debtor's wind up of its operations, including in connection with this Chapter 11 Case and the Finacity Sale Transaction (as defined below).

### C.    Overview of the Debtor's Business, Operations, and Capital Structure

(1)    The Debtor's Historical Operations

10.    The Company was founded by Mr. Greensill in 2011 as a financial services company to provide supply chain financing, working capital solutions and related services.  Until the appointment of the Administrators (as defined below), the Company also operated a bank through a German subsidiary.

---

[2]    GCMC performs substantially all corporate and administrative functions for the Company and employs substantially all of the Company's workforce in the United Kingdom.

11.     The Company arranged factoring and reverse factoring programs for clients globally.  Factoring is a type of financing for suppliers where the supplier sells its accounts receivable at a discount and the financier later collects the full value of the invoice from the buyer.  With factoring, the financier's relationship is with the supplier whereas with reverse factoring the relationship is with the buyer of the goods or services.  Reverse factoring or supply chain financing is a working capital solution whereby a finance intermediary pays a buyer's open invoices to suppliers early at a discount and then collects payment directly from the buyer on the due date of such invoices.  The Company also packaged these payment obligations into notes which were sold to third party investors.  These working capital solutions provide much needed cash flow relief, particularly to small businesses, by decreasing the risks of nonpayment and uncertainty as to timing of cash flows, that would otherwise result from having to wait for the buyers to pay on account of outstanding invoices.  In 2019, the Company provided $143 billion of financing to approximately 10 million customers and suppliers.

12.     Historically, the Debtor served as the base for the Company's sales force in the United States and the Americas and employed more than 70 employees across 13 states as of January 1, 2021.  The vast majority of the Debtor's employees were located at the NY Office.  The Debtor's employees sold the Company's products and services to clients and investors in the Americas and all revenue arising therefrom went directly to Greensill Capital (UK) Limited ("GCUK").

13.     In June 2019, the Debtor acquired Finacity Corporation and its subsidiaries (collectively, "Finacity").[3]  Finacity is a leader in the structuring and provision of asset-backed working capital funding solutions, consumer receivables financing, supplier and payables financing, back-up servicing, and transaction reporting around the world.  As of the date hereof, Finacity served as agent on outstanding transactions with borrowers and obligors in more than 175 countries. Finacity averages approximately 60 million in accounts receivable items each year. Finacity's clients range from large-multinational shipping companies to micro-finance branches in Latin America.  While there is some overlap in the products and services offered by the Company and Finacity, Finacity operates as a separate business from the Debtor or the Company.

(2)     The Debtor's Capital Structure

14.     The Debtor has no revenue and no secured debt.  As of the Petition Date, the Debtor's significant assets consist of (a) approximately $400,000 in cash on hand, (b) its equity interests in Finacity, (c) certain furniture and office equipment located at the NY Office that was delivered but never used due to the pandemic-related office closing, and (d) certain valuable art pieces displayed at the NY Office.

15.     The Debtor is party to a retention and services agreement, dated June 10, 2013, with GCUK (the "Intercompany Services Agreement").  Pursuant to the Intercompany Services Agreement, the Debtor agreed to use its employees to develop referrals and other busiess opportunities in the United States in exchange for (a) compensation set forth on a schedule to the Intercompany Services Agreement

---

[3]     The entities comprising Finacity are not debtors in this Chapter 11 Case and have not filed voluntary petitions under chapter 11 of the Bankruptcy Code.

(consisting of base monthly fees plus success and referral fees as agreed to by the parties) and (b) reimbursement of all reasonable out of pocket expenses incurred by the Debtor on behalf of GCUK in connection with rendering services under the agreement. Among other things, the Intercompany Services Agreement required the Debtor (unless determined otherwise in advance in GCUK's sole discretion) to pay all expenses incurred by the Debtor, including rent, salaries, telephone and telecopy charges, secretarial services, meals and entertainment expenses and otherwise, provided that such expenses would be paid by GCUK, as determined in its sole discretion, in accordance with a schedule to the agreement.

16.    In order to satisfy obligations in the ordinary course, such as payroll and lease obligations, the Debtor borrowed from GCUK pursuant to a Call Account Loan Agreement, dated January 1, 2019 (as may be amended, modified, and/or supplemented from time to time, the "Intercompany Revolver").[4]  The Intercompany Revolver provided for a commitment of $40 million for an unsecured loan facility, the proceeds of which were to be used for general corporate purposes.  As of the Petition Date, the outstanding amount owed to GCUK under the Intercompany Services Agreement and the Intercompany Revolver was approximately $51 million (the "Intercompany Balance").

17.    Prior to the Petition Date, the Debtor was also party to an intercompany aircraft agreement, dated May 2018 (the "Intercompany Aircraft Agreement"), with Greensill Capital (IOM) Limited ("Greensill IOM"), a direct, wholly owned subsidiary of GCMC and an affiliate of the Debtor.  Under the Intercompany

---

[4]    In addition, the Company funded the Debtor pursuant to capital contributions that totaled approximately $12.5 million.

