TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, NY 10119
Telephone: (212) 594-5000
Albert Togut
Kyle J. Ortiz
Bryan M. Kotliar
Eitan E. Blander

*Proposed Counsel for the Debtor and
Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| GREENSILL CAPITAL INC., | Case No.: 21-10561 (MEW) |
| Debtor.[1] | |

**DEBTOR'S APPLICATION FOR ENTRY OF ORDERS:
(I)(A) APPROVING BIDDING PROCEDURES RELATING TO THE SALE OF
DEBTOR'S OWNERSHIP INTERESTS IN FINACITY CORPORATION;
(B) ESTABLISHING STALKING HORSE BIDDER AND BID PROTECTIONS;
(C) SCHEDULING AN AUCTION AND A SALE HEARING; AND
(D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND
(II)(A) APPROVING THE SALE OF THE DEBTOR'S OWNERSHIP INTERESTS
IN FINACITY CORPORATION FREE AND CLEAR OF ALL LIENS, CLAIMS,
INTERESTS, AND ENCUMBRANCES; AND (B) GRANTING RELATED RELIEF**

Greensill Capital Inc., as debtor and debtor in possession (the "Debtor") in

the above-captioned case (the "Chapter 11 Case"), hereby makes this application (the

"Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**

(the "Bidding Procedures Order"), pursuant to sections 105 and 363 of title 11 of the

United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 9007 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rule 6004-1 of the Local

Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of

---

[1] The last four digits of the Debtor's federal tax identification number are 3971. The Debtor's corporate headquarters are located at 2 Gansevoort Street, New York, New York 10014.

New York (the "Local Bankruptcy Rules"), and the Guidelines for the Conduct of Asset

Sales promulgated by General Order M-383 of the Bankruptcy Court (the "Sale

Guidelines"):

(a)     approving the proposed auction and bidding procedures, substantially in the form attached to the Bidding Procedures Order as **Exhibit 1** (the "Bidding Procedures") to be used in connection with the sale (the "Sale") of the Debtor's 100% ownership interests in Finacity Corporation (the "Finacity Equity");

(b)     establishing the Katz Parties (as defined below) as the stalking horse bidder (the "Stalking Horse Bidder") and authorizing the Debtor to pay the Break-Up Fee and Expense Reimbursement (each as defined below and together, the "Bid Protections") set forth in and pursuant to the terms of the stalking horse asset purchase agreement, a copy of which is attached hereto as **Exhibit B** (the "Stalking Horse Purchase Agreement");

(c)     scheduling an auction for the Finacity Equity (the "Auction") and the hearing with respect to the Sale (the "Sale Hearing"); and

(d)     approving the form and manner of notice of the Auction and Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "Sale Notice").

By this Motion, the Debtor also seeks entry of an order, substantially in the form

attached hereto as **Exhibit C** (the "Sale Order"), pursuant to sections 105 and 363 of the

Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9007:

(a)     authorizing the Sale of the Finacity Equity to the Stalking Horse Bidder or the Successful Bidder (as defined in the Bidding Procedures Order) free and clear of all liens, claims, interests, and encumbrances; and

(b)     granting related relief.

In support of this Motion, the Debtor relies upon and incorporate by reference

the *Declaration of Matthew Tocks in Support of the Debtor's in Support of Chapter 11 Petition

and First Day Motions*, filed on March 25, 2021 [Docket No. 2] (the "First Day

Declaration") and the *Declaration of Lee Jason Goldberg in Support of the Debtor's Sale and

Bidding Procedures Motion*, a copy of which is attached hereto as **Exhibit D** (the

"Goldberg Declaration").[2]  In further support of this Motion, the Debtor, by and
through its undersigned counsel, respectfully represents:

**JURISDICTION AND VENUE**

1.      This United States Bankruptcy Court for the Southern District of
New York (the "Court") has jurisdiction to consider this Motion pursuant to 28 U.S.C.
§§ 157 and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31,
2012 (Preska, C.J.) (the "Amended Standing Order").  This is a core proceeding under
28 U.S.C. § 157(b).  The Debtor confirms its consent, pursuant to Bankruptcy Rule 7008,
to the entry of a final order by the Court in connection with the Motion to the extent
that it is later determined that the Court, absent consent of the parties, cannot enter final
orders or judgments in connection herewith consistent with Article III of the United
States Constitution.

2.      Venue of this Chapter 11 Case and this Motion in this District is
proper under 28 U.S.C. §§ 1408 and 1409.

3.      The predicates for the relief requested herein are sections 105 and
363 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9007, Local Bankruptcy
Rules 6004-1 and the Sale Guidelines.  105(a), 107(c), 342(a) and 521(a)(1) of the
Bankruptcy Code, Bankruptcy Rules 1007(d) and 2002.

**BACKGROUND**

**A.      General Background**

4.      On March 25, 2021 (the "Petition Date"), the Debtor commenced
this Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the
Bankruptcy Code.

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in
the First Day Declaration.

5.      The Debtor continues to operate its business and manage its

properties as a debtor and debtor in possession pursuant to sections 1107(a) and 1108 of

the Bankruptcy Code.

6.      No trustee or examiner has been appointed in this Chapter 11 Case.

As of the date hereof, no official creditors' committee has been appointed.

7.      The factual background regarding the Debtor, including its

corporate and capital structure, and the events leading to this Chapter 11 Case, is set

forth in the First Day Declaration

**B.      The 2019 Acquisition**

8.      Finacity Corporation and its subsidiaries (collectively, "Finacity") is

a leader in the structuring and provision of asset-backed working capital funding

solutions, consumer receivables financing, supplier and payables financing, back-up

servicing, and transaction reporting around the world.  *See* First Day Declaration ¶ 13.

As of the Petition Date, Finacity served as agent on outstanding transactions with

borrowers and obligors in more than 175 countries.  *Id.*  Finacity averages

approximately 60 million in accounts receivable items each year.  *Id.*  Finacity's clients

range from large-multinational shipping companies to micro-finance branches in Latin

America.  *Id.*  While there is some overlap in the products and services offered by the

Company and Finacity, Finacity operates as a separate business from the Debtor or the

Company.  *Id.*

9.      On June 10, 2019 (the "Closing Date"), the Debtor acquired 100% of

the outstanding preferred and common equity interests of Finacity from certain "Seller

Parties" pursuant to a Stock Purchase Agreement, dated June 10, 2019 (the "2019 SPA")

for a combination of upfront and deferred cash consideration (the "2019 Acquisition").

