## Exhibit B

## Stalking Horse Purchase Agreement

*Filing Version*

## STOCK SALE AND SETTLEMENT AGREEMENT

This STOCK SALE AND SETTLEMENT AGREEMENT (this "Agreement") is made as of March [●], 2021 (the "Effective Date"), among Greensill Capital Inc., a Delaware corporation ("Greensill US"), as seller, Finacity Corporation, a Delaware corporation (the "Company"), and Adrian Katz, Dana Katz, and the Katz Family Trust, as purchasers (each, a "Katz Party" and collectively, the "Katz Parties"). Greensill US, the Company, and the Katz Parties are each sometimes referred to in this Agreement as a "Party," and collectively as the "Parties."

## RECITALS

WHEREAS, pursuant to a comprehensive restructuring, on March 8, 2021, Greensill Capital (UK) Limited, a company incorporated under the laws of England and the sole stockholder of Greensill US ("Greensill UK"), was placed in an administrative proceeding under the laws of England and Wales (the "UK Proceeding"); on March 8, 2021, Greensill Capital Pty Limited, an Australian proprietary limited company, the ultimate parent of Greensill US ("Greensill Australia"), was placed in an administrative proceeding under the laws of New South Wales (the "Australian Proceeding"); and on March 25, 2021, Greensill US commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") which is being administered under case number 21-1056-MEW (the "US Proceeding" and together with the UK Proceeding and Australian Proceeding, the "Proceedings");

WHEREAS, pursuant to that certain Stock Purchase Agreement, dated as of June 10, 2019 (as modified by that certain letter agreement, dated December 20, 2019, among Greensill US and the Katz Sellers, the "2019 SPA"), by and among Greensill US, the Company, the Katz Parties and the other sellers party thereto, and Farkouh Furman & Faccio LLP as the seller representative, the Katz Parties and such other sellers sold all of their equity interests in the Company, consisting of common and preferred shares, to Greensill US for upfront and deferred cash consideration;

WHEREAS, the continuing obligations of Greensill US to the Katz Parties under the 2019 SPA are guaranteed by (i) Greensill Australia, pursuant to a guarantee dated June 10, 2019 (the "SPA Guarantee") and (ii) the Company pursuant to a guarantee dated June 10, 2019 (the "Company Guarantee");

WHEREAS, the continuing obligations of the Company to Adrian Katz under the employment agreement dated June 10, 2019 (as amended by that certain Amended and Restated Employment Agreement, dated December 11, 2019, the "Katz Employment Agreement") are guaranteed by Greensill Australia, pursuant to a guarantee dated June 10, 2019 (the "Employment Guarantee", and together with the SPA Guarantee and the Company Guarantee, the "Guarantees");

WHEREAS, the Katz Parties desire to purchase from Greensill US, and Greensill US desires to sell to the Katz Parties, all of the issued and outstanding capital stock of the Company (the "Equity Interests"), upon the terms and subject to the conditions contained in this Agreement;

WHEREAS, concurrently with the execution and delivery of this Agreement, and as a condition and inducement to the Parties' willingness to enter into the transactions contemplated by this Agreement (the "Transaction"), Greensill UK, with the consent of the administrator in respect of the UK Proceeding, the Company and Neely Funding LLC, a Delaware limited liability company and wholly owned subsidiary of the Company ("Neely"), are entering into that certain amendment, dated March [    ], 2021 (the "Loan Amendment"), to that certain Call Account Loan Agreement, dated November 29, 2020, among  Greensill UK, as lender, the Company and Neely, as successor to the Company by way of novation, as borrower (as so amended, the "Loan Agreement"), and pursuant to the Loan Amendment, the Company will pay off and terminate the Loan Agreement;

WHEREAS, this Agreement and the terms and conditions contained herein with respect to the Transaction will serve as the initial bid for the purchase and sale of the Equity Interests, pursuant to the bidding and auction procedures (the "Bidding Procedures") as approved by the Bidding Procedures Order (as defined below);

WHEREAS, the execution and delivery of this Agreement and Greensill US's ability to consummate the Transaction are subject to entry of the Sale Order (as defined below) approving the Transaction under, *inter alia*, sections 105 and 363 of the Bankruptcy Code; and

WHEREAS, the Parties desire to consummate the proposed transactions as promptly as practicable after the Bankruptcy Court enters the Sale Order.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants, and agreements contained in this Agreement, and other good and valid consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

ARTICLE I.

SALE AND PURCHASE OF THE EQUITY INTERESTS; CLOSING

Section 1.1    Sale and Purchase of the Equity Interests. On the terms and subject to the conditions contained in this Agreement, at the Closing, Greensill US shall sell to the Katz Parties on a pro rata basis (specified in respect of each Katz Party under "Pro Rata Portion" on Exhibit A hereto), and the Katz Parties shall purchase on a pro rata basis from Greensill US, all of the outstanding Equity Interests, free and clear of all liens, claims, interests, and encumbrances, in exchange for (a) the release by the Katz Parties of Greensill US, Greensill Australia and the Company from their obligations with respect to the Katz Parties under the 2019 SPA and the Guarantees, and (b) a cash amount equal to $3,000,000 (the "Cash Component") (the foregoing (a) and (b), collectively, the "Purchase Consideration").

