# Exhibit D

# Goldberg Declaration

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>GREENSILL CAPITAL INC.,<br><br>Debtor.[1] | Chapter 11<br><br>Case No.: 21-10561 (MEW) |

**DECLARATION OF LEE JASON GOLDBERG**
**IN SUPPORT OF DEBTOR'S BIDDING PROCEDURES MOTION**

I, Lee Jason Goldberg, being duly sworn, hereby depose and state:

1. I am a Director at GLC Advisors & Co., LLC ("GLC"), a financial advisory and investment banking firm which has its principal office at 600 Lexington Avenue, 9th Floor, New York, New York 10022. Subject to Court approval, GLC has been retained by the Greensill Capital, Inc., the debtor and debtor in possession (the "Debtor") in the above-captioned case (this "Chapter 11 Case") as its financial advisor and investment banker.

2. I make this Declaration in support of *Debtor's Application for Entry of Orders: (I)(A) Approving Bidding Procedures Relating to the Sale of Debtor's Ownership Interests in Finacity Corporation; (B) Establishing Stalking Horse Bidder and Bid Protections; (C) Scheduling an Auction and a Sale Hearing; and (E) Approving the Form and Manner of Notice Thereof; and (II)(A) Approving the Sale of the Debtor's Ownership Interests in Finacity Corporation Free and Clear of All Liens, Claims, Interests, and Encumbrances; and (B) Granting Related Relief* (the "Motion").[2]

---

[1] The last four digits of the Debtor's federal tax identification number are 3971. The Debtor's corporate headquarters are located at 2 Gansevoort Street, New York, New York 10014.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

3. Except where specifically noted, the statements in this Declaration are based on my personal knowledge, belief, or opinion; information that I have received from the Debtor's employees or advisors, the employees or advisors of Finacity, and/or employees of GLC working directly with me or under my supervision, direction, or control; or from the records maintained in the ordinary course of business of the Debtor and/or Finacity.

4. As a professional retained by the Debtor, GLC is charging for services provided in this matter, but I am not being compensated for providing this Declaration or testimony. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of GLC.

## I.   Professional Background and Qualifications

5. I have a Bachelor of Arts in Economics-Philosophy from Columbia University and a Juris Doctor from Fordham University School of Law. I am a Director of GLC, which I joined in 2015. Prior to GLC, I was an Associate in the Business Finance & Restructuring group at Weil, Gotshal & Manges LLP, where I focused on company and creditor representations prior to and during chapter 11 cases.

6. GLC is a leading independent investment banking firm, with offices in New York, San Francisco, and Denver. GLC's professionals include those who have previously served in the heads of restructuring and leveraged finance teams at Credit Suisse First Boston LLC; Donaldson, Lufkin & Jenrette Securities Corporation; Morgan Stanley & Co. International PLC; Smith Barney Inc.; and UBS Investment Bank. GLC is highly qualified to advise on strategic alternatives and its professionals have extensive experience in deals involving complex financial and operational restructurings.

7.  GLC and its professionals have worked with financially troubled companies and their stakeholders in a variety of industries in connection with complex financial restructurings, both out of court and in chapter 11 cases. GLC's business reorganization professionals have served as financial advisors to companies and creditors in numerous restructurings, including: (1) acting as the investment banker to Natrol, Inc. (*In re Natrol, Inc.*, Case No. 14-11446, Bankr. D. Del.); (2) acting as the financial advisor to the ad hoc noteholder group of Oncure Holdings, Inc. (*In re Oncure Holdings, Inc.*, Case No. 13-11540, Bankr. D. Del.); (3) acting as the financial advisor to the official committee of unsecured creditors of Rural/Metro Corporation (*In re Rural/Metro Corporation*, Case No. 13-11952, Bankr. D. Del.); (4) acting as the financial advisor to the official committee of unsecured creditors of The Majestic Star Casino, LLC (*In re The Majestic Star Casino, LLC*, Case No. 09-14136, Bankr. D. Del.); (5) acting as the financial advisor to the two ad hoc bondholder groups of Visteon Corporation (*In re Visteon Corporation*, Case No. 09-11786, Bankr. D. Del.); (6) acting as financial advisor to the ad hoc sewer warrantholder group of Jefferson County, Alabama (*In re Jefferson County, Alabama*, Case No. 11-05736, Bankr. D. Ala.); (7) acting as financial advisor to the indenture trustee of Detroit Water and Sewerage Department revenue bonds (*In re City of Detroit, Michigan*, Case No. 13-53846, Bankr. D. Mich.); (8) acting as financial advisor to an ad hoc bondholder group of Toys R Us (*In re Toys R Us, Inc.*, Case No. 17-34665, Bankr. D. Virginia); (9) acting as financial advisor to an ad hoc bondholder group of iHeartMedia (*In re iHeartMedia, Inc.*, Case No. 18-37274, Bankr. D. Texas); (10) acting as financial advisor to an ad hoc bondholder group of FirstEnergy Solutions (*In re FirstEnergy Solutions Corp.*, Case No 18-50757, Bankr. D. Ohio); (11) acting as financial advisor to an ad hoc bondholder group of Caesars (I*n re Caesars Entertainment Operating Company, Inc.*, Case No. 15-01145, Bankr. D. Illinois); (12) acting as financial advisor to