Aircraft Agreement, Greensill IOM agreed to provide transportation services at an agreed rate that the Debtor agreed to use for a minimum number of flight hours each year.  On March 19, 2021, the Debtor terminated the Intercompany Aircraft Agreement by providing notice to Greensill IOM.  Following the Debtor's termination of this agreement, Greensill IOM asserted that the Debtor owes a balance of €40,511.99, which the Debtor disputes.[5]

18.    Other than outstanding employee claims, rejection damages arising from the NY Office lease, and the Intercompany Balance, the Debtor does not anticipate any other material claims against the Debtor.

## II.    EVENTS LEADING TO THIS CHAPTER 11 CASE

### A.    The Company's Financial Distress and the Administration Proceedings

19.    In early 2021, the Company experienced severe financial distress as a result of a series of factors.  These included a combination of (among other things): (a) the expiry of a key insurance policy of GCUK, which resulted in the loss of significant insurance cover for the Company's newly originated assets;  (b) the withdrawal of substantial financial support from certain of the Company's key creditors;  and (c) pressure on and from key investors of the Company to reduce the Company's exposure to the GFG Alliance group.  These events together precipitated the cessation of GCUK operations and left the Company in a position of increased financial instability.

20.    By an order of the English High Court dated March 8, 2021, Christine Laverty, Trevor O'Sullivan and William Stagg each of Grant Thornton UK

---

[5]    Notwithstanding the Debtor being a party to this agreement, neither the Debtor nor any of its employees used Greensill IOM's services thereunder.

LLP were appointed as administrators (the "Administrators") of both GCUK and

GCMC (the "UK Administration Proceedings"). Subsequently on March 8, 2021, the

directors of Greensill Parent resolved to appoint Matthew Byrnes, Philip Wilson and

Michael McCann, each of Grant Thornton Australia Limited, as administrators of

Greensill Parent pursuant to s.436A Corporations Act (together with the UK

Administration Proceedings, the "Administration Proceedings").

21.     In the weeks and months prior to the Administration Proceedings,

Greensill Parent and GCUK undertook contingency planning in relation to a potential

sale of the Company's business and certain of its assets. On February 22, 2021, Greensill

Parent, GCUK and the Debtor received a non-binding indicative proposal from Apollo

(and certain investment funds managed by Apollo Global Management, Inc., including

Athene Holding Ltd and Athora Holding Ltd (together the "Apollo Investors") for

certain assets of the Company, and on March 2, 2021, GCUK entered into an exclusivity

agreement with the Apollo Investors. However, these negotiations were unsuccessful

and no transaction was ultimately concluded.

22.     Following the Administrators' move towards liquidating the

Company, on March 17, 2021, the Debtor terminated substantially all of its employees in

the United States other than certain corporate office and field employees (the

"Remaining Employees") necessary to (a) administer this Chapter 11 Case, pursue the

Finacity Sale Transaction, and wind up the estate, and (b) assist the Administrators with

the process of maximizing recoveries for the creditors with respect to transactions with

counterparties located in the Americas for the benefit of the Company. The Debtor and

GCUK entered into a services agreement on March 25, 2021 (the "Services Agreement"),

pursuant to which GCUK agreed to pay, subject to the terms of such agreement,

amounts to the Debtor sufficient to permit it meet its obligations to the Remaining

Employees under their existing employment terms, including wages and benefits, while they are employed. The Remaining Employees continue to be employees of the Debtor and are not employees of GCUK.

**B.      The Debtor's Purpose for this Chapter 11 Case**

23.      The Debtor intends to use this Chapter 11 Case to preserve and maximize value for the benefit of all creditors in connection with the winding up of its affairs. The events affecting the Company in Europe made the filing of this Chapter 11 Case unavoidable. Here, the purpose of filing the petition with this Court is to best insulate the Debtor from the distress affecting the Company elsewhere in the world. The Debtor has valuable assets that are worth preserving and can be sold for the benefit of its creditors and shareholder. This Court will be best able to provide the Debtor protection while it continues to pursue a sale of its equity interests in Finacity (the "Finacity Sale Transaction"). In that regard, the Debtor is in the process of engaging an investment banker (the "Investment Banker") to assist with the Debtor's sale efforts.

24.      In order to fund this Chapter 11 Case, including the costs of pursuing the Finacity Sale Transaction described above, Peter Greensill Family Trust (the "DIP Lender") agreed to provide the Debtor with $2 million of critical and nececessary financing pursuant to the DIP Facility (as defined below). I believe based on the information provided to me that the DIP Facility will allow the Debtor to meet ordinary course expenses, accrued but unpaid payroll for the Terminated Employees (as defined below) (subject to the Court's approval of the Wages and Benefits Motion (as defined below)), and the costs of administering this Chapter 11 Case through the sale and plan processes.

25.      The Debtor believes that with the benefit of a robust marketing

process with the assistance of the Investment Banker and the liquidity from the DIP

Facility, the Debtor will be able to maximize the value of its key asset and make

distributions to allowed general unsecured and priority claims.