The Seller Parties consisted of a consortium of persons and entities that held 100% of the

4

outstanding shares of Finacity. Included among the Seller Parties were Adrian Katz,

Finacity's Chief Executive Officer ("Mr. Katz"), Dana Katz, and the Katz Family Trust

(collectively, the "Katz Parties"). Prior to the Closing Date, the Katz Parties collectively

held approximately 20.78% of the Finacity Equity.

10.    In connection with the 2019 Acquisition, the Seller Parties other

than the Katz Parties received a cash out payment, and the Katz Parties received a

combination of up-front cash and deferred cash consideration. This deferred cash

consideration included certain contingent payments to be made by the Debtor, as the

purchasing party under the 2019 SPA, over a period of five (5) calendar years starting

on January 1, 2020 and payable in June of the following year (the "Earn-Out

Payments"). The Katz Parties are entitled to the full amount of the Earn-Out Payments

each year of $5,304,000 (the "Maximum Earn-Out Payment") if consolidated

"Applicable Revenue" for Finacity exceeds a target threshold of $13,500,000 during the

relevant calendar year (the "Target").[3] To the extent that Applicable Revenue is less

than the Target, the Maximum Earn-Out Payment is reduced by an amount that is equal

to twice the proportional shortfall of the Applicable Revenue relative to the Target.[4]

11.    In both 2019 and 2020, the Applicable Revenue surpassed the

Target for such years. The Debtor paid the 2019 Maximum Earn-Out Payment to the

Katz Parties in June 2020 and owes the 2020 Maximum Earn-Out Payment to the Katz

Parties in June 2021. If Finacity continues to hit the Target for calendar years 2021 to

2023, the Debtor's obligations on account of the Earn-Out Payments will amount to

---

[3]    In general, "Applicable Revenue" is defined as consolidated revenue less certain revenue received in connection with certain types of activities.

[4]    For example, if Applicable Revenue is 10% less than the Target, the Earn-Out Payment for the relevant calendar year will be reduced by 20%.

$21,216,000 (including the accrued, earned but unpaid 2020 Earn-Out Payment as described above).

12.     In addition, pursuant to guarantees executed in conjunction with the closing of the 2019 Acquisition, the Debtor's obligation to pay the Earn-Out Payments is guaranteed by Finacity, as well as by Greensill Parent.  To the extent that the Debtor is not released from the Earn-Out Payments and the Debtor is unable to satisfy such liabilities when they come due, the Katz Parties would be able to seek the remaining payments from Finacity itself—thereby affecting Finacity's bottom line and reducing the overall value of the Finacity Equity by a corresponding amount.

13.     Finally, pursuant to his employment agreement with Finacity, Mr. Katz is entitled to receive compensation as an executive of Finacity (the "Employment Agreement").  In general, the Employment Agreement provides for (a) an annual base salary of $560,000 per year until June 2024, (b) usual and customary benefits provided on the same terms as similarly situated employees of Finacity, and (c) certain contingent compensation in the forms of (i) a "Retention Bonus" of $3,629,000 payable by Finacity to Mr. Katz for each year that Mr. Katz has worked in good faith to support the application and revocation of Finacity's receivables monitoring and reporting services across all relevant financing programs of Finacity and (ii) a performance bonus of up to $6,000,000 for each of the first five years of Mr. Katz's employment assuming certain contingencies related to Finacity's performance are achieved (collectively, the "Employment Agreement Obligations").  The Employment Agreement Obligations are guaranteed by Greensill Parent.

C.     **The Prepetition Sale Process**

14.     In early 2021, the Company experienced severe financial distress as a result of a series of factors.  *See* First Day Declaration ¶ 19.  These included a

combination of (among other things):  (a) the expiry of a key insurance policy of GCUK, which resulted in the loss of a significant insurance cover for the Company's newly originated assets;  (b) the withdrawal of substantial financial support from certain of the Company's key creditors;  and (c) pressure on and from key investors of the Company to reduce the Company's exposure to the CFG Alliance group.  *Id.*  These events together precipitated the cessation of GCUK operations and left the Company in a position of increased financial instability.  *Id.*

15.    By an order of the English High Court dated March 8, 2021, Christine Laverty, Trevor O'Sullivan and William Stagg each of Grant Thornton UK LLP were appointed as administrators (the "Administrators") of both GCUK and GCMC (the "UK Administration Proceedings").  *Id.* ¶ 20.  Subsequently on March 8, 2021, the directors of Greensill Parent resolved to appoint Matthew Byrnes, Philip Wilson and Michael McCann, each of Grant Thornton Australia Limited, as administrators of Greensill Parent pursuant to s.436A Corporation Act (together with the UK Administration Proceedings, the "Administration Proceedings").  *Id.*

16.    In the weeks and months prior to the Administration Proceedings, Greensill Parent and GCUK undertook contingency planning in relation to a potential sale of the Company's business and certain of its assets.  *Id.* ¶ 21.  On February 22, 2021, Greensill Parent, GCUK and the Debtor received a non-binding indicative proposal from Apollo (and certain investment funds managed by Apollo Global Management, Inc., including Athene Holding Ltd (together, the "Apollo Investors")) for certain assets of the Company (the "Apollo Proposal").  *Id.*  On March 2, 2021, GCUK entered into an exclusivity agreement with the Apollo Investors; however, these negotiations were unsuccessful and no transaction was ultimately concluded.  *Id.*

17.     Following the termination of the negotiations with the Apollo Investors, the Debtor continued to explore a sale of the Finacity Equity to other potential purchasers.  On the Petition Date, the Debtor commenced this case by filing a voluntary chapter 11 petition with this Court.  The Debtor intends to use this Chapter 11 Case to preserve and maximize value for the benefit of all creditors in connection with the winding up of its affairs.  *Id.* ¶ 23.  In that regard, the Debtor stated that it was its intention to pursue a sale of its equity interests in Finacity pursuant to an orderly sale and marketing process overseen by this Court (the "<u>Sale Process</u>").

18.     In furtherance of the Sale Process, on March 26, 2021, the Debtor engaged GLC Advisors & Co., LLC, as its investment banker ("<u>GLC</u>").  The Debtor believes that with the benefit of a robust marketing process with the assistance of GLC, the Debtor will be able to maximize the value of its key asset and pay a significant portion of general unsecured and priority claims.