Section 1.2    Closing. The consummation of the transactions contemplated by this Agreement (the "Closing") shall take place virtually through electronic transfer on the date that is two business days after the date on which each of the conditions set forth in ARTICLE VI has been satisfied or, if permitted, waived (other than any conditions that by their nature can only be satisfied on the Closing Date (as defined below), but subject to the satisfaction of such conditions on the Closing Date or waiver), or at such other place and at such other time as Greensill US and

the Katz Parties may agree. The date on which the Closing occurs is referred to in this Agreement as the "Closing Date."

Section 1.3    Payment by the Company. At the Closing, the Katz Parties shall pay or cause to be paid the Cash Component of the Purchase Consideration by wire transfer of immediately available funds to the account Greensill US designates in writing to the Company at least two business days prior to the Closing Date.

Section 1.4    Deliveries by Greensill US. At or prior to the Closing, Greensill US shall deliver, or cause to be delivered each of the following:

(a)    To the Katz Parties, all stock certificates evidencing the Equity Interests, each endorsed in blank by Greensill US or accompanied by a stock power or other instrument of transfer executed in blank by Greensill US or affidavits of loss in customary form, duly executed by Greensill US;

(b)    To the Katz Parties and the Company, a copy of the resolutions approved by the board of directors of Greensill US (or a sub-committee thereof) authorizing the execution, delivery, and performance by Greensill US of this Agreement and the consummation by Greensill US of the Transaction;

(c)    the written resignation, effective as of the Closing, of each member of the board of directors of the Company, except for Adrian Katz;

(d)    To the Company, the Loan Amendment, executed by Greensill UK, the Company and Neely; and

(e)    such other documents, certificates, or instruments as the Katz Parties or the Company may reasonably request in order to effectuate the transactions contemplated by this Agreement and to vest in the Katz Parties good and valid title to all of the Equity Interests.

Section 1.5    Deliveries by Katz Parties. At or prior to the Closing, the Katz Parties shall deliver, or cause to be delivered, to Greensill US each of the following:

(a)    the Cash Component in accordance with Section 1.3;

(b)    an agreement evidencing the valid termination of the Employment Guarantee, effective as of the Closing, duly executed by Adrian Katz and in form and substance reasonably acceptable to Greensill US; and

(c)    such other documents, certificates, or instruments as Greensill US may reasonably request in order to effectuate the transactions contemplated by this Agreement and to transfer to the Katz Parties good and valid title to all of the Equity Interests.

3

ARTICLE II.

REPRESENTATIONS AND WARRANTIES OF GREENSILL US

Greensill US represents and warrants to the Katz Parties and the Company as of the Effective Date and as of the Closing Date (as though made on the Closing Date) as follows:

Section 2.1    Organization and Authorization. Greensill US is validly existing and in good standing under the laws of Delaware. Greensill US has all requisite corporate power and authority to execute, deliver, and perform this Agreement and to consummate the transactions contemplated by this Agreement. The execution, delivery, and performance by Greensill US of this Agreement and the consummation by Greensill US of the transactions contemplated by this Agreement have been validly authorized by all necessary action by Greensill US, the holders of its equity interests and all necessary actions under the Proceedings.  Greensill US has validly executed and delivered this Agreement. Assuming the valid authorization, execution and delivery of this Agreement by the other Parties, this Agreement constitutes a legal, valid, and binding obligation of Greensill US, enforceable against Greensill US in accordance with its terms.

Section 2.2    Ownership of Equity Interests. Greensill US owns, beneficially and of record, and has good and valid title to all of the Equity Interests, which are comprised solely of (i) 384,330 shares of common stock, par value $0.001 ("Common Stock"), (ii) 1,086,289 shares of Series 1-B preferred stock, par value $0.001 ("Series 1-B Stock"), and (iii) 153,847 shares of Series 1-C preferred stock, par value $0.001 ("Series 1-C Stock"), free and clear of all liens, claims, interests, and encumbrances (other than such liens, claims, interests, or encumbrances arising under any postpetition "debtor in possession" financing for Greensill US approved by the Bankruptcy Court (the "DIP Liens"), which shall be satisfied at the Closing by Greensill US using the proceeds of the Cash Component). Except for this Agreement, there are no outstanding options, warrants, rights, calls, convertible securities, or other agreements obligating Greensill US to transfer or sell any equity interest of the Company, including the Equity Interests. There are no voting trusts, stockholder agreements, proxies, or other contracts or understandings in effect to which Greensill US is a party with respect to the voting or transfer of any of the Equity Interests. Upon delivery to the Katz Parties at the Closing of the stock certificate(s) representing the Equity Interests, endorsed by Greensill US or accompanied by a stock power or other instrument of transfer executed by Greensill US, and upon the Katz Parties' release of their claims against Greensill US and its affiliates pursuant hereto, the Katz Parties will acquire good and valid title to all of the Equity Interests, free and clear of all liens, claims, interests, and encumbrances (other than restrictions on transfer imposed under applicable securities laws).

Section 2.3    Required Consents; No Conflicts. Subject to approval of the Bankruptcy Court, the execution, delivery, and performance by Greensill US of this Agreement and the consummation by Greensill US of the transactions contemplated by this Agreement do not and will not (a) require any consent authorization, or approval of, or a filing, notification, or registration (each, a "Consent") with, any individual, corporation, limited liability company, partnership, joint venture, trust, governmental authority, or other legal entity (each, a "Person"), or (b) violate, conflict with, result in a breach, cancellation, or termination of, constitute a default under, result in the creation of any lien or encumbrance on any of the Equity Interests, or result

4

in a circumstance that, with or without notice or lapse of time or both, would constitute any of the foregoing under (i) any law or order applicable to or binding on Greensill US or any of Greensill US's properties or assets, including the Equity Interests, (ii) any material agreement to which Greensill US is a party or by which Greensill US or any of Greensill US's properties or assets, including the Equity Interests, is bound, or (iii) any of the organizational or other governing documents of Greensill US, in each case, as amended.