3

the ad hoc bondholder group of UCI (*In re UCI International, LLC,* Case No. 16-11354, Bankr. D. Delaware); (13) acting as financial advisor to Sprint Corporation on its acquisition of certain assets of RadioShack (*In re RadioShack,* Case No. Case 15-10197, Bankr. D. Delaware); and (14) acting as investment banker to Amerimark on its out of court restructuring.

## II. Sales & Marketing Efforts

8. On March 25, 2021 (the "Petition Date"), the Debtor commenced this Chapter 11 Case to pursue an orderly marketing and auction process for the sale of the Debtor's 100% ownership interest (the "Finacity Equity") in Finacity Corporation (together with its subsidiaries, "Finacity").

9. Under the proposed Bidding Procedures Order, the Debtor and its advisors, including GLC, will market the Finacity Equity. Such marketing will include the Debtor and its advisors, including GLC, (a) contacting a broad range of both strategic and financial investors that may have an interest in bidding for Finacity, (b) providing access to a data room of confidential information on Finacity to potential bidders, and (c) providing other relevant information and marketing materials to potential bidders. In this way, the Debtor and GLC intend to maximize the number of participants who may participate as bidders at the Auction and thereby maximize the value to be achieved from the Sale and Auction.

10. As of the date hereof, GLC has created and begun populating a virtual data room with diligence information and is in the process of preparing a draft confidential information memorandum and teaser for distribution to potential bidders that sign a customary non-disclosure agreement. The Debtor and its advisors, including GLC, are committed to working with Finacity, its management team and potential bidders to provide access to confidential information on Finacity and to arrange

4

management meetings to facilitate the due diligence necessary to understand and evaluate the Finacity business. Providing potential bidders with access to diligence and information necessary to make a bid depends on the cooperation of Finacity and its management throughout the Sale Process, as further discussed below.

### III. Proposed Bidding Procedures Timeline

11. GLC believes that conducting the Sale Process within the time period set forth in the Motion and the Bidding Procedures Order is adequate and will provide potential bidders with sufficient time and information necessary to formulate a bid assuming the full cooperation of Finacity and its management. Moreover, I understand that the proposed sale timeline is necessary in light of the Debtor's significant liquidity constraints—i.e., the Debtor has no revenue and needs access to postpetition debtor in possession financing ("DIP Financing") to obtain access to liquidity to fund the Chapter 11 Case through the anticipated closing of the Sale. Moving forward with the Stalking Horse Bid (as described in greater detail below) in accordance with the milestones set forth therein is a necessary step for the Debtor to obtain DIP Financing to pursue the Sale Process as it provides potential lenders with a source of repayment.

12. The success of the Sale Process and the Debtor's ability to maximize value for the benefit of all stakeholders is dependent upon the cooperation of Finacity, its management team, and most critically, Adrian Katz, Finacity's Chief Executive Officer (in his capacity as CEO) with respect to assisting the due diligence process and providing the Debtor, GLC, and potential bidders with access to confidential information and key personnel.