### III.    FIRST DAY PLEADINGS

26.    Substantially contemporaneously with the filing of this Declaration,

the Debtor has filed various First Day Pleadings, and, at the "first day" hearing

(the "First Day Hearing") will seek orders granting various forms of relief.  I have

reviewed each of the First Day Pleadings or have otherwise had their contents

explained to me, including the exhibits thereto, and I believe that the relief sought in

each of the First Day Pleadings is important to the Debtor's ability to transition to, and

operate in, chapter 11 with minimum interruption or loss of value.

27.    Because of the Debtor's limited operations historically, the Debtor

has only filed four First Day Pleadings to be heard at the first day hearing:  the Creditor

Matrix Motion (requesting entry of final order), the Wages and Benefits Motion

(requesting entry of interim order), the Section 345 Motion (requesting entry of interim

order), and the DIP Financing Motion (requesting entry of interim order).  The Contract

and Lease Rejection Motion was filed as part of the First Day Pleadings but the Debtor

will request that the Court schedule a hearing on that matter at a later date.[6]

---

[6]    Because the Debtor wishes to avoid incurring April rent obligations in connection with the NY Office,
the Debtor intends to request that the Court schedule the Contract and Lease Rejection Motion by no
later than March 31, 2021.

**A.    Debtor's Application for Entry of Order (I) Waiving Certain
Creditor List Filing Requirements;  and (II) Authorizing the Debtor to
Establish Procedures for Notifying Parties of the Commencement of this
Case (the "Creditor Matrix Motion").**

28.    By the Creditor Matrix Motion, the Debtor is seeking entry of an
order (i) waiving the requirements applicable to creditor list filing pursuant to
section 521(a)(1) of the Bankruptcy Code, Bankruptcy Rule 1007(d), and Local
Bankruptcy Rule 1007-1 (collectively, the "List Filing Requirements"), and (ii) (A)
authorizing the Debtor to establish certain procedures (the "Procedures") for providing
notice to parties of the commencement of this Chapter 11 Case and of the meeting of
creditors pursuant to sections 341 and 342(a) of the Bankruptcy Code and (B) approving
the form of notice of commencement (the "Notice of Commencement").

29.    Under the circumstances, I believe reformatting the creditor list,
preparing and formatting a creditor matrix, and otherwise complying with the List
Filing Requirements will impose unnecessary administrative burdens on, and will
distract, the Debtor without any corresponding benefit to the estate.

30.    The Debtor believes that service of the Notice of Commencement
by regular first-class mail and email, where available, will maximize efficiency in
administering this Chapter 11 Case and will ease administrative burdens that would
otherwise fall upon the Court and the U.S. Trustee.  In addition, the Debtor will
endeavor to serve the Notice of Commencement by email where possible.  The
Procedures ensure that the Debtor's creditors receive prompt notice of the
commencement of this Chapter 11 Case and of the meeting of creditors held pursuant to
section 341 of the Bankruptcy Code.

31.     I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtor's estate, creditors, and all other parties in interest. Accordingly, I respectfully submit that the Creditor Matrix Motion should be approved.

**B.     Debtor's Application for Entry of Interim and Final Orders Authorizing the Debtor to (I) Pay Prepetition Employee Wages, Salaries, Benefits, and Other Compensation;  (II) Continue to Pay Postpetition Employee Wages, Salaries, Benefits, and Other Compensation;  and (III) Granting Related Relief  (the "Wages and Benefits Motion").**

32.     As of March 15, 2021, the Debtor employed approximately 75 employees, located across 14 states (the "Employees").  The vast majority of the Debtor's employees were located at the Debtor's corporate headquarters in New York. The Employees were responsible for, among other things, developing referrals and other business opportunities in the Americas for GCUK.

33.     On March 17, 2021, the Debtor terminated substantially all of its Employees (the "Terminated Employees") other than the Remaining Employees who are necessary to (a) administer this Chapter 11 Case, pursue the Finacity Sale Transaction, and wind up the estate, and (b) assist the Administrators with the process of maximizing recoveries for creditors with respect to transactions with counterparties located in the Americas for the benefit of the Company.  As discussed in Paragraph 22 above, the Debtor and GCUK have entered into the Services Agreement, pursuant to which GCUK agreed to pay, subject to the terms of such agreement, amounts to the Debtor sufficient to permit it to meet its obliagtions to the Remaining Employees under their existing employment terms, including wages and benefits, while they remain employed.  Two of the Remaining Employees will be terminated as of April 1, 2021.

34.     The Remaining Employees include personnel who are intimately familiar with the Debtor's business, processes, and systems who possess unique skills

and experience regarding the Debtor's business.[7]  Without the continued, uninterrupted services of the Remaining Employees, the Debtor's ability to maintain and administer its estate will be materially impaired and the Debtor's business could be severely and adversely affected thereby resulting in a loss of value to the detriment of all creditors and stakeholders.