**D.     <u>The Stalking Horse Purchase Agreement</u>**

19.     In connection with the Debtor's sale efforts to date, the Debtor received a bid for the Finacity Equity from the Katz Parties.  After extensive negotiations among the Debtor, the Katz Parties, Finacity, and their respective advisors, the parties have reached agreement on the Stalking Horse Purchase Agreement.  Pursuant to the Stalking Horse Purchase Agreement, the Katz Parties will serve as the initial "stalking horse" bidder for the Finacity Equity, which will be subject to the auction and marketing process overseen by the Court pursuant to the proposed Bidding Procedures.

20.     The Katz Parties are in a unique position to provide value to the Debtor in their capacity as the Stalking Horse Bidder because Mr. Katz is the founder and current CEO of Finacity.  Notably, Mr. Katz has no control over the Debtor or any

of its parent or sister entities.  Rather, Mr. Katz is an insider of Finacity, the Debtor's
asset that is being marketed and sold pursuant to the Sale Process.   As an insider of the
asset but not the seller, Mr. Katz is in a particular position to properly value the
Debtor's interest in the Finacity Equity and set the floor as a Stalking Horse Bidder, but
at the same time, has no conflicts in relation to the Debtor or its officers that would raise
suspicions about the legitimacy or impartiality of the Sale Process.

21.     The Stalking Horse Purchase Agreement provides for total
consideration of approximately $24 million consisting of:  (1) $3,000,000 in cash (the
"Cash Component"), which will be paid directly to the Debtor's estate;  and (2) the
release of all liabilities stemming from the Earn-Out Payments, against the Debtor and
the guarantors, and of all other claims held by the Katz Parties against the Debtor (the
"Releases"), which, if allowed in their full amounts could aggregate to more than
$21,000,000 in general unsecured claims against the Debtor's estate.[5]

22.     Significantly, the Debtor's potential liability on account of the Earn-
Out Payments is larger than the Debtor's estimated general unsecured claims pool
($21,126,000—which includes the Maximum Earn-Out Payment payable in June 2021
and amounts due if Mr. Katz becomes entitled to the Maximum Earn-Out Payments for
the next three years—versus approximately $5-7 million in general unsecured claims,
excluding intercompany claims).  The transaction contemplated by the Stalking Horse
Purchase Agreement is therefore also beneficial in that it serves to simplify and resolve
potential unsecured claims against the Debtor.  If the claims on account of the Earn-Out

---

[5]     At the closing of the transactions contemplated by the Stalking Horse Purchase Agreement, GC UK
has agreed to accept from Finacity Corporation and/or its subsidiaries approximately $4.5 million in
full and final satisfaction and release of an $10 million intercompany loan balance outstanding
between GC UK and Neely Funding, LLC, a wholly owned subsidiary of Finacity Corporation.

Payments were allowed against the Debtor in the amounts asserted by Mr. Katz, the resulting dilution to the general unsecured claims would likely reduce creditor recoveries significantly. Simply put, the purchase price in the Stalking Horse Purchase Agreement provides more relative value to the estate than simply the Cash Component. In addition, as the Earn-Out Payments are guaranteed by Finacity, any portion of the Earn-Out Payments, if allowed or valid, would potentially reduce the value of Finacity by increasing its own liabilities, thereby reducing the value of the Finacity Equity.

23.    In order to incentivize the Stalking Horse Bidder to serve as the initial floor bid for the Sale Process, the Stalking Horse Purchase Agreement provides for a break-up fee of $500,000 (i.e., approximately 2% of the total consideration) in the event that the Finacity Equity is sold to a party other than the Stalking Horse Bidder (the "Break-Up Fee") and an expense reimbursement not to exceed $100,000 (the "Expense Reimbursement" and together with the Break-Up Fee, the "Bid Protections"). Importantly, the Break-Up Fee is only payable by the Debtor if the Debtor consummates a sale of the Finacity Equity to a third party other than the Stalking Horse Bidder and under no other circumstances (e.g., the breach or termination of the Stalking Horse Purchase Agreement by the Debtor or the exercise of a "fiduciary out").

E.    **Key Dates and Deadlines**

24.    As explained in greater detail above and in the First Day Declaration, the Debtor filed this Chapter 11 Case to complete the Sale Process and sell its most significant asset—the Finacity Equity. The Debtor believes that holding an auction for the Finacity Equity with the Stalking Horse Purchase Agreement as the initial bid represents the best means to obtain the highest and otherwise best bid for a key asset and maximize returns to creditors.

25.     The Debtor proposes to conduct the Sale and Auction on the

following timeline:

| Tuesday, April 20, 2021 at 4:00 p.m. (ET) | Bid Deadline |
|---|---|
| Thursday, April 22, 2021 at 2:00 p.m. (ET) | Deadline for the Debtor to notify bidders of their status as Qualified Bidders |
| Friday, April 23, 2021 at 10:00 a.m. (ET) | Auction (to be held virtually) |
| Monday, April 26, 2021 at 2:00 p.m. (ET) | Sale Objection Deadline |
| Tuesday, April 27, 2021 at 10:00 a.m. (ET) | Sale Hearing |
| Friday, April 30, 2021 at 4:00 p.m. (ET) | Sale Closing |

26.     The Debtor believes that conducting the Sale Process within the

time period set forth above and in the Bidding Procedures is reasonable and will

provide potential bidders with sufficient time and information necessary to formulate a

bid, assuming the full cooperation of Finacity and its management.

27.     Moreover, the proposed sale timeline is necessary in light of the

Debtor's significant liquidity constraints—i.e., the Debtor has no revenue and needs

access to postpetition debtor in possession financing ("DIP Financing") to obtain access

to liquidity to fund the Chapter 11 Case through the anticipated closing of the Sale.

Moving forward with the Stalking Horse Bid (as described in greater detail below) in

accordance with the milestones set forth therein is a necessary step for the Debtor to

obtain DIP Financing to pursue the Sale Process as it provides potential lenders with a

source of repayment.

28.     The success of the Sale Process and the Debtor's ability to maximize value for the benefit of all stakeholders is dependent upon the cooperation of Finacity, its management team, and most critically, Mr. Katz, Finacity's Chief Executive Officer (in his capacity as CEO) with respect to assisting the due diligence process and providing the Debtor, GLC, and potential bidders with access to confidential information and key personnel.  The Debtor and its advisors, including GLC, are committed to working with Finacity and potential bidders to provide access to diligence information and arrange for management meetings to understand the Finacity business.

29.     Under the Bidding Procedures, the Debtor and its advisors, including GLC, will continue to market the Finacity Equity.  Such marketing will include the Debtor and its advisors, including GLC, (a) contacting a broad range of both strategic and financial investors that may have an interest in bidding for Finacity, (b) providing access to a data room of confidential information on Finacity to all potential bidders, and (c) providing other relevant information and marketing materials to potential bidders.  In this way, the Debtor and GLC intend to maximize the number of participants who may participate as bidders at the Auction and thereby maximize the value to be achieved from the Sale and Auction.