Section 2.4    No Adverse Proceedings. There is no action, suit, arbitration, proceeding, audit, hearing, examination, investigation, or other litigation (whether civil, criminal, administrative or investigative) pending or, to Greensill US's knowledge after reasonable inquiry, threatened by or against Greensill US or any of its affiliates with respect to this Agreement or the transactions contemplated by this Agreement or that, if determined adversely to Greensill US, would prevent or delay the consummation by Greensill US of the transactions contemplated by this Agreement.

ARTICLE III.

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to the Katz Parties as of the Effective Date and as of the Closing Date (as though made on the Closing Date) as follows:

Section 3.1    Organization and Authorization.

(a)    The Company is validly existing and in good standing under the laws of Delaware. The Company has all requisite corporate power and authority to execute, deliver, and perform this Agreement and to consummate the transactions contemplated by this Agreement. The execution, delivery, and performance by the Company of this Agreement and the consummation by the Company of the transactions contemplated by this Agreement have been validly authorized by all necessary action by the Company and, if applicable, the holders of its equity interests. The Company has validly executed and delivered this Agreement. Assuming the valid authorization, execution and delivery of this Agreement by the other Parties, this Agreement constitutes a legal, valid, and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability (the "Enforceability Limitations").

Section 3.2    Capitalization. The authorized capital stock of the Company consists of: (i) 2,700,000 shares of Common Stock, of which 384,330 shares are issued and outstanding, (ii) 1,277,999 shares of Series 1-B Stock, of which 1,086,289 shares are issued and outstanding and (iii) 153,847 shares of Series 1-C Stock, of which 153,847 shares are issued and outstanding. The Equity Interests constitute all of the issued and outstanding equity interests of the Company. Greensill US owns all of the Equity Interests of the Company. The Equity Interests (A) have been duly authorized, (B) are validly issued, fully-paid, and non-assessable, and (C) were not issued in violation of any preemptive right, subscription right, right of first refusal, or applicable law.

Section 3.3    Required Consents; No Conflicts. The execution, delivery, and performance by the Company of this Agreement and the consummation by the Company of the transactions contemplated by this Agreement do not and will not (a) require any Consent of, or with, any Person, other than those that have been obtained, taken or made, with the exception of the Consents set forth on Schedule 3.3 hereto, or (b) violate, conflict with, result in a breach, cancellation, or termination of, constitute a default under, or result in a circumstance that, with or without notice or lapse of time or both, would constitute any of the foregoing under (i) any law or order applicable to or binding on the Company or any of the Company's properties or assets, (ii) any material agreement to which the Company is a party or by which Greensill US or any of the Company's properties or assets is bound, or (iii) any of the organizational or other governing documents of the Company, in each case, as amended.

Section 3.4    No Adverse Proceedings. There is no action, suit, arbitration, proceeding, audit, hearing, examination, investigation, or other litigation (whether civil, criminal, administrative or investigative) pending or, to the Company's knowledge, threatened by or against the Company or any of its affiliates with respect to this Agreement or the transactions contemplated by this Agreement or that, if determined adversely to the Company, would prevent or delay the consummation by the Company of the transactions contemplated by this Agreement.

Section 3.5    Brokers. No broker, finder, or investment bank is entitled to any brokerage, finder's, or similar fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company.

ARTICLE IV.

REPRESENTATIONS AND WARRANTIES OF THE KATZ PARTIES

Each Katz Party represents and warrants, solely with respect to itself, himself or herself, as the case may be, and not on a joint basis with any other the Katz Party, to Greensill US and the Company as of the Effective Date and as of the Closing Date (as though made on the Closing Date) as follows:

Section 4.1    Organization; Authorization of each Katz Party. Such Katz Party, if such Katz Party is not an individual, is validly existing and in good standing under the laws of its jurisdiction of organization. Such Katz Party, if such Katz Party is an individual, has the requisite capacity or, if such Katz Party is not an individual, has all requisite trust, corporate, limited partnership, limited liability company, or other legal entity, as applicable, power and authority to execute, deliver, and perform this Agreement and to consummate the transactions contemplated by this Agreement. The execution, delivery, and performance by such Katz Party of this Agreement and the consummation by such Katz Party of the transactions contemplated by this Agreement have been validly authorized by all necessary action by such Katz Party, and, if applicable, the holders of its equity interests. Such Katz Party has validly executed and delivered this Agreement. Assuming the valid authorization, execution, and delivery of this Agreement by the other parties to this Agreement, this Agreement constitutes, legal, valid, and binding obligations of such Katz Party, enforceable against such Katz Party in accordance with its terms, subject to the Enforceability Limitations.