13. Thus, based on my professional experience and subject to the full cooperation of Finacity and Mr. Katz, I believe that the proposed timeline set forth in

the Bidding Procedures is adequate and will allow the Debtor and GLC sufficient time to market the Finacity Equity and obtain the highest and best offer in light of the liquidity constraints imposed by this Chapter 11 Case and the Debtor's need to obtain DIP Financing.

### IV.  The Stalking Horse Purchase Agreement

14.  In connection with the Debtor's sale efforts to date, the Debtor received a bid for the Finacity Equity from Mr. Katz and certain related parties (collectively, the "Katz Parties").  After what I understand to be extensive negotiations among the Debtor, the Katz Parties, Finacity, and their respective advisors,[3] the parties have reached agreement on that certain Stock and Sale Purchase Agreement, dated March 29, 2021 (the "Stalking Horse Purchase Agreement"), a copy of which is attached to the Motion as Exhibit B.  Pursuant to the Stalking Horse Purchase Agreement, the Katz Parties will serve as the initial "stalking horse" bidder for the Finacity Equity (the "Stalking Horse Bidder"), which will be subject to the auction and marketing process overseen by the Court pursuant to the proposed Bidding Procedures.

15.  The Stalking Horse Purchase Agreement provides for the following consideration to the Debtor:  (a) $3,000,000 in cash (the "Cash Component"), which will be paid directly to the Debtor's estate;  and (b) the release of all liabilities stemming from the Earn-Out Payments, against the Debtor and the guarantors, and of all other claims held by the Katz Parties against the Debtor (the "Releases"), which, if allowed in their full amounts could aggregate to more than $21,000,000 in general unsecured claims against the Debtor's estate.

---

[3]  Most of these negotiations occurred before GLC's involvement in the Chapter 11 Case.

16.  I understand that the Debtor's potential liability on account of the Earn-Out Payments is larger than the Debtor's estimated general unsecured claims pool ($21,126,000—which includes the Maximum Earn-Out Payment payable in June 2021 and amounts due if Mr. Katz becomes entitled to the Maximum Earn-Out Payments for the next three years—versus approximately $5-7 million in general unsecured claims). If the claims on account of the Earn-Out Payments were allowed against the Debtor in the amounts asserted by Mr. Katz, the resulting dilution to the general unsecured claims pool would likely reduce creditor recoveries significantly. In addition, as the Earn-Out Payments are guaranteed by Finacity, any portion of the Earn-Out Payments, if allowed or valid, would potentially reduce the value of Finacity by increasing its own liabilities, thereby reducing the value of the Finacity Equity.

**V.    The Bid Protections**

17.  Pursuant to the Motion, the Debtor is requesting approval of the provisions in the Stalking Horse Purchase Agreement regarding the payment of a $500,000 break-up fee (i.e., approximately 2% of the total consideration) (the "Break-Up Fee") and an expense reimbursement not to exceed $100,000 (the "Expense Reimbursement", and together with the Break-Up Fee, the "Bid Protections"). Importantly, the Break-Up Fee is only payable by the Debtor if the Debtor consummates a sale of the Finacity Equity to a third party other than the Stalking Horse Bidder and under no other circumstances (e.g., the breach or termination of the Stalking Horse Purchase Agreement by the Debtor or the exercise of a "fiduciary out").

18.  The Bid Protections have induced the Stalking Horse Purchaser to provide a commitment to purchase the Finacity Equity, while providing the Debtor with the potential to obtain even greater benefits for the Debtor's estate through the Auction. By having an initial bid, the Debtor is able to establish a floor price which

7

other potential bidders understand they need to exceed in order participate at the Auction. More importantly, having an initial bid from the Stalking Horse Purchaser enabled the Debtor to obtain the critical and necessary DIP Financing it needs to fund this Chapter 11 Case through the Sale Process from the DIP Financing provider because a committed bid for the Finacity Equity from the Stalking Horse Purchaser demonstrated a source of repayment of the DIP Financing. I believe that the Bid Protections are necessary and appropriate and will allow the Debtor to maximize the potential sale value of the Finacity Equity and ultimately provide the Debtor with a successful sale of its most significant asset.

   I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: New York, New York
    March 29, 2021

            By: */s/ Lee Jason Goldberg*
            Name: Lee Jason Goldberg
            Title: Director
               GLC Advisors & Co., LLC