35.     By the Wages and Benefits Motion, the Debtor is seeking entry of interim and final orders pursuant to sections 105(a), 363(b), 507(a), 541(b)(7) and 541(d) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Bankruptcy Rule 9013-1(a) to pay and honor certain prepetition claims relating to, among other things, wage obliagtions, withholding obligations, processing costs, vacation beenfits, health care benefits, insurance and disability plans, COBRA benefits, workers' compensation programs, and other benefits programs (the "Compensation and Benefits Programs"), and (b) pay all costs related to or on account of the Compensation and Benefits Programs, including administrative costs (whether accruing pre- or post-petition) for the Employees as applicable.

36.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtor's estate, creditors, and all other parties in interest. Accordingly, I respectfully submit that the Wages and Benefits Motion should be approved.

---

[7]     The Debtor may be required to pay certain *de minimis* registration and licensing fees in the states where the Remaining Employees are located (the "Registration Fees").  As of the Petition Date, the Debtor does not believe that any Registration Fees are outstanding, but out of an abundance of caution, the Debtor is seeking authority to continue to pay the Registration Fees in the ordinary course of business (including any that accrued and may have been owing as of the Petition Date).

**C.    Debtor's Application for Entry of Interim and Final Orders (I)
Extending the Deadline for the Debtor to Comply With, or Seek Waiver
of, Section 345(b) of the Bankruptcy Code;  and (II) Granting Related
Relief (the "Section 345 Motion")**

37.    The Debtor currently maintains a single deposit account (the "CIBC
Account") with Canada Imperial Bank of Commerce ("CIBC").  CIBC is not designated
as an authorized depository (and "Authorized Depository") by the Office of the United
States Trustee for Region 2 (the "U.S. Trustee") pursuant to the U.S. Trustee's Operating
Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the
"UST Guidelines").  While the Debtor is in the process of opening a new deposit
account with an Authorized Depository in accordance with the UST Guidelines, the
process of changing banks may not be completed as of the Petition Date.  Before the
process of opening a new bank account at an Authorized Depository is complete, the
Debtor must be able to pay any charges in connection with the transfer of funds, or
unpaid CIBC Fees.

38.    Because the Debtor may incur certain service related charges in
connection with the CIBC Account (the "CIBC Fees"), or charges related to the transfer
of funds out of the CIBC Account, the Debtor is seeking to continue using all Business
Forms substantially in the forms used immediately prior to the Petition Date, without
reference to the Debtor's status as debtor-in-possession; *provided that* in the event that
the Debtor generates new Business Forms during the pendency of this Chapter 11 Case
other than from their existing stock, such Business Forms will include a legend referring
the Debtor as "Debtor-In-Possession."  Moreover, to the extent practicable, the Debtor
also will laser print such legend on any Business Form electronically generated during
this Chapter 11 Case.

39.    By the Section 345 Motion, the Debtor is seeking entry of an interim order (the "Proposed Interim Order") and final order (the "Proposed Final Order") authorizing the Debtor to (i) extend the time to comply with section 345(b) of the Bankruptcy Code by forty-five (45) days (or such later time as may be agreed to by the U.S. Trustee (as defined below) or as approved by the Court) or seek a waiver thereof; and (ii) granting related relief.

40.    I believe that the relief requested in the Section 345 Motion is in the best interests of the Debtor's estate, creditors, and all other parties in interest. Accordingly, I respectfully submit that the Section 345 Motion should be approved.

**D.    Debtor's Application for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Post-Petition Secured Financing;  (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing;  and (IV) Granting Related Relief (the "DIP Financing Motion")**

41.    By the DIP Financing Motion, the Debtor is seeking entry of an interim order (the "Proposed Interim DIP Order") and final order (the "Proposed Final DIP Order" and, together with the Proposed Interim DIP Order, the "DIP Orders") (i) authorizing the Debtor to obtain postpetition debtor in possession financing pursuant to the Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, a copy of which is attached to the Proposed Interim DIP Order as **Exhibit 1** (the "DIP Credit Agreement"), (ii) granting liens and superpriority administrative claims, (iii) scheduling a final hearing within approximately 28 days of the Petition Date (the "Final Hearing") and (iv) granting related relief.

42.    As described in greater detail above, the Debtor intends to use this Chapter 11 Case to pursue the Finacity Sale Transaction to a successful bidder after the conclusion of a bidding and auction process overseen by the Court (the "Sale Process"). The Debtor requires access to the liquidity under the DIP Credit Agreement (the "DIP

<u>Facility</u>") to continue meeting ordinary course expenses and the cost of this Chapter 11

Case through the conclusion of the Sale Process.

43.     As part of the Debtor's preparations for this Chapter 11 Case, the

Debtor and its advisors analyzed how much postpetition financing would be required

to operate the Debtor's business, conclude the Sale Process, and fund the administrative

costs of this Chapter 11 Case.  The Debtor's postpetition financing needs are reflected in

the budget attached as **<u>Schedule 1</u>** to the Proposed Interim DIP Order (the "<u>DIP</u>

<u>Budget</u>").  I believe that access to financing in accordance with the DIP Budget is

essential to the preservation and maximization of its assets.