30.     As of the date hereof, GLC has created and begun populating a virtual data room with diligence information and is in the process of preparing a draft confidential information memorandum and teaser for distribution to potential bidders that sign a customary non-disclosure agreement.  The Debtor and its advisors, including GLC, are committed to working with Finacity, its management team and potential bidders to provide access to confidential information on Finacity and to arrange management meetings to facilitate the due diligence necessary to understand and evaluate the Finacity business.  Providing potential bidders with access to diligence and

information necessary to make a bid depends the cooperation of Finacity and its management throughout the Sale Process.

31.     In formulating the procedures and time periods, the Debtor balanced the need to provide adequate and appropriate notice to parties in interest and to potential purchasers with the need to quickly and efficiently sell its primary asset and exit the Chapter 11 Case.  The Debtor has no revenue and had only approximately $400,000 in cash on hand as of the Petition Date.  *See* First Day Declaration ¶ 14.  As such, the Debtor's ability to obtain necessary postpetition financing (the "DIP Financing") to pursue the Sale Process depends on having an established committed purchaser for the Finacity Equity in order to demonstrate to potential lenders a source of repayment.

32.     In addition, the Debtor has significant business and financial imperatives to move quickly to protect and preserve value.  Even with some additional liquidity provided by a DIP Financing, the Debtor faces budget constraints that become tighter with each day that the Debtor remains in chapter 11.  In addition, the faster the Sale Process concludes, the faster the Debtor can obtain the proceeds of a sale of the Finacity Equity and make a distribution to its creditors, including its employees that rely on funds from the Debtor to meet daily living expenses.

33.     The Debtor has balanced the benefits of running an extended auction with its liquidity needs and its ability to maintain operations, as well as administrative solvency, and are proposing a sale timeline that is designed to take full advantage of a competitive marketing and auction process, while at the same time attempts to limit the burden of administrative expenses that may risk a liquidity shortfall that could have a disastrous impact the Chapter 11 Case.  The Debtor has determined, in its business judgment, that the proposed Sale Process offers the best

chance of maximizing returns to creditors while obtaining the highest and best bid for the Finacity Equity.

## F.    **Proposed Bidding Procedures**

34.    The Bidding Procedures are intended to provide for a fair, timely and competitive sale process consistent with the timeline of this Chapter 11 Case.  The Bidding Procedures, if approved, will enable the Debtor to identify bids from potential buyers that would constitute the best and highest offer for the Finacity Equity.

35.    To assist the Court and parties in interest, certain key terms of the Bidding Procedures are highlighted below:

| **Qualification of Bidders** | A Potential Bidder must accompany its bid with:  (a) written evidence of available cash, a binding commitment for financing (not subject to any conditions other than those expressly set forth in the applicable Proposed Purchase Agreement) or such other evidence of ability to consummate the transaction contemplated by the applicable Proposed Purchase Agreement as the Debtor may reasonably request, (b) a written statement that the Potential Bidder has obtained all applicable internal approvals to make a binding and irrevocable bid on the terms proposed, (c) a covenant to cooperate with the Debtor to provide pertinent factual information regarding the Potential Bidder's business operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements, (d) if the purchase price includes non-cash consideration or fewer contingencies than are in the Stalking Horse Purchase Agreement, an analysis in reasonable detail of the value of the non-cash consideration and sufficient back-up documentation that demonstrates that the bid is a higher and better offer than the transaction contemplated by the Stalking Horse Purchase Agreement, and (e) if the Qualified Bid includes a Proposed Purchase Agreement that is not executed, a signed statement that such bid is irrevocable until the selection of the Successful Bid. |
| --- | --- |
| **Qualification of Bids Prior to Auction** | A bid is a written proposal from a Potential Bidder that provides, at a minimum, that:<br><br>(a)    the Potential Bidder offers to purchase the Finacity Equity at the purchase price and upon the terms and conditions set forth in a copy of the Stalking Horse Purchase Agreement enclosed therewith, marked to |

show any proposed amendments and modifications, or such other form of agreement customarily used in stock sale transactions (the "Proposed Purchase Agreement");

(b)     states that all necessary filings under applicable regulatory, antitrust and other laws will be made (pursuant to the terms and conditions in the Proposed Purchase Agreement) and that payment of the fees associated with such filings will be made by the Potential Bidder;

(c)     is formal, binding and unconditional (except for those conditions expressly set forth in the applicable Proposed Purchase Agreement) and is not subject to any due diligence or contingency and is irrevocable until the selection of the Successful Bid (as defined below);

(d)     does not entitle a bidder (other than the Stalking Horse Bidder) to any breakup fee, termination fee, expense reimbursement or similar type of payment or reimbursement and includes a waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code;

(e)     is determined by the Debtor, after consultation with counsel to any Committee, to be higher or better than the terms of the Stalking Horse Purchase Agreement, taking into account the Break-Up Fee, Expense Reimbursement, and the Minimum Overbid (as defined below);

(f)     includes cash consideration sufficient to pay the Break-Up Fee and the Expense Reimbursement;

(g)     is accompanied by the Good Faith Deposit;  and

(h)     is received by the Bid Deadline.

The Debtor may waive the requirement for a Potential Bidder to provide the Good Faith Deposit.  The Stalking Horse Bidder shall not be required to make the Good Faith Deposit.

A Potential Bidder must deposit with an escrow agent selected by the Debtor (the "Escrow Agent") a deposit equal to 10% of the proposed purchase price (any such deposit, a "Good Faith Deposit").  The Good Faith Deposit must be made by wire transfer and will be held by the Escrow Agent in accordance with the terms of the escrow agreement.