6

Section 4.2    Required Consents; No Conflicts. The execution, delivery, and performance by such Katz Party of this Agreement and the consummation by such Katz Party of the transactions contemplated by this Agreement do not and will not (a) require any Consent of, or with, any Person, other than those that have been obtained, taken or made, or (b) violate, conflict with, result in a breach, cancellation, or termination of, constitute a default under, or result in a circumstance that, with or without notice or lapse of time or both, would constitute any of the foregoing under (i) any law or order applicable to or binding on such Katz Party Greensill US or any of such Katz Party's properties or assets, (ii) any material agreement to which such Katz Party is a party or by which such Katz Party or any of such Katz Party's properties or assets, is bound, or (iii) if such Katz Party is not an individual, any of the organizational or other governing documents of such Katz Party, in each case, as amended.

Section 4.3    No Adverse Proceedings. There is no action, suit, arbitration, proceeding, audit, hearing, examination, investigation, or other litigation (whether civil, criminal, administrative or investigative) pending or, to such Katz Party's knowledge, threatened by or against such Katz Party or any of its affiliates with respect to this Agreement or the transactions contemplated by this Agreement or that, if determined adversely to such Katz Party, would prevent or delay the consummation by such Katz Party of the transactions contemplated by this Agreement.

Section 4.4    Securities Law Matters. Such Katz Party is acquiring the Equity Interests solely for the purpose of investment and not with a view to, or for sale in connection with, any distribution of the Equity Interests in violation of applicable securities laws. Such Katz Party is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act of 1933.

Section 4.5    Brokers. No broker, finder, or investment bank is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of such Katz Party.

ARTICLE V.

COVENANTS AND AGREEMENTS

Section 5.1    Conduct of the Business Pending the Closing. From the Effective Date until the Closing Date, the Company shall, and shall cause its subsidiaries to, operate the Company's business in all material respects in the ordinary course of business consistent with past practice. Consistent with the foregoing, the Company shall, and shall cause its subsidiaries to, use reasonable best efforts to keep and maintain its assets in good operating condition and repair and use its reasonable best efforts consistent with good business practice to maintain the business organization of the Company and its subsidiaries intact and to preserve the goodwill of the suppliers, contractors, licensors, employees, customers, distributors, and others having business relations with the Company or any of its subsidiaries.

Section 5.2    Termination of Related Party Contracts. Prior to the Closing, Greensill US, the Company and the Company's subsidiaries shall take (or cause their respective affiliates to take) such actions as are necessary to terminate, effective as of the Closing, all contracts,

services, and other inter-company arrangements, whether written or oral, between or among the Company or the Company's subsidiaries (other than the Company and its subsidiaries), on one hand, and Greensill US or any affiliate of Greensill US on the other hand, from and after the Closing, no further rights or liabilities of any party shall continue under such terminated contracts, services, or arrangements.

Section 5.3    Resignations. On or prior to the Closing Date, Greensill US shall cause each member of the board of directors of the Company, except for Adrian Katz, to tender his or her resignation from such position effective as of the Closing.

Section 5.4    Future Assistance.  If after the Closing any Party is contesting or defending against any action, suit, arbitration, proceeding, audit, hearing, examination, investigation, or other litigation (whether civil, criminal, administrative or investigative), hearing, investigation, claim, or demand relating to (i) any transaction contemplated by this Agreement or the Loan Agreement or (ii) any fact, situation, condition, event, action, failure to act, or transaction occurring prior to the Closing Date involving the Company or the Company's business, each other Party shall (A) fully cooperate with the contesting or defending party and its counsel in, and assist the contesting or defending party and its counsel with, the contest or defense, (B) make available such other Party's personnel (including for purposes of fact finding, consultation, interviews, depositions, and, if required, as witnesses), and (C) provide such information, testimony, and access to its books and records, in each case as shall be reasonably requested in connection with the contest or defense, all at the sole cost and expense (not including employee compensation and benefits costs) of the contesting or defending Party; provided, however, that the foregoing shall not apply to any matter involving a dispute between the Parties.

Section 5.5    Confidentiality. Following the Closing, Greensill US shall, and shall cause its affiliates to, keep confidential all information relating to the Company, the Company's subsidiaries and the Company's business (the "Confidential Information"), except to the extent such Confidential Information (i) is or becomes generally available to the public other than as a result of a disclosure by Greensill US in violation of this Agreement, (ii) is disclosed to Greensill US after the Closing Date on a non-confidential basis from a third party other than any Katz Party, the Company or any subsidiary of the Company, provided that such third party is not known to Greensill US to be bound by a confidentially agreement with or other obligation of confidentiality or secrecy to any Katz Party, the Company, or any subsidiary of the Company with respect to such Confidential Information, or (iii) is required to be disclosed by applicable law, in which case of this sub-clause (iii) Greensill US shall, to the extent reasonably practicable and not prohibited by law, (A) provide the Katz Parties with prompt written notice of such requirement so that the Katz Parties may seek an appropriate protective order or other remedy or waive compliance, in whole or in part, with this Section 5.5, (B) cooperate with the Katz Parties, at the Katz Parties' expense, to obtain such protective order or other remedy, (C) disclose only the portion of that Confidential Information Greensill US is advised in writing by its counsel is legally required to be disclosed, (D) before making any disclosure, provide the Katz Parties with the text of the proposed disclosure and consider in good faith the Katz Parties' suggestions concerning the scope and content of the Confidential Information to be disclosed, and (E) use its reasonable best efforts to preserve the confidentiality of all Confidential Information so

disclosed.  Greensill US may disclose the contents of this Agreement and may file an unredacted copy of this Agreement in the US Proceeding.

Section 5.6    <u>Releases</u>.