44.     Obtaining postpetition financing is crucial to the success of this

Chapter 11 Case.  I believe that the DIP Facility will allow the Debtor to meet its

liquidity needs for the duration of this Chapter 11 Case and enable it to maximize the

return to its estate from the Sale Process.  In that regard, the DIP Budget reflects the

Debtor's reasonable judgment and projections as to the cash needs of their businesses

over the next six weeks.

45.     The Debtor discussed with the Administrators and a potential

bidder for the Finacity Equity providing third party sources of financing for this

Chapter 11 Case.  Both parties declined to provide financing.  Given the lack of material

assets (other than the Finacity Equity),the Debtor's lack of revenue, and the timing of its

bankruptcy filing, the Debtor did not believe there would be much interest from other

potential sources.

46.     Following these discussions, the Debtor sought financing from the

DIP Lender who agreed to extend the DIP Facility in an aggregate amount of $2 million,

of which $1.5 million will be available immediately upon entry of the Proposed Interim

Order (the "Interim Amount") and the remaining $500,000 will be available following
the Court's entry of the Proposed Final Order.

47.    From the period between the entry of the Proposed Interim Order
and the Final Hearing (the "Interim Period"), the proceeds of the DIP Facility will be
used to fund the Sale Process, make payments under the Court's "first day" orders, and
fund administrative expenses in connection with the Chapter 11 Case, including
professionals' fees.[8]  Subject to the entry of the Proposed Final Order, the remaining
proceeds of the DIP Facility, if necessary, will be used to (a) pay any remaining
expenses incurred or expected to be incurred in connection with the Sale Process,
(b) fund a chapter 11 plan process, and (c) pay administrative expenses in connection
with the Chapter 11 Case, including professionals' fees.

48.    Given the Debtor's financial condition, I do not believe that the
Debtor would be able to obtain financing on an unsecured basis pursuant to sections
364(b) and 503(b)(1) of the Bankruptcy Code, or even on a superpriority basis under
section 364(c)(1) of the Bankruptcy Code, on terms more favorable than those of the DIP
Facility.  Similarly, I believe that if the Debtor were to solicit offers for financing secured
by liens on their unencumbered assets pursuant to section 364(c)(2) of the Bankruptcy
Code, or junior liens on their encumbered assets to the extent there are any, pursuant to
section 364(c)(3) of the Bankruptcy Code, such financing would provide for terms that
are far more onerous than those of the DIP Facility, including a significantly higher
interest rate, liens on the proceeds of avoidance actions, more punitive default and

---

[8]    The Debtor intends to use the proceeds from the Finacity Sale Transaction to repay the DIP Facility in
full and fund remaining administrative expenses and payments to allowed general unsecured and
priority claims under a chapter 11 plan of liquidation to be filed in the near term.

milestone provisions, and countless other fees (*i.e.*, commitment fees, exit fees, monitoring fees, etc.).

49.    Finally, the DIP Lender, as a related party to the ultimate shareholder of the Company has a substantial interest in the success of both the Sale Process and this Chapter 11 Case, and is therefore willing to provide the DIP Facility on terms that are favorable to the Debtor and beneficial to all parties in interest.

50.    These factors, the Debtor's review of debtor in possession financing that has been approved in other recent cases, and the Debtor's general experience with financing as part of its business operations, have informed the Debtor's conclusion that the DIP Facility is fair and reasonable and represents the best financing currently available to the Debtor.

51.    I believe that the relief requested in the DIP Financing Motion is in the best interests of the Debtor's estate, creditors, and all other parties in interest. Accordingly, I respectfully submit that the DIP Financing Motion should be approved.

**E.    Debtor's Omnibus Application for Entry of Order Authorizing the Debtor to (I) Reject Certain Executory Contracts;  And (II)(A) Reject an Unexpired Lease of Nonresidential Real Property;  And (B) Abandon Certain Personal Property Related Thereto (the "Contracts and Lease Rejection Motion")**

52.    By the Contracts and Lease Rejection Motion, the Debtor is seeking entry of an order authorizing, but not directing, the Debtor to (i) reject certain executory contacts (each a "Contract," and collectively, the "Contracts") pursuant to section 363 of the Bankruptcy Code, effective upon the dates listed on **Exhibit 1** (as applicable, the "Rejection Dates") to the form attached to the Contracts and Lease Rejection Motion as **Exhibit A** (the "Proposed Order"),  and (ii)(A) reject the indenture lease agreement, entered into as of July 20, 2016, for the Debtor's corporate headquarters located at 2 Gansevoort Street, New York, New York 10014 (as may be amended, modified, and/or

18

supplemented from time to time, the "Lease"), effective as of the earlier of (1) March 31, 2021 or (2) the date upon which the Debtor surrenders the premises relating to the Lease (the "Premises") to Sage Realty Corporation (the "Landlord") (such date, the "Lease Rejection Date");  and (B) abandon, as of the Lease Rejection Date, any personal property of the Debtor, including, but not limited to, furniture, fixtures, and equipment (collectively, the "Personal Property") that remains, as of the Lease Rejection Date, on the Premises, as applicable.