A bid received from a Potential Bidder that is determined by the Debtor to meet the above requirements will be considered a "Qualified Bid," and each Potential Bidder that submits a Qualified

| | |
|---|---|
| | Bid will be considered a "<u>Qualified Bidder</u>."  For purposes hereof, the Stalking Horse Bidder is a Qualified Bidder and the Stalking Horse Purchase Agreement executed by the Stalking Horse Bidder is a Qualified Bid.  A Qualified Bid and bids at the Auction may be valued by the Debtor based upon factors as it determines in good faith to be relevant, including:  (a) the purported amount of the Qualified Bid, including non-cash consideration if applicable, (b) the value to be provided to the Debtor under the Qualified Bid, (c) contingencies with respect to the Sale Transaction and the ability to close the proposed Sale Transaction on a basis acceptable to the Debtor, and any incremental costs to the Debtor in closing delays, (d) the ability to obtain any and all necessary antitrust or other applicable regulatory approvals for the proposed transaction, and (e) any other factors the Debtor may deem relevant.<br><br>Qualified Bidders that have submitted Qualified Bids are eligible to participate in the Auction.  The Debtor will select what it determines to be the highest or best Qualified Bid (or collection of Qualified Bids) (the "<u>Baseline Bid</u>") to serve as the starting point at the Auction taking into account all relevant considerations, including payment of the Break-Up Fee and Expense Reimbursement, the financial condition of the applicable bidder and certainty of closing.  As soon as reasonably practicable and not later than the start of the Auction, the Debtor will identify the Baseline Bid and provide to all Qualified Bidders and counsel for any Committee copies of all Qualified Bids (with such distribution permissible by electronic means, including posting to the Data Room).  For the avoidance of doubt, any Baseline Bid must provide for at least $250,000 of incremental value to the Debtor after taking into account the payment of the Break-Up Fee and Expense Reimbursement to the Stalking Horse Purchaser. |
| **Stalking Horse Protections / Bidding Increments** | In the event the Debtor consummates a transaction for the sale of the Finacity Equity to any party other than the Stalking Horse Bidder (an "<u>Alternative Transaction</u>"), the Debtor shall pay the Stalking Horse Bidder an amount equal to $500,000 (the "<u>Break-Up Fee</u>") by wire transfer to an account designated by the Stalking Horse Bidder.  The Debtor shall also pay the Stalking Horse Bidder by wire transfer to an designated account, reimbursement of all reasonable and documented attorneys' fees and other costs and expenses of the Stalking Horse Bidder actually incurred in connection with Stalking Horse Bidder's efforts to negotiate and consummate the transactions contemplated by the Stalking Horse Purchase Agreement (including, without limitation, the fees and expenses of counsel), upon the earliest to occur of the following: (i) the termination of Stalking Horse Purchase Agreement based on the Debtor's breach thereof and (ii) the Debtor's consummation of an Alternative Transaction;  provided, however, that such |

| | |
|---|---|
| | reimbursement shall be capped at $100,000 (the "Expense Reimbursement"). The Break-Up Fee and Expense Reimbursement (to the extent due and owing) shall constitute a first priority administrative expense of the Debtor's bankruptcy estate under sections 503(b) and 507(a)(2) of the Bankruptcy Code.<br><br>At the Auction, participants (including the Stalking Horse Bidder) will be permitted to increase their bids. Bidding on the Finacity Equity will start at the purchase price and terms proposed in the Baseline Bid and will proceed thereafter in increments of $250,000 (the "Minimum Overbid"). |
| **Auction Procedures** | If more than one Qualified Bid is received by the Bid Deadline, the Debtor will conduct the Auction. The Auction will take place at 10:00 a.m. (ET) on April 23, 2021 (such date, or such other date as the Debtor may notify Qualified Bidders who have submitted Qualified Bids and counsel for any Committee, the "Auction Date") and be held virtually pursuant to a Zoom link to be provided to Qualified Bidders prior to the start of the Auction. Only a Qualified Bidder that has submitted a Qualified Bid will be eligible to participate at the Auction, subject to such limitations as the Debtor may impose in good faith. A reasonable number of representatives of the professional advisors and members of any Committee will be permitted to attend and observe the Auction.<br><br>In the event the Stalking Horse Bid is the only Qualified Bid received by the Debtor by the Bid Deadline, no Auction will be conducted, and Stalking Horse Bidder will be the Successful Bidder. At the Sale Hearing, the Debtor will present the Successful Bid to the Bankruptcy Court for approval. Following the entry of the Sale Order, the Debtor will proceed to close the Sale Transaction upon the satisfaction or waiver of all applicable conditions precedent to closing. |

## G.   Notice Procedures

36.    The Debtor requests approval of the Sale Notice, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**. Within three (3) days of the entry of the Bidding Procedures Order, the Debtor will serve the Sale Notice by overnight mail and email (where available) on the following parties (collectively, the "Sale Notice Parties"):

a.    the Office of the United States Trustee for the Southern District of New York, Region 2 (the "U.S. Trustee"),

b.    counsel to any statutory committee appointed in this Chapter 11 Case,

c.    the Debtor's top 20 unsecured creditors as of the Petition Date,

d.    all entities reasonably known to have expressed an interest in the acquisition, directly or indirectly, of Finacity or the Finacity Equity,

e.    the Internal Revenue Service, United States Securities and Exchange Commission, and any other governmental authorities that (i) as a result of the Sale, may have claims, contingent or otherwise, in connection with the Debtor's ownership of the Finacity Equity or (ii) may have a claim against the Debtor or other reasonably known interest in the relief requested by the Motion relating to the Sale,

f.    counsel to the administrator for Greensill Capital (UK) Limited,

g.    counsel to Greensill Capital Pty Limited,

h.    each party to the Stalking Horse Purchase Agreement;

i.    all persons and entities known by the Debtor to have asserted any lien, claim, interest or encumbrance in the Finacity Equity;  and

j.    all other parties who have requested notice pursuant to Bankruptcy Rule 2002 as of the date hereof.

37.    In addition, the Debtor will also post the Sale Notice and the Bidding Procedures Order on the Debtor's case website (https://cases.stretto.com/greensill) by no later than two (2) days after the entry of the Bidding Procedures Order.

38.    The Debtor submits that the procedures described above contain adequate and reasonable notice of the key dates and deadlines for the Sale, including, among other things, the deadline to object to the Sale of the Finacity Equity, the Auction, the Bid Deadline, and the Sale Hearing.

## RELIEF REQUESTED

39.    By this Motion, the Debtor seeks entry of:  (I) the Bidding
Procedures Order, substantially in the form attached hereto as **Exhibit A**:  (a) approving
the Bidding Procedures, substantially in the form attached as **Exhibit 1** to the Bidding
Procedures Order; (b) establishing the Stalking Horse Bidder and approving the Bid
Protections; (c) scheduling the Auction and the Sale Hearing; (d) and approving the Sale
Notice, a copy of which is attached as **Exhibit 2** to the Bidding Procedures Order; and
(II) the Sale Order, in substantially the form attached hereto as **Exhibit C**:
(a) authorizing the Sale of the Finacity Equity to the Stalking Horse Bidder or the
Successful Bidder free and clear of all liens, claims, interests, and encumbrances; and
(b) granting related relief.