(a)    Effective upon the occurrence of the Closing, each Katz Party and the Company, for itself and its successors and assigns, and, to the maximum extent permitted by law, their controlled affiliates and subsidiaries (collectively, "<u>Katz and Company Releasors</u>"), each fully, forever and irrevocably releases, discharges and acquits Greensill US and its Related Parties (as defined below) (collectively, the "<u>Katz and Company Releasees</u>") of and from any and all claims, rights, demands, disputes, obligations, liabilities, indebtedness, breaches of contract, remedies or causes of action arising from or out of, are connected with, or relate to any of the Company or its affiliates, in each case that the Katz and Company Releasors have, may have, or claim to have as of the Closing, of whatever nature, character, or description, whether in contract, in law, in equity or otherwise, whether known or unknown, asserted or unasserted, fixed, liquidated or contingent, anticipated or unanticipated, direct or indirect, including without limitation, any and all claims of the Katz Parties in respect of the Earn-out Payments (as defined in the 2019 SPA) and any and all claims under the Guarantees, including without limitation any claim for payment of the Earn-out Payments and Contingent Compensation Payments (as defined in the Katz Employment Agreement) (each a "<u>Katz and Company Released Claim</u>").  For the avoidance of doubt, following the occurrence of the Closing, the Katz and Company Releasors shall be forever barred from asserting or collecting on any claim against any Katz and Company Releasees in connection with the Proceedings or in any other context.  "<u>Related Parties</u>" means, with respect to any Person, such Person's predecessors, successors, assigns, and present and former affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective managed accounts or funds or investment vehicles, and each of their respective current and former equity holders, officers, directors, managers principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, in each case acting in such capacity; for the avoidance of doubt Greensill Australia is a Related Party with respect to Greensill US.

(b)    Effective upon the occurrence of the Closing, Greensill US, for itself, and its successors and assigns and, to the maximum extent permitted by law, their controlled affiliates and subsidiaries (collectively, the "<u>Greensill US Releasors</u>"), each fully, forever and irrevocably release, discharge and acquit the Company, the Katz Parties and their respective Related Parties (collectively, the "<u>Greensill US Releasees</u>") of and from any and all claims, rights, demands, disputes, obligations, liabilities, indebtedness, breaches of contract, remedies or causes of action arising from or out of, are connected with, or relate to any of  Greensill US or its affiliates, in each case that the Greensill US Releasors have, may have, or claim to have as of the Closing, of whatever nature, character, or description, whether in contract, in law, in equity or otherwise, whether known or unknown, asserted or unasserted, fixed, liquidated or contingent, anticipated or unanticipated, direct or indirect, including without limitation, any and all claims under the 2019 SPA (each, a "<u>Greensill US Released Claim</u>" and together with each Katz and Company Released Claim, the "<u>Released Claims</u>").

9

(c)    The Parties acknowledge that the laws of some jurisdictions provide that a general release does not extend to claims that are not known or suspected to exist at the time an agreement is executed that, if known, would have materially affected the agreement, and the Parties do hereby specifically and expressly waive the provisions of any such or similar statutory or other provision of law that is or may be applicable to this Agreement. The Parties specifically and expressly waive all protections of California Civil Code Section 1542, to the extent applicable, which states: A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

(d)    Notwithstanding anything to the contrary in the foregoing, nothing in this Section 5.6 shall or shall be deemed to (i) release any party or entity from any of their post-Closing obligations under this Agreement, the Loan Agreement, or any document, instrument, or agreement executed to implement the transactions hereunder or thereunder, (ii) release any trade obligations incurred in the ordinary course of the Company's business, (iii) result in the waiving or limiting by any officer, director, or employee of the Company of (1) any right to indemnification by, or expense reimbursement or advance by, the Company or the Company's insurance carriers, (2) any rights as beneficiaries of any insurance policies, or (3) any wages, salaries, compensation, or benefits (other than the Contingent Compensation Payments, to the extent the Katz and Company Releasees have any liability therefor under the Guarantees), or (iv) release any Person for any Released Claims that are determined by a final non-appealable judgment of a court of competent jurisdiction to have constituted actual fraud or willful misconduct.

(e)    Except as expressly set forth in this Agreement, each Party hereby covenants and agrees that it shall refrain from initiating, filing, instituting, maintaining, or proceeding upon, or encouraging, advising or voluntarily assisting any other Person to initiate, institute, maintain or proceed upon any of the Released Claims it is releasing pursuant to this Section 5.6 upon the occurrence of the Closing, except, for the avoidance of doubt, that nothing in this subparagraph shall prevent a Party from enforcing its rights under this Agreement.

(f)    The Parties agree that the representations and warranties contained in this Agreement will not survive the Closing hereunder, and none of the Parties will have any liability to each other after the Closing for any breach thereof. The Parties agree that the covenants contained in this Agreement to be performed at or after the Closing will survive the Closing hereunder until the expiration of the applicable statute of limitations or for such shorter period explicit specified therein, and each Party will be liable to the other after the Closing for any breach thereof.

(g)    The Parties expressly acknowledge and agree that Greensill Australia shall be a third party beneficiary of this Agreement for the purpose of receiving the benefit of the releases provided to it by the Katz and Company Releasors pursuant to Section 5.6(a) and shall be entitled to enforce such releases as if it were a party hereto.