53.    The Debtor has made efforts to preserve and maximize value for its creditors and other stakeholders, and the Debtor has targeted potential areas of cost savings and focused on terminating burdensome and costly contractual arrangements that are no longer necessary given the reduced scope of the Debtor's operations. Specifically, the Debtor has terminated substantially all of its employees that operated the Premises.

54.    Moreover, the Debtor intends to remove, prior to the Lease Rejection Date, all Personal Property of the Debtor from the Premises, including equipment, fixtures, furniture, and other Personal Property of value that may be located on, or have been installed on the Premises.  If there is anything left on the Premises, the Debtor intends to abandon it.  Because the Debtor no longer operates its business on the Premises, and the Debtor is either removing all Personal Property from the Premises or abandoning it, I believe that rejecting the Lease is in the best interests of the estate, rather than the Debtor continuing to pay rent for office space that the Debtor no longer needs while it winds up its operations.

55.    As an extension of the Debtor's effort to terminate burdensome and costly contractual arrangements discussed above, the Debtor and its advisors have also reviewed and analyzed the Contracts, which relate to the provision of services in

connection with the Debtor's use of the Premises that will be rejected by the Debtor pursuant to the Proposed Order. Because the Debtor intends to wind up its operations during this Chapter 11 Case and seeks to reject the Lease, the Debtor no longer requires the services provided by counterparties to the Contracts. For example, the Debtor does not require internet, phone, paper storage or shredding services at the Premises. Moreover, the Debtor has no need for any shared office space facilities as the Debtor has terminated substantially all of its employees, including all employees that would otherwise need access to such space.

56. I believe that the Debtor is exercising sound business judgment by rejecting the Contracts as doing so will benefit the Debtor's estate by enabling the Debtor to avoid the obligations related to the Contracts that would unnecessarily deplete the Debtor's estate.

57. I believe that the relief requested in the Contracts and Lease Rejection Motion is in the best interests of the Debtor's estate, creditors, and all other parties in interest. Accordingly, I respectfully submit that the Contracts and Lease Rejection Motion should be approved.

## IV. ADDITIONAL DISCLOSURES REQUIRED UNDER LOCAL BANKRUPTCY RULE 1007-2

58. Local Bankruptcy Rule 1007-2 requires that the Debtor provide certain information, which is set forth below:

- Local Bankruptcy Rule 1007-2(a)(2):  not applicable to this Chapter 11 Case because such case was not originally commenced as a chapter 7, chapter 12, or chapter 13 case;

- Local Bankruptcy Rule 1007-2(a)(3):  **Exhibit 2** lists the names and addresses of the members of, and attorneys for, any committee organized prior to the Petition Date and a brief description of the circumstances surrounding the formation of the committee and the date of its formation;

- Local Bankruptcy Rule 1007-2(a)(4): **Exhibit 3** lists the following information with respect to each of the holders of the Debtor's twenty (20) largest unsecured claims, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), telephone number, the name(s) of person(s) familiar with the Debtor's accounts, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured;[9]

- Local Bankruptcy Rule 1007-2(a)(5): **Exhibit 4** lists the holders of the five largest secured claims against each Debtor;

- Local Bankruptcy Rule 1007-2(a)(6): **Exhibit 5** provides a summary of the unaudited assets and liabilities for the Debtor;

- Local Bankruptcy Rule 1007-2(a)(7): **Exhibit 6** provides the following information:  the number and classes of shares of stock, debentures, and other securities of the Debtor that are publicly held and the number of record holders thereof;  and the number and classes of shares of stock, debentures, and other securities of the Debtor that are held by the Debtor's directors and officers, and the amounts so held;

- Local Bankruptcy Rule 1007-2(a)(8): **Exhibit 7** provides a list of all of the Debtor's property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending;

- Local Bankruptcy Rule 1007-2(a)(9): **Exhibit 8** provides a list of the premises owned, leased, or held under other arrangement from which the Debtor operates its business;

- Local Bankruptcy Rule 1007-2(a)(10): **Exhibit 9** provides the location of the Debtor's substantial assets, and the location of its books and records;

- Local Bankruptcy Rule 1007-2(a)(11): **Exhibit 10** provides a list of actions against the Debtor;

- Local Bankruptcy Rule 1007-2(a)(12): **Exhibit 11** provides a list of the names of the individuals who comprise the Debtor's existing

---

[9]   In each case, the claim amounts are estimated and subject to verification.  The Debtor reserves all rights, including to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

senior management, their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience;

- <u>Local Bankruptcy Rule 1007-2(b)(1)–(2)</u>: **Exhibit 12** provides the estimated amount to be paid to the Debtor's employees (not including officers, directors, and stockholders), and the estimated amount to be paid to the Debtor's officers, stockholders, directors, and financial and business consultants retained by the Debtor for the thirty (30) day period following the Petition Date; and

- <u>Local Bankruptcy Rule 1007-2(b)(3)</u>: **Exhibit 13** sets forth, for the thirty (30) day period following the Petition Date, estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remaining unpaid, other than professional fees, and other information relevant to the foregoing.