## BASIS FOR THE RELIEF REQUESTED

40.    Ample authority exists for approval of the Bidding Procedures and
a sale of substantially all or a portion of the Debtor's assets to the Stalking Horse Bidder
or the Successful Bidder, as applicable.  The Debtor submits that application of
section 363(b) of the Bankruptcy Code for sales outside of the ordinary course of
business is met here.  Section 363(b) of the Bankruptcy Code provides, in relevant part,
that a debtor may "after notice and a hearing . . . use, sell, or lease other than in the
ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  Section 363(b)
of the Bankruptcy Code is supplemented by the Court's equitable powers under
section 105(a) of the Bankruptcy Code to "issue any order, process, or judgment that is
necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

41.    As set forth below, the Debtor submits that it has satisfied the
requirements of sections 105 and 363 of the Bankruptcy Code, as those sections have
been construed by courts in the Second Circuit.

I.    **The Relief Sought in the Bidding Procedures Order is in
the Best Interests of the Debtor's Estate and Should be Approved**

A.    The Bidding Procedures Are Warranted

42.    Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the

ordinary course of business may be by private sale or by public auction." Fed. R. Bankr.

P. 6004(f)(1).  The paramount goal of any proposed sale of property of the debtor's

estate is to maximize the value of the sale proceeds received by the estate.  *See Official*

*Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147

B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures "are important tools to encourage

bidding and to maximize the value of the debtor's assets").  Courts uniformly recognize

that procedures established for the purpose of enhancing competitive bidding are

consistent with the fundamental goal of maximizing value of a debtor's estate.  *See, e.g.*

*Calpine Corp. v, O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527,

537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding

provide a benefit to a debtor's estate*); In re: Fin'l News Network Inc.,* 126 B.R.152, 156

(Bankr. S.D.N.Y. 1992) ("court-imposed rules for the disposition of assets . . . [should]

provide an adequate basis for comparison of offers, and [should] provide for fair and

efficient resolution of bankrupt estates").

43.    The proposed Bidding Procedures are designed to facilitate a sale

process in compliance with the Bankruptcy Rules and relevant case law by providing a

method by which the Debtor will be able to maximize the value of the Finacity Equity.

The Debtor, with the assistance of its advisors, including GLC, its investment banker,

has structured the Bidding Procedures to attract competitive and active bidding from

those parties with the financial capability to do so.  The Stalking Horse Bid enables the

Debtor to set a floor for the value of the Finacity Equity, while also increasing the

likelihood that they will receive the greatest possible bid for the Finacity Equity at the Auction. Moreover, the Bidding Procedures will allow the Debtor to conduct the Auction in a fair, controlled and transparent manner that will encourage participation by financially capable bidders that demonstrate the wherewithal to close a transaction.

44.    The Bidding Procedures facilitate an orderly, value-maximizing Auction, thereby optimizing recoveries for all parties in interest.  The Bidding Procedures also provide an appropriate framework for the Debtor to review, analyze, and compare all bids received to determine which bid is in the best interests of the Debtor and its creditors.  The Bidding Procedures clearly set forth the participation requirements for Qualified Bidders and bid requirements for Qualified Bids. Accordingly, approval of the Bidding Procedures, including the dates established thereby for the Auction and the Sale Hearing, is warranted.

45.    The Debtor undertook a marketing process prepetition in furtherance of a potential out-of-court transaction that would allow the Debtor to maximize the value of its interest in Finacity.   The Debtor commenced this Chapter 11 case, in part, to continue that marketing effort, particularly after negotiations failed with the Apollo Investors regarding a larger sale transaction that would have included the sale of Finacity.  Between the marketing process to date and the proposed Sale Process set forth in the Bidding Procedures, the Debtor believes that there is sufficient time for potential bidders to conduct and complete diligence and submit bids.

46.    The timeline proposed in this Chapter 11 Case is substantially similar to other timelines approved by courts in this and other districts.  *See* e.g., *In re Cosmoledo, LLC*, Case No. 20-12117 (MEW) (Bankr. S.D.N.Y. Oct. 2, 2020) [Docket No. 88] (scheduling bid deadline 18 days following entry of bidding procedures order); *In re Hooper Homes, Inc.*, Case No. 18-23302 (RDD) (Bankr. S.D.N.Y. Sept. 20, 2018) [Docket

No. 119] (scheduling bid deadline 15 days following entry of bidding procedures order); *In re The Northwest Company LLC*, Case No. 20-10990 (MEW) (Bankr. S.D.N.Y. July 23, 2020) [Docket No. 213] (scheduling bid deadline line 11 days following entry of bidding procedures order).  Furthermore, as the transaction is structured as a proposed stock sale, the Debtor is not seeking approval to assume and assign any executory contracts and/or unexpired leases, which should further streamline the bidding and auction process and substantially narrow the issues typically associated with an asset sale transaction under sections 363 and 365 of the Bankruptcy Code.

B.    The Bid Protections Have a Sound
      Business Purpose and Should Be Approved

47.    The use of a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases.   Courts have recognized that the use of a stalking-horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Official Committee of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011).  As a result, a stalking horse bidder virtually always require break-up fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing [their] bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." I*d.* (internal citations omitted).

48.    Bidding protections encourage a potential purchaser to invest the substantial time, money, and effort to negotiate with the Debtor.  Bankruptcy courts in the Second Circuit approve bidder protections under the "business judgment rule," which prohibits a court from second-guessing corporate directors' decisions made in

good faith and in the exercise of honest judgment.  *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

49.     Here, the Debtor has determined, in the exercise of its business judgment, to provide for the Bid Protections to the Stalking Horse Bidder.  The Bid Protections have induced the Stalking Horse Purchaser to provide a commitment to purchase the Finacity Equity, while providing the Debtor with the potential to obtain even greater benefits for the Debtor's estate through the Auction.  By having an initial bid, the Debtor is able to establish a floor price which other potential bidders understand they need to exceed in order participate at the Auction.  More importantly, having an initial bid from the Stalking Horse Purchaser enabled the Debtor to obtain the critical and necessary DIP Financing it needs to fund this Chapter 11 Case through the Sale Process from the DIP Financing provider because a committed bid for the Finacity Equity from the Stalking Horse Purchaser demonstrated a source of repayment of the DIP Financing.  The Debtor believes that the Bid Protections are necessary and appropriate and will allow the Debtor to maximize the potential sale value of the Finacity Equity and ultimately provide the Debtor with a successful sale of its most significant asset.