Section 5.7    Alternative Transaction.  Greensill US (and its authorized representatives) shall be permitted to conduct a sale and marketing process for the Equity Interests, including, without limitation, by (a) seeking, soliciting, offering (by way of providing information), or proposing (whether publicly or otherwise) an alternative transaction that contemplates the sale of the Equity Interests to any party other than the Katz Parties (an "Alternative Transaction") and (b) retaining such professionals, advisors and other third parties as necessary to coordinate with potential buyers, evaluate proposals, and conduct (and assist with conducting) diligence related to the Company; provided that following entry of the Bidding Procedures Order such sale and marketing process shall be conducted in accordance with the Bidding Procedures Order.

Section 5.8    Access to Company Records.  The Company and the Katz Parties shall use their best efforts to provide Greensill US (and its designated representatives) and potential bidders (and their designated representatives) with reasonable access, upon reasonable advance notice, to the Company's and its subsidiaries' books and records, corporate offices, and other facilities in accordance with the Bidding Procedures Order; provided that any access pursuant to this Section 5.8 shall be conducted in such a manner as not to interfere unreasonably with the conduct of the Company's business and that shall reasonably account for the limitations imposed by COVID 19; provided that any access pursuant to this Section 5.8 to a competitor of Finacity will be subject to reasonable and customary safeguards to protect the Company's commercially sensitive information; provided further that prior to any access pursuant to this Section 5.8, such potential bidder (and its designated representatives) shall be subject to confidentiality obligations that extend to the Company, in form and substance reasonably satisfactory to the Company, with respect to the access and information to be provided under this Section 5.8. Notwithstanding the foregoing, this Section 5.8 shall not require the Company to permit any access, or to disclose any information, that the Company determines in good faith would result in (i) any violation of any contract (other than any confidentiality or nondisclosure provisions thereof) or law to which the Company or any of its subsidiaries is a party or is subject or the waiver of any privilege (including attorney-client privilege) that the Company or any subsidiary of the Company is entitled to assert in a manner that, in the Company's good faith judgment (after consultation with counsel), would reasonably be expected to adversely affect in any material respect the Company's or any subsidiary of the Company's position in any then-pending or threatened litigation; provided that, in any such case, the Company shall use its reasonable best efforts to obtain any required Consents and take such other reasonable action (such as the entry into a joint defense agreement or other arrangement to avoid the waiver of attorney-client privilege) to permit such access or disclosure, or (ii) if the Company or any of the Company's subsidiaries, on the one hand, and such potential bidder or any of its affiliates, on the other hand, are adverse parties in a litigation, such information being reasonably pertinent thereto.

Section 5.9    Consents and Approvals.  Greensill US and the Katz Parties shall each use their reasonable best efforts (i) to obtain all consents and approvals, as reasonably requested by any Party, to more effectively consummate the purchase and sale of the Company, together with any other necessary consents and approvals to consummate the transactions contemplated hereby, and (ii) to make, as reasonably requested by any Party, all filings, applications, statements and reports to all authorities which are required to be made prior to the Closing Date by or on behalf of any Party or any of their respective affiliates pursuant to any applicable regulation in connection with this Agreement and the transactions contemplated hereby.

Section 5.10    Stalking Horse Provisions.

(a)    In the event Greensill US consummates an Alternative Transaction, Greensill US shall, directly or indirectly, pay the Katz Parties by wire transfer to an account designated by the Katz Parties an amount equal to $500,000 (the "Break-Up Fee").

(b)    Greensill US shall pay, directly or indirectly, the Katz Parties, in accordance with the Bidding Procedures and by wire transfer to an account designated by Purchaser, reimbursement of all reasonable and documented attorneys' fees and other costs and expenses of the Katz Parties actually incurred in connection with Purchaser's efforts to negotiate and consummate the transactions contemplated by this Agreement (including, without limitation, the fees and expenses of counsel), upon the earliest to occur of the following: (i) the termination of this Agreement based on Greensill US's breach hereof and (ii) Greensill US's consummation of Alternative Transaction; provided, however, that such reimbursement shall be capped at $100,000 (the "Expense Reimbursement" and, together with the Break-Up Fee, the "Bid Protections").  For the avoidance of doubt, Greensill US shall not owe the Expense Reimbursement if the Katz Parties are the successful bidder.

(c)    The Bidding Procedures Order shall provide that the Bid Protections (to the extent due and owing) shall be a first priority administrative expense of Greensill US's bankruptcy estate under sections 503(b) and 507(a)(2) of the Bankruptcy Code.

ARTICLE VI.

CONDITIONS TO CLOSING

Section 6.1    Conditions to Obligations of Greensill US.  The obligation of Greensill US to consummate the Transaction is conditional on the following conditions being satisfied (or waived by Greensill US) in accordance with this Agreement:

(a)    the Bankruptcy Court has entered an order authorizing the sale of the Equity Interests and no stay with respect to such order (including any stay under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure) shall be in effect as of the Closing Date;

(b)    each of the representations and warranties to the Katz Parties in this Agreement being true, accurate and not misleading in all respects as of the date of this Agreement and as of the Closing, as though made on and as of that date; and

(c)    the Katz Parties having, as of the Closing, performed and complied in all respects with all covenants and agreements contained in this Agreement which are required to be performed or complied by it, on or prior to the Closing.