59.    Copies of the resolutions authorizing the filing of the Debtor's

chapter 11 petition is annexed thereto.

*[Remainder of page left blank intentionally;  signature page follows]*

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:    New York, New York
          March 25, 2021


By:    */s/ Matthew Tocks*
Name:  Matthew Tocks
Title: Head of Restructuirng (Americas)
       Greensill Capital Inc.

**<u>Exhibit 1</u>**

**Organizational Chart**



## Exhibit 2

**List of Committees Formed Prior to the Petition Date**

## **Exhibit 2**

### List of Committees Formed Prior to the Petition Date

Pursuant to Local Bankruptcy Rule 1007-2(a)(3), to the best of the Debtor's knowledge and belief, no committee has been organized prior to the Petition Date.

**Exhibit 3**

**List of Holders of 20 Largest Unsecured Claims**

---

**Fill in this information to identify the case:**

Debtor name  Greensill Capital Inc.

United States Bankruptcy Court for the:  Southern  District of  New York
(State)

Case number (If known): _____

☐ Check if this is an
amended filing

---

## Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

**12/15**

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider,* as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.*

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Brian Haezebroeck | haezebroeck@msn.com | Employee Obligations | N/A | N/A | N/A | $43,260.00 |
| 2 | Pieter Frederik Boom | pfboom01@gmail.com | Employee Obligations | N/A | N/A | N/A | $39,615.38 |
| 3 | Randolph Habeck | dolph.habeck@mac.com | Employee Obligations | N/A | N/A | N/A | $37,692.31 |
| 4 | Shinichi Cowe | srcowe@gmail.com | Employee Obligations | N/A | N/A | N/A | $33,051.12 |
| 5 | Donatus Anusionwu | danusionwu@gmail.com | Employee Obligations | N/A | N/A | N/A | $32,307.69 |
| 6 | Lucia Martinez | luciamartinezcfa@gmail.com | Employee Obligations | N/A | N/A | N/A | $31,634.62 |
| 7 | Michael Pilat | mike@mikepilat.com | Employee Obligations | N/A | N/A | N/A | $29,615.38 |
| 8 | Ryan Waterman | rwaterman@centurylink.net | Employee Obligations | N/A | N/A | N/A | $27,730.77 |

*The Debtor has requested authority from the Bankruptcy Court to pay certain of the amounts reflected herein.

Debtor  **Greensill Capital Inc.**
_____
Name

Case number *(if known)* _____

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | **Total claim, if partially secured** | **Deduction for value of collateral or setoff** | **Unsecured claim** |
| 9  John Smith | johnswood77@gmail.com | Employee Obligations | N/A | N/A | N/A | $27,103.85 |
| 10  Sarood Baig | stbaig@gmail.com | Employee Obligations | N/A | N/A | N/A | $27,103.85 |
| 11  Thomas Owen | towen@iowatelecom.net | Employee Obligations | N/A | N/A | N/A | $26,740.38 |
| 12  Jacob Streit | jakes918@gmail.com | Employee Obligations | N/A | N/A | N/A | $25,961.54 |
| 13  Jamey Ross | rossjamey@gmail.com | Employee Obligations | N/A | N/A | N/A | $25,750.00 |
| 14  Scott Cline | scbball33@gmail.com | Employee Obligations | N/A | N/A | N/A | $25,750.00 |
| 15  Marisa Lazatin | marisabgorman@gmail.com | Employee Obligations | N/A | N/A | N/A | $24,759.62 |
| 16  Indirah Toovey | indi2v50@gmail.com | Employee Obligations | N/A | N/A | N/A | $24,230.77 |
| 17  Matthew Wright | matthewwright@gmail.com | Employee Obligations | N/A | N/A | N/A | $24,230.77 |
| 18  Dinesh Kumar | hdinkumar@yahoo.com | Employee Obligations | N/A | N/A | N/A | $24,230.77 |
| 19  Thomas Coenen | tcoenen@gmail.com | Employee Obligations | N/A | N/A | N/A | $24,066.35 |
| 20  John Zimmerman | j.zimmerman@yahoo.com | Employee Obligations | N/A | N/A | N/A | $23,692.31 |

**Exhibit 4**

**Holders of the Debtor's Five Largest Secured Claims**

**<u>Exhibit 4</u>**

**Holders of the Debtor's Five Largest Secured Claims**

   Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the Debtor does not have any creditors holding secured claims against it as of the Petition Date.

**Exhibit 5**

**Summary of the Debtor's Assets and Liabilities**

**Exhibit 5**

**Summary of the Debtor's Assets and Liabilities**

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the following are estimates of the Debtor's total assets and liabilities.  The following financial data is the latest available information and reflects the Debtor's financial condition.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtor.  The Debtor reserves all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

On a book value basis, as of February 28, 2021, the total value of the Debtor's assets is approximately $35,219,846.74 and the total amount of the Debtor's liabilities is approximately $24,385,273.83.