50.     Subject to the Court's approval, the Stalking Horse Bidder would be entitled to the Break-Up Fee and Expense Reimbursement only in circumstances where the Debtor consummates a sale for the Finacity Equity to a Successful Bidder other than the Stalking Horse Bidder.  These Bid Protections are paid only from the

proceeds of such sale and are not payable in any other circumstances—for example, if the Stalking Horse Purchase Agreement is terminated for any other reason.

51.    The Bid Protection should be approved and accorded administrative expense status under sections 503(b)(1)(A) and 507 of the Bankruptcy Code, because they provide a clear benefit to the Debtor's estate and the Stalking Horse Bidder expressly conditioned its willingness to enter into the Stalking Horse Purchase Agreement upon the Debtor's agreement to, and Court approval of, the Bid Protections. The Bid Protections will enable the Debtor to secure an adequate floor for Finacity Equity and thus ensure that competing bids will be materially higher or better than that contained in the Stalking Horse Purchase Agreement.

52.    Similar types of bid protections have been approved by this Court. *See, e.g., In re Fairway Group Holdings Corp.*, Case No. 20-10161 (JLG) (Bankr. S.D.N.Y. Feb. 21, 2020) [Docket No. 202] (approving break-up fee equal to 3% of the purchase price);  *In re Hollander Sleep Products, LLC*, Case No. 19-11608 (MEW) (Bankr. S.D.N.Y. July 3, 2019) [Docket No. 180] (authorizing break-up fee, expense reimbursement, and work fee of 2.6% in the aggregate); *In re Hooper Holmes, Inc. d/b/a Provant Health*, Case No. 18-23302 (RDD) (Bankr. S.D.N.Y. Sept. 20, 2018) [Docket No. 119] (authorizing stalking horse break-up fee of 3% and expense reimbursement of approximately 1%); *In re Sears Holdings Corp.*, Case No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 16, 2018) [Docket No. 775] (authorizing a break-up fee of 1.5%); *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. May 7, 2018) [Docket No. 223] (authorizing stalking horse break-up fee of 3% and expense reimbursement of approximately 1%); *In re Avaya, Inc.*, Case No. 17-10089 (SMB) (Bank. S.D.N.Y. Apr. 5, 2017) [Docket No. 356] (same).

53.     Although the Cash Component constitutes a relatively small portion of the total purchase price pursuant to the Stalking Horse Purchase Agreement, the Break-Up Fee should be assessed and compared against the total value of the Sale Transaction to the estate, and not just the cash injection.  *See e.g., In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y. 2014) (finding RSA termination fee fair and reasonable in the context of the larger transaction—rather than solely compared to the proposed backstopped rights offering—and holding that the termination fee is "simply one component of a much larger negotiated transaction . . . that creates tremendous value for the estate . . . .").[6]  The Bid Protections should therefore be assessed in proportion to total consideration under the bid, and not the discrete Cash Component.  *See e.g., In re HSS Holding, LLC*, No. 13-12740 (BLS) (Bankr. D. Del. Nov. 7, 2013) (approving payment $1.145 million break-up fee to stalking horse bidder whose bid contained no cash component and consisted almost entirely of a credit bid).

C.     <u>The Form and Manner of Sale Notice Should Be Approved</u>

54.     The proposed Sale Notice, substantially in the form attached to the Bidding Procedures as **<u>Exhibit 2</u>**, is calculated to provide adequate notice concerning the Bidding Procedures and proposed Sale.

55.     Once this Court enters the Bidding Procedures Order, the Debtor proposes to give notice, by no later than three (3) days following the entry of such order, on the Sale Notice Parties by service of the Sale Notice by overnight mail and email (where available), and post such Sale Notice (and the Bidding Procedures Order) on the Debtor's case website (https://cases.stretto.com/greensill) by no later than two

---

[6]     Although *Genco* involved a termination fee relating to a rights offering, the Court in that case analogized such fee to a stalking horse break-up fee, which it held satisfied the business judgment rule under the facts of that case.  *Id.* at 465.

(2) days following the entry of such order.  In addition, GLC will continue to proactively contact those parties it believes are most likely sources of potential bids.

56.     The Debtor submits that this form and manner of notice are more than reasonable and effective under the circumstances to give potential bidders the knowledge needed to participate in the bidding process and a full and fair opportunity for creditors or other parties in interest to object to the proposed Sale if necessary.  .

57.     Notably, the Debtor does not seek to assume and assign any executory contracts or leases under section 365 of the Bankruptcy Code as part of the Sale, which involves only the transfer of stock shares;  the Debtor is therefore not required to serve any additional notice of assumption and cure, with opportunity to object, to those contract counterparties whose interests are often at the center of 363-sale contested matters.  Additionally, because the Finacity Equity is unencumbered (other than potentially pursuant to a DIP Financing, which would be anticipated to be satisfied from the proceeds of the Sale), the Debtor does not anticipate any objections from secured creditors holding liens against the Finacity Equity.

## II.   Debtor Has Demonstrated a Sound Business Justification for the Sale of the Finacity Equity

### A.   Selling the Finacity Equity is a Proper Exercise of Business Judgment

58.     Section 363(b) of the Bankruptcy Code permits a debtor-in-possession, after notice and a hearing, to sell property of the estate other than in the ordinary course of business.  11 U.S.C. § 363(b).  Courts have uniformly held that approval of a proposed sale of property under section 363(b) of the Bankruptcy Code is appropriate if the transaction is supported by the debtor-in-possession's reasonable business judgment. *See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983); *see also In re Delaware & Hudson Ry. Co.*, 124 B.R. 169,

176 (D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying the pre-confirmation sale of assets); *In re Abbotts Dairies Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir. 1986); *Stephens Indus. v. McClung*, 789 F.2d 386, 389-90 (6th Cir. 1986) ("[T]he court relies on an estate representative's sound business judgment in approving acts outside the ordinary course of business."); *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("A presumption of reasonableness attaches to a Debtor's management decisions.").

59.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See, e.g., In re Food Barn Stores, Inc.,* 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"). Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets of the estate. *See, e.g., Integrated Res.*, 147 B.R. at 656-57 (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

60.     If a valid business justification exists for a sale, the debtor's decision to sell property out of the ordinary course of business enjoys a strong presumption that "the directors of a corporation acted on an informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also In re ASARCO, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011)

("The business judgment standard in section 363 is flexible and encourages discretion."); *GBL Holding Co.v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005) ("Great judicial deference is given to the [t]rustee's exercise of business judgment" [in approving a proposed sale under section 363].).