Section 6.2    Conditions to Obligations of the Katz Parties.  The obligations of the Katz Parties to consummate the Transactions are conditional on the following conditions being satisfied (or waived by the Katz Parties) in accordance with this Agreement:

(a)    the Bankruptcy Court shall have entered an order approving the bidding procedures and stalking horse provisions contained in Section 5.10 (the "Bidding Procedures

<u>Order</u>") in form and substance satisfactory to the Katz Parties, which order shall have become a final, non-appealable order;

(b)    after entry, the Bidding Procedures Order shall not have been altered or modified in any manner adverse to the Katz Parties, and Greensill US shall have complied in all material respects with the Bidding Procedures Order;

(c)    the Bankruptcy Court shall have entered a final non-appealable order, in form and substance satisfactory to the Katz Parties, approving the Transaction (the "<u>Sale Order</u>"), which order shall be in form and substance satisfactory to the Katz Parties;

(d)    no stay with respect to the Sale Order (including any stay under Rule 6004(h) of the Federal Rules of Bankruptcy Procedure) shall be in effect as of the Closing Date;

(e)    each Greensill US and the Company having, as of the Closing, performed and complied in all respects with all covenants and agreements contained in this Agreement which are required to be performed or complied by it, on or prior to the Closing; and

(f)    the DIP Liens with respect to the Equity Interests shall have been released and discharged.


ARTICLE VII.

TERMINATION

Section 7.1    <u>Termination</u>.  This Agreement may be terminated, and the transactions contemplated by this Agreement may be abandoned at any time prior to the Closing:

(a)    by the mutual written agreement of Greensill US and the Katz Parties;

(b)    by the Katz Parties, by written notice delivered by the Katz Parties to Greensill US and the Company, if the Closing does not occur on or prior to May 15, 2021 (the "<u>Outside Date</u>"), <u>provided</u> <u>however</u>, that the Outside Date may be extended upon written consent of the Parties (which consent may be provided via email exchange between counsel);

(c)    by the Katz Parties, by written notice delivered by the Katz Parties to Greensill US and the Company, or Greensill US, by written notice delivered by Greensill US to the Katz Parties, if an auction has occurred pursuant to the Bidding Procedures Order and the Katz Parties are not the Successful Bidder (as defined in the Bidding Procedures Order); <u>provided</u> that if the Katz Parties are designated the Back-Up Bidder (as defined in the Bidding Procedures Order), the Company and the Katz Parties shall not be permitted to terminate pursuant to this <u>Section 7.1(c)</u> absent written agreement of Greensill US (which may be sent via email by counsel) or relief from the Bankruptcy Court;

(d)    by the Katz Parties, by written notice delivered by the Katz Parties to Greensill US and the Company, or Greensill US, by written notice delivered by Greensill US to

13

the Katz Parties, if prior to the entry of the Sale Order the Bankruptcy Court enters one or more orders approving Greensill US's sale of the Equity Interests to an entity other than the Katz Parties.

Section 7.2    Effect of Termination.  If this Agreement is terminated pursuant to Section 7.1, this Agreement will immediately become void and have no further force or effect, and no Party will have any liability to any other Party; provided, however, that (a) Section 5.10, this Section 7.2 and ARTICLE VIII will survive such termination, and (b) no such termination will relieve any Party from liability for any fraud by such Party prior to such termination.

ARTICLE VIII.

MISCELLANEOUS

Section 8.1    Expenses. Each Party shall bear its own fees and expenses with respect to this Agreement and the transactions contemplated by this Agreement.

Section 8.2    Amendments. The Parties may amend, modify, or supplement this Agreement only by a written agreement signed by each Party.

Section 8.3    Notices. Any notice, request, instruction, or other communication to be given under this Agreement by a Party shall be in writing and shall be deemed to have been given to the other Party (a) when delivered, if delivered in person or by overnight delivery service (charges prepaid), (b) when sent, if sent via email, provided, that no undeliverable message is received by the sender, or (c) when received, if sent by registered or certified mail, return receipt requested, in each case to the address, facsimile number, or email address of such Party set forth below and marked to the attention of the designated individual:

     (a)    if to Greensill US, to:

            Greensill Capital Inc.
            22 Homedale Road
            Bronxville, NY 10708
            Attention: Jill M. Frizzley
            Email: jfrizzley@wildrosepartnersllc.com

            with a copy (which will not constitute notice) to:

            Togut, Segal & Segal LLP
            One Penn Plaza, Suite 3335
            New York, NY  10119
            Attention Kyle Ortiz
            Email: kortiz@teamtogut.com

     (b)    if to the Company, to:

            Finacity Corporation
            263 Tresser Boulevard

14

Stamford, Connecticut 06901
Attention:  Jeff Gulbin
Email:  jgulbin@finacity.com

with a copy (which will not constitute notice) to:

Jones Day
250 Vesey Street
New York, New York 10281-1047
Attention:  Glenn Arden
Email:  gsarden@jonesday.com

(c)    if to any Katz Party, to the address/information listed on such Katz Party's
signature page.

or to such other individual or address, facsimile number, or email address as a Party may
designate for itself by notice given in accordance with this <u>Section 8.3</u>.

Section 8.4    <u>Waivers</u>. No failure or delay by a Party in enforcing any of such Party's
rights under this Agreement will be deemed to be a waiver of such rights. No single or partial
exercise of a Party's rights will be deemed to preclude any other or further exercise of such
Party's rights under this Agreement. No waiver of any of a Party's rights under this Agreement
will be effective until it is in writing and signed by such Party.

Section 8.5    <u>Assignment</u>. This Agreement will be binding on and inure to the benefit of
the Parties and their respective successors and permitted assigns. No Party may, by operation of
law or otherwise, assign this Agreement or any of such Party's rights or obligations under this
Agreement without the written Consent of the other Parties.