**Exhibit 6**

**Summary of Publicly Held Securities of the Debtor**

**<u>Exhibit 6</u>**

**Summary of Publicly Held Securities of the Debtor**

Pursuant to Local Bankruptcy Rule 1007-2(a)(7), to the best of the Debtor's knowledge and belief, there are no shares of stock, debentures or other securities of the Debtor that are publicly held, nor held by any of the Debtor's officers and directors.

**<u>Exhibit 7</u>**

**Summary of Debtor's Property Held by Third Parties**

### **Exhibit 7**

**Summary of Debtor's Property Held by Third Parties**

   Pursuant to Local Bankruptcy Rule 1007-2(a)(8), to the best of the Debtor's knowledge and belief, none of the Debtor's property is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

## Exhibit 8

**Summary of Debtor's Premises from Which the Debtor Operates Its Business**

**Exhibit 8**

**Summary of Debtor's Premises From Which the Debtor Operates Its Business**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the sole premise owned, leased, or held under other arrangement from which the Debtor operates its business as of the Petition Date is 2 Gansevoort Street, New York, NY 10014.

**Exhibit 9**

**Location of Debtor's Substantial Assets, Books and Records,
and Nature and Location of Debtor's Assets Outside the United States**

<u>**Exhibit 9**</u>

**Location of Debtor's Substantial Assets, Books and Records,
and Nature and Location of Debtor's Assets Outside the United States**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the location of the Debtor's substantial assets, the location of its books and records, and if any, the nature, location, and value of any assets held by the Debtor outside the territorial limits of the United States.

| Debtor's Assets | Location |
|---|---|
| Debtor's Substantial Assets | The Debtor's substantial assets are located at:<br><br>2 Gansevoort Street<br>New York, NY 10014 |

**Debtor's Books and Records**

One Southampton Street
Covent Garden
London, WC2R 0LR

## Exhibit 10

**Schedule of Pending Litigation**

**Exhibit 10**

**Schedule of Pending Litigation**

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), to the best of the Debtor's knowledge and belief, there are no actions or proceedings, pending or threatened, against the Debtor or its property where a judgment against the Debtor or a seizure of its property may be imminent.

## Exhibit 11

**Senior Management of the Debtor**

## Exhibit 11

### Senior Management of the Debtor

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following lists the names of the individuals who comprise the Debtor's existing senior management, their tenure with the Debtor, and a brief summary of their relevant responsibilities and experience.

**Alexander ("Lex") D. Greensill,** *President*

Alexander ("Lex") D. Greensill currently serves as the President of the Debtor, a role he has held since 2013.  Mr. Greensill is also the founder and Chief Executive Officer of Greensill Capital Pty Limited, the Debtor's indirect parent (together with certain of its affiliates and subsidiaries, "Greensill").  Prior to his tenure with Greensill, Mr. Greensill served as a Managing Director at Citibank from August 2009 to August 2011 and an Executive Director at Morgan Stanley from June 2005 to August 2009.

**Hugh McKee,** *Corporate Secretary & Regional General Counsel*

Hugh McKee currently serves as a Corporate Secretary and Regional General Counsel for the Debtor, roles he has held since January of 2019.  Prior to this, Mr. McKee served as the Debtor's Assistant General Counsel from October of 2017 to January of 2019.  Before joining the Debtor, Mr. McKee held various legal positions beginning in 2008.  Mr. McKee's term of service with the Debtor will terminate effective April 1, 2021.

**Hayley James,** *Corporate Secretary*

Hayley James currently serves as a Corporate Secretary for the Debtor, a role she has held since February of 2020.  Prior to this, Ms. James served as a Corporate Secretary for Ecclesiastical Insurance Group from September of 2017 through February of 2020.

**Exhibit 12**

**Debtor's Payroll for 30-Day Period Following the Petition Date**

**<u>Exhibit 12</u>**

**Payroll**

      Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtor's employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, directors, stockholders, and financial and business consultants retained by the Debtor's for the 30-day period following the Petition Date.

| Greensill Capital Inc. | |
|---|---:|
| Payments to Employees | $82,500 |
| Payments to Officers, Directors, and Stockholders | $0 |
| Payments to Financial and Business Consultants | $0 |

**Exhibit 13**

**Debtor's Estimated Cash Receipts and Disbursements,
Net Cash Gain or Loss, Unpaid Obligations, and Receivables**

## Exhibit 13

**Debtor's Estimated Cash Receipts and Disbursements,
Net Cash Gain or Loss, Unpaid Obligations, and Receivables**

Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following provides, for the 30-day period following the commencement of this chapter 11 case, the Debtor's estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| Greensill Capital Inc. | |
|---|---:|
| Cash Receipts | $0 |
| Cash Disbursements | $1,600,000 |
| Net Cash Gain (Loss) | $(1,600,000) |
| Unpaid Obligations | $0 |
| Unpaid Receivables | $0 |