61.     Therefore, any party objecting to the proposed sale must make a showing of "bad faith, self-interest or gross negligence." *In re Integrated Res., Inc.*, 147 B.R. at 656 (citing *Smith v. Van Gorkom*, 488 A.2d 858, 872-73 (Del. 1985)); *see also Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

62.     Here, the Debtor has determined in the exercise of its reasonable business judgment that the best means by which creditors may obtain any recovery is through a prompt sale of its most significant asset—the Finacity Equity.  The proposed Sale Process is reasonable and designed to ensure the Debtor obtains the highest and best bid for the Finacity Equity.

63.     The Stalking Horse Purchase Agreement is beneficial to the Debtor and maximizes returns to creditors.  Importantly, the Katz Parties have agreed as part of the total consideration to release claims against the Debtor that, if allowed in their asserted amounts, could dilute the Debtor's unsecured claims pool significantly.  In addition, the Cash Component, which will be more than enough to satisfy the likely balance of any DIP Financing in full and provide sufficient cash to pay the costs of the sale and fund a chapter 11 plan process to make distributions to creditors.

B.    The Sale Should Be Free and Clear of All Liens

64.    Section 363(f) of the Bankruptcy Code authorizes a debtor to sell

assets free and clear of all liens, claims, interests and encumbrances provided that one

of the following conditions are met:  (a) applicable non-bankruptcy law permits the sale

of such property free and clear of such interest; (b) such entity consents; (c) such interest

is a lien and the price at which such property is to be sold is greater than the value of all

liens on such property; (d) such interest is in bona fide dispute; or (e) such entity could

be compelled, in legal or equitable proceeding, to accept a money satisfaction of such

interest.  11 U.S.C. § 363(f)(1)-(5).

65.    Based on its review of its books and records and research on public

records, the Debtor believes that the only party with an interest in the Finacity Equity is

the DIP Facility.  The Cash Component provides more than enough cash consideration

to repay the DIP Facility in full in cash.  To the extent there are any other creditors with

alleged security interests in, or liens on, the Finacity Equity, the Debtor believes that the

notice procedures described herein and approved by the Bidding Procedures Order

provide such parties with ample notice and an opportunity to object.  Their failure to do

so should be deemed consent for purposes of section 363(f)(2) of the Bankruptcy Code.

*See In re Borders Grp.,* Inc., 453 B.R. 477, 484 (Bankr. S.D.N.Y. 2011) ("Under section

363(f)(2), a lienholder who receives notice of a sale but does not object within the

prescribed time period is deemed to consent to the proposed sale, and assets thereafter

may be sold free and clear of liens.").

C.    There Should be a Finding of Good Faith

66.    Section 363(m) of the Bankruptcy Code provides, in relevant part:

"The reversal or modification on appeal of an authorization under subsection (b) or (c)

of this section of a sale or lease of property does not affect the validity of a sale or lease

under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal."  11 U.S.C. § 363(m).

67.    "[W]hen a bankruptcy court authorizes a sale of assets under § 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser." *In re Abbotts Dairies, Inc.,* 788 F.2d 143, 149-50 (3d Cir. 1986). The purpose of such a finding is to facilitate a safe-harbor determination under § 363(m), which protects purchasers against the invalidation of a sale allowing a reversal or modification of a bankruptcy court's sale order when the sale is made in "good faith."

68.    Section 363(m) of the Bankruptcy Code fosters the "'policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely.'" *Reloeb Co. v. LTV Corp (In re Chateaugay Corp.),* 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143, 147 (3d Cir. 1986)); *see also Allstate Ins. Co. v. Hughes,* 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.,* 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

69.    Here, although the Katz Parties include an insider of Finacity, he exerts no control over the Debtor or its parent or sister companies.  Moreover, the total consideration provided by the Stalking Horse Bid is subject to higher and better offers pursuant to the Sale Process.  The Debtor believes that the Stalking Horse Bidder has

conducted itself at all times to date in good faith and have negotiated the proposed Sale at arm's length and without fraud or collusion.

70.    To the extent the Successful Bidder is not the Stalking Horse Bidder, the Debtor intends to show that it negotiated with the Successful Bidder at arm's-length, in good faith, and in an effort to achieve the best offer for the Finacity Equity in accordance with the Bidding Procedures.

## WAIVER OF STAY OF SALE ORDER

71.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  The Debtor requests that any order approving this Motion (or authorizing a transaction to sell the Finacity Equity) be effective immediately, thereby waiving the 14-day stays imposed by Bankruptcy Rule 6004.  These waivers or eliminations of the 14-day stays are necessary for the Sale to close and the funding to be received as expeditiously as possible.

72.    As previously stated, the Debtor has no revenue and needs DIP Financing to keep afloat and administratively solvent through the bidding and sale process.  Such DIP Financing is dependent upon the Debtor's ability to demonstrate to potential lenders a source of repayment from its single significant asset—the Finacity Equity.  As a result, any administrative costs that are incurred during the pendency of the Chapter 11 Case will inevitably reduce recovery by creditors by a corresponding amount.   With this in mind, the Debtor respectfully submits that it is in the best interest of the Debtor's estate and creditors to close the Sale as soon as possible after all closing conditions have been met or waived.  Accordingly, the Debtor requests that the Court eliminate the 14-day stays imposed by Bankruptcy Rule 6004.

## NOTICE

73.    Notice of this Motion shall be given to:  (a) the United States Trustee for the Southern District of New York;  (b) the parties listed in the list of twenty (20) largest unsecured creditors filed by the Debtor in this Chapter 11 Case;  (c) the Internal Revenue Service;  and (d) any such other party entitled to notice pursuant to Local Bankruptcy Rule for the United States Bankruptcy Court for the Southern District of New York 9013-1(b).  The Debtor submits that no other or further notice need be provided.

## NO PRIOR REQUEST

74.    No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that the Court (a) enter the Bidding Procedures Order and the Sale Order and (b) grant such other and further relief as may be just and proper.

DATED:   New York, New York
   March 29, 2021

         GREENSILL CAPITAL INC.,
         *Debtor and Debtor in Possession*
         By its Attorneys
         TOGUT, SEGAL & SEGAL LLP
         By:

         */s/ Kyle J. Ortiz*
         Albert Togut
         Kyle J. Ortiz
         Bryan M. Kotliar
         Eitan E. Blander
         One Penn Plaza, Suite 3335
         New York, New York 10119
         Telephone: (212) 594-5000