Section 8.6    <u>No Third Party Beneficiaries</u>. Except as provided in Section 5.6(g), this
Agreement is solely for the benefit of the Parties and their respective successors and permitted
assigns, and nothing in this Agreement, express or implied, is intended to or will confer on any
other Person any legal or equitable right, benefit, or remedy of any nature whatsoever under or
by reason of this Agreement.

Section 8.7    <u>Further Assurances</u>. On and after the Closing Date, upon the request of
any Party, the other Parties shall execute and deliver such assignments and other instruments as
may be reasonably requested by the requesting Party in order to evidence and effectuate the
transactions contemplated by this Agreement.

Section 8.8    <u>Severability</u>. If any provision of this Agreement is declared invalid,
illegal, or unenforceable, (a) all other provisions of this Agreement will remain in full force and
effect and (b) the Parties shall negotiate in good faith to amend or modify this Agreement to
replace such invalid, illegal, or unenforceable provision with a valid, legal, and enforceable
provision giving effect to the Parties' intent to the maximum extent permitted by law.

Section 8.9    <u>Entire Agreement</u>. This Agreement and the Loan Agreement contain the
entire agreement among the Parties and supersede all prior agreements, arrangements, and

understandings, written or oral, among the Parties relating to the subject matter of this Agreement and the Loan Agreement.

Section 8.10    No Strict Construction. The Parties have each participated in the negotiation and drafting of the terms of this Agreement. The Parties agree that any rule of legal interpretation to the effect that any ambiguity is to be resolved against the drafting party will not apply in interpreting this Agreement.

Section 8.11    Governing Law. This Agreement, and all claims or causes of action that are based on, arise out of, or relate to this Agreement, will be governed by and construed in accordance with the laws of the State of New York (including Sections 5-1401 and 5-1402 of the General Obligations Law).

Section 8.12    Jurisdiction, Service, and Venue. Each Party agrees:  (a) to submit to the exclusive jurisdiction of the Bankruptcy Court, or if the US Proceeding with respect to Greensill US is no longer pending before the Bankruptcy Court or the Bankruptcy Court refuses jurisdiction, the state courts located in the county of New York in the State of New York (unless the federal courts have exclusive jurisdiction, in which case the federal courts located in New York County in the State of New York) (the "Specified Courts") for any litigation arising out of or relating to this Agreement or the transactions contemplated by this Agreement; (b) to commence any litigation arising out of or relating to this Agreement or the transactions contemplated by this Agreement only in the Specified Courts; (c) that service of any process, summons, notice, or document by U.S. registered mail to the address of such Party set forth in Section 8.3 will be effective service of process for any litigation brought against such Party in any of the Specified Courts; (d) to waive any objection to the laying of venue of any Proceeding arising out of or relating to this Agreement or the transactions contemplated by this Agreement in the Specified Courts; and (e) to waive and not to plead or claim that any such Proceeding brought in any of the Specified Courts has been brought in an inconvenient forum.

Section 8.13    WAIVER OF TRIAL BY JURY. EACH PARTY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 8.13.

Section 8.14    Counterparts. This Agreement may be signed (as an original executed counterpart, facsimile, .pdf, .jpeg or similar attachment) in any number of counterparts, each of which is an original and all of which taken together shall constitute one and the same instrument.

[Remainder of page intentionally left blank; signature page follows.]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered as of the Effective Date.

**SELLER:**

**GREENSILL CAPITAL INC.**

By:
Name: _____
Title: _____

[Signature Page to Stock Purchase Agreement]

**COMPANY:**

**FINACITY CORPORATION**

By:
Name: _____
Title: _____

[Signature Page to Stock Purchase Agreement]

**KATZ PARTIES:**

_____

**ADRIAN KATZ**

Address: 15 Hart Lane, Weston, CT 06883

_____

**DANA KATZ**

Address: 15 Hart Lane, Weston, CT 06883

**KATZ FAMILY TRUST**

By:
Name: _____
Title: _____

Address: 15 Hart Lane, Weston, CT 06883

[Signature Page to Stock Purchase Agreement]

## Exhibit A

Pro Rata Percentages

| Name of Katz Party | Pro Rata Percentage |
|---|---|
| Adrian Katz | 61.236129% |
| Dana Katz | 29.423806% |
| Katz Family Trust | 9.340065% |

## Schedule 3.3

Required Consents; No Conflicts

1.      Consent of the landlord pursuant to that certain Office Lease Agreement between CT Stamford Atlantic Forum, L.L.C. and Finacity, Inc., dated May 24, 2006, as amended by the First Amendment to Lease between Two Stamford Plaza Owner LLC (as successor-in-interest to CT-Stamford Atlantic Forum, L.L.C.) and Finacity Corp., dated April 9, 2008; Second Amendment between One Stamford Plaza Owner LLC (formerly known as CTStamford Atlantic Forum, L.L.C.) and Finacity, Inc., dated September 27, 2013; and Third Amendment to Lease and Lease of Relocation Space between One Stamford Plaza Owner LLC and the Company, dated February 28, 2019, pertaining to the premises located at 281 Tresser Boulevard, Building 2, Stamford, CT 06901 and 281 Tresser Boulevard, Building 1, Stamford, CT 06901 ("Office Lease").

2.      Master Subscription Agreement between the Company and S&P Global Market Intelligence LLC, dated January 1, 2018.