## <u>Exhibit C</u>

**Redline comparison of the Disclosure Statement and
the Solicitation Disclosure Statement**

---

ACCEPTANCES OR REJECTIONS WITH RESPECT TO THE PLAN ARE BEING SOLICITED PURSUANT TO THIS ~~PROPOSED~~ DISCLOSURE STATEMENT ~~HAS NOT BEEN APPROVED BY~~, WHICH THE BANKRUPTCY COURT ~~AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF~~HAS APPROVED ON A PROVISIONAL BASIS, SUBJECT TO FINAL APPROVAL AT THE ~~BANKRUPTCY CODE.~~COMBINED HEARING. THE DEBTOR RESERVES THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT. THIS PROPOSED DISCLOSURE STATEMENT IS A SOLICITIATION VERISON AND INTENDED SOLELY FOR SOLICITATION OF VOTES ON THE PLAN

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| GREENSILL CAPITAL INC., | Case No.: 21-10561 (MEW) |
| Debtor.[1] | |

**DISCLOSURE STATEMENT FOR THE**

**CHAPTER 11 PLAN OF LIQUIDATION OF GREENSILL CAPITAL INC.**

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Kyle J. Ortiz
Bryan M. Kotliar
Amanda C. Glaubach

*Attorneys for Debtor*
*and Debtor in Possession*

Dated:  ~~August 27~~September 24, 2021
        New York, New York

---

[1]  The last four digits of the Debtor's federal tax identification number are 3971.  The Debtor's address is c/o Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, New York 10119.

## **INTRODUCTION AND DISCLAIMER**

On March 24, 201925, 2021 (the "Petition Date"), Greensill Capital Inc., the debtor and debtor in possession (the "Debtor") commenced the above-captioned case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The Debtor submits this Disclosure Statement to all Holders of Claims against the Debtor entitled to vote on the *Chapter 11 Plan of Liquidation of Greensill Capital Inc*, a copy of which is attached hereto as **Appendix A** (as may be amended, supplemented or otherwise modified from time to time, the "Plan").[2]

The purpose of this Disclosure Statement is to provide Holders of Claims entitled to vote on the Plan with adequate information to make an informed judgment as to whether to vote to accept or reject the Plan. The Debtor is providing you with the information in this Disclosure Statement because you may be a creditor entitled to vote on the Plan. This Disclosure Statement is to be used solely in connection with evaluation of the Plan and not for any other purposes.

> To be counted, your ballot must be duly completed, executed, and actually received by 5:00 p.m. (prevailing Eastern Time) on October 115, 2021 (the "Voting Deadline"). Ballots may be delivered either (a) electronically to the following email address: greensillballots@teamtogut.com or (b) by delivering a paper copy to the Debtor's counsel at the following address: Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, New York 10119, Attn: Kyle J. Ortiz, Esq., Bryan M. Kotliar, Esq., and John C. Gallego.

The Debtor believes that the Plan is in the best interests of creditors and other stakeholders and is a fair means of moving this Chapter 11 Case towards efficient resolution. All creditors entitled to vote on the Plan are urged to vote in favor of it.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN. THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION ABOUT THE PLAN AND IMPORTANT CONSIDERATIONS PERTINENT TO ACCEPTANCE OR REJECTION OF THE PLAN.

This Disclosure Statement and any accompanying letters are the only documents to be used in connection with the solicitation of votes on the Plan. No person is authorized by the Debtor to give any information or to make any representation other than as contained in this Disclosure Statement and the appendices attached hereto or incorporated by reference or referred to herein. If given or made,

---

[2]    All capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.

such information or representation may not be relied upon as having been authorized by the Debtor.

THE DEBTOR HAS PREPARED THIS DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF VOTES ON THE PLAN.  FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, INCLUDING SECTION II—"RISK FACTORS TO BE CONSIDERED," THE PLAN, AND THE APPENDICES AND EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY.  IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO THE SATISFACTION OR WAIVER OF MATERIAL CONDITIONS PRECEDENT.  *SEE* ARTICLE IX OF THE PLAN.  THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS PRECEDENT WILL BE SATISFIED.  THERE CAN BE NO ASSURANCE, THEREFORE, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR. PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN, INCLUDING MATTERS THAT ARE EXPECTED TO AFFECT (A) THE TIMING OF THE RECEIPT OF DISTRIBUTIONS BY HOLDERS OF CLAIMS AND INTERESTS IN CERTAIN CLASSES AND (B) THE AMOUNT OF DISTRIBUTIONS ULTIMATELY RECEIVED BY SUCH HOLDERS ARE DESCRIBED IN SECTION I—"SUMMARY OF THE PLAN OF LIQUIDATION." IF THE PLAN IS NOT CONFIRMED AND/OR EFFECTUATED, THEN THE DEBTOR WILL HAVE TO CONSIDER ALL OF ITS OPTIONS AS A DEBTOR IN BANKRUPTCY.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY CREDITOR OR INTEREST HOLDER DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.  FURTHER, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURES CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN OR A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE INFORMATION REGARDING THE DEBTOR'S HISTORY, BUSINESS, AND OPERATIONS IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN.  AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, LITIGATIONS, AND APPEALS INCLUDING FOR AVOIDANCE OF DEBT AND LITIGATION CLAIMS THAT MAY BE PENDING AS OF THE FILING OF THIS CHAPTER 11 CASE OR COMMENCED AFTER THE FILING OF THIS CHAPTER 11 CASE, THIS DISCLOSURE STATEMENT IS NOT TO BE CONSTRUED AS AN ADMISSION OR A STIPULATION BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN (A) CONSTITUTES AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, (B) SHALL BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR (C) SHALL BE DEEMED A REPRESENTATION OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS.

CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY THEIR NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE," OR THE NEGATIVE THEREOF, OTHER VARIATIONS THEREON, OR COMPARABLE TERMINOLOGY. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHER, THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THAT THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE PRESENTED IN SUCH FORWARD-LOOKING STATEMENTS. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE VALUE OF THE PROPERTY DISTRIBUTED TO HOLDERS OF ALLOWED CLAIMS OR EQUITY INTERESTS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. THEREFORE, ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE. THE DEBTOR IS UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIMS ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, EXCEPT AS REQUIRED BY APPLICABLE LAW. ALL HOLDERS OF IMPAIRED CLAIMS SHOULD CAREFULLY READ AND CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY, INCLUDING SECTION II— "RISK FACTORS TO BE CONSIDERED."

NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN

4

ACCEPTANCE OF THE PLAN WHICH ARE OTHER THAN AS SET FORTH HEREIN, OR INCONSISTENT WITH THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT, AND THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR INTEREST.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, A SUMMARY OF THE PLAN, CERTAIN EVENTS IN THIS CHAPTER 11 CASE, AND CERTAIN DOCUMENTS RELATED TO THE PLAN. ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY, TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS, BY REFERENCE TO SUCH DOCUMENTS OR STATUTORY PROVISIONS. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN AND CONTROL FOR ALL PURPOSES.

EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN, THIS DISCLOSURE STATEMENT DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF AND THAT MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. ACCORDINGLY, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCE, IMPLY THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTOR RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTOR'S BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS. THE DEBTOR'S MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTOR HAS USED ITS REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED (UNLESS OTHERWISE EXPRESSLY PROVIDED HEREIN) AND NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS AND ITS FUTURE RESULTS AND OPERATIONS. THE DEBTOR EXPRESSLY CAUTIONS READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

NEITHER THIS DISCLOSURE STATEMENT, THE PLAN, OR THE CONFIRMATION ORDER, WAIVE ANY RIGHTS OF THE DEBTOR WITH RESPECT TO THE HOLDERS OF CLAIMS OR INTERESTS PRIOR TO THE EFFECTIVE DATE. RATHER, THIS DISCLOSURE STATEMENT SHALL CONSTITUTE A STATEMENT

MADE IN SETTLEMENT NEGOTIATIONS RELATED TO POTENTIAL CONTESTED
MATTERS, POTENTIAL ADVERSARY PROCEEDINGS, AND OTHER PENDING OR
THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A
PARTICULAR CLAIM OR OBJECTION TO A PARTICULAR CLAIM IS OR IS NOT
IDENTIFIED IN THIS DISCLOSURE STATEMENT.  EXCEPT AS PROVIDED UNDER
THE PLAN, THE DEBTOR MAY OBJECT TO CLAIMS AFTER CONFIRMATION OR
THE EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS
DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO
CLAIMS ON THE TERMS SPECIFIED IN THE PLAN.

THE DEBTOR IS GENERALLY MAKING THE STATEMENTS AND
PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE
STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE
SPECIFICALLY NOTED.  ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY
UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTOR
HAS NO AFFIRMATIVE DUTY TO DO SO.  HOLDERS OF CLAIMS AND INTERESTS
REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE
TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED
SINCE THIS DISCLOSURE STATEMENT WAS SENT.  INFORMATION CONTAINED
HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE
DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN
AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTOR HAS NOT AUTHORIZED ANY ENTITY TO GIVE ANY
INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT
WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTOR HAS
NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR
THE VALUE OF ITS PROPERTY OTHER THAN AS SET FORTH IN THIS
DISCLOSURE STATEMENT.

HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT
THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTOR AND
THEIR OWN ANALYSES OF THE TERMS OF THE PLAN IN DECIDING WHETHER
TO VOTE TO ACCEPT OR REJECT THE PLAN.  IMPORTANTLY, PRIOR TO
DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A
CLAIM IN A VOTING CLASS SHOULD REVIEW THE PLAN IN ITS ENTIRETY AND
CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE
STATEMENT AND ANY APPENDICES HERETO.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND
THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST AND
INTERESTS IN THE DEBTOR (INCLUDING THOSE HOLDERS WHO DO NOT
SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT
THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE
BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS
CONTEMPLATED THEREBY.

Rules of Interpretation

For purposes of this Disclosure Statement, unless otherwise provided herein, (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) each pronoun stated in the masculine, feminine, or neuter gender includes the masculine, feminine, and neuter gender; (c) any reference in this Disclosure Statement to an existing document or schedule filed or to be filed means such document or schedule, as it may have been or may be amended, modified, or supplemented; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Disclosure Statement to Sections, Articles, and Appendices are references to Sections, Articles, and Appendices of or to this Disclosure Statement; (f) the words "herein," "hereunder," and "hereto" refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Disclosure Statement; (h) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (i) all references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (j) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, unless otherwise stated; (k) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to this Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; (l) unless otherwise specified, all references in this Disclosure Statement to monetary figures shall refer to currency of the United States of America; (m) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (n) to the extent this Disclosure Statement is inconsistent with the terms of the Plan, the Plan shall control; (o) to the extent this Disclosure Statement is inconsistent with the Confirmation Order, the Confirmation Order shall control; (p) to the extent any such term sheet is inconsistent with the applicable definitive document included in the Plan Supplement (as defined below), such definitive document shall control; and (q) any immaterial effectuating provision may be interpreted by the Debtor, as applicable, in a manner that is consistent with the overall purpose and intent of this Disclosure Statement and the Plan without further Bankruptcy Court order.

# I.    SUMMARY OF THE PLAN OF LIQUIDATION

## A.    Executive Summary of the Plan

As described at more length below, the Plan is centered around (i) the sale of the Debtor's 100% ownership interest in Finacity Corporation to White Oak Global Advisors, LLC, and (ii) the Global Settlement.  The Finacity Sale and the Global Settlement reflect the result of substantial negotiations among the Debtor, the Creditors' Committee, GCUK, the Katz Parties, and other interested parties.  Following the close of the Finacity Sale, the Debtor has liquidated its primary tangible asset.  The Debtor's remaining assets consist almost entirely of potential Causes of Action.  The Plan contemplates payment in full of Priority Wage Claims and the funding of the Liquidation Trust with the remaining Sale Proceeds and cash on hand to pursue over $65 million in Retained Causes of Action.  The Plan's primary objective is to maximize the value of recoveries to all Holders of Allowed Claims and distribute all property recovered by the Liquidation Trustee on account of the Retained Causes of Action in accordance with the Plan and the priorities established by the Bankruptcy Code and applicable orders of the Bankruptcy Court.

On the Effective Date of the Plan, if you are a former employee of the Debtor who was terminated prior to the Petition Date (a "Terminated Employee") and if your Priority Wage Claims are allowed, you will receive payment in cash of your Allowed Priority Wage Claim up to the statutory cap of $13,650.  All remaining Allowed claims of Terminated Employees and all other Allowed General Unsecured Claims will receive beneficial interests in the Liquidation Trust.  Proceeds from any subsequent actions by the Liquidation Trust will go first to pay senior claims of the Liquidation Trust, including the costs of administration, and then to pay beneficiaries of the Liquidation Trust, including, for Terminated Employees, any remaining amounts not already paid as a Priority Wage Claim.  If the Debtor settles or resolves any Retained Causes of Action prior to the Effective Date, 100% of such amounts will be distributed to Allowed General Unsecured Claims, including, for Terminated Employees, any remaining amounts not already paid as a Priority Wage Claim.

The Plan ensures that the Liquidation Trust will be funded with an initial minimum reserve of $250,000 (the "Liquidation Trust Minimum Cash Amount") to ensure the Liquidation Trustee can effectively pursue the Retained Causes of Action for the benefit of Beneficiaries of the Liquidation Trust.  Although the Debtor expects sufficient cash to be available following payments made on the Effective Date to fund the Liquidation Trust Minimum Cash Amount, to the extent there is any shortfall, Togut, Segal & Segal LLP and Arent Fox LLP (counsel to the Debtor and Creditors' Committee, respectively) will defer payment on a portion of their Allowed Professional Fee Claims on a pro rata basis sufficient to ensure the Liquidation Trust Minimum Cash Amount is fully funded.  In such a scenario, the Professional Fee Claims will be paid on a Pro Rata basis from the Liquidation Trust Net Recovery, i.e. the proceeds of the Retained Assets, including the Retained Causes of Action.

Among other Retained Causes of Action, and without limitation, the Liquidation Trust may pursue (i) fraudulent transfer claims related to over $50 million in payments made to certain parties related to the Debtor's 2019 acquisition of Finacity

Corporation (the "2019 Acquisition") that were preserved under the Finacity Sale, which will be further described in the Plan Supplement; (ii) claims arising from and relating to more than $15 million in additional payments made in the two years preceding the Petition Date, which will be further described in the Plan Supplement; and (iii) claims against or relating to the Debtor's $5 million Directors & Officers insurance policy with Axis Insurance Company with an effective date through November 24, 2021. The Debtor anticipates that the Liquidation Trust will make periodic distributions to Beneficiaries of the Liquidation Trust in the event the Liquidation Trustee is able to successfully pursue the Retained Causes of Action.

The cornerstone of the Plan is the Global Settlement between the Debtor, the Creditors' Committee, and the GCUK/GCMC Parties. Pursuant to the Global Settlement, and subject to the Effective Date, among other valuable consideration received by the Estate, GCUK has agreed to subordinate its $52,840,506.80 claim to General Unsecured Claims and receive only 20% of the Liquidation Trust Net Recovery until Allowed General Unsecured Claims are paid in full (with such claims to receive the other 80% of the Liquidation Trust Net Recovery) and then 100% of the Liquidation Trust Net Recovery thereafter. Any residual Liquidation Trust Net Recovery following full payment of the Subordinated GCUK Intercompany Loan Claim will be distributed to GCMC, the Debtor's sole shareholder. Also, as part of the Global Settlement, GCUK has agreed to contribute to the Debtor all of its legal, equitable, and beneficial rights relating to Causes of Action that it may hold arising from the 2019 Acquisition (the "GCUK Claim Contribution"). Such GCUK Claim Contribution supports the Liquidation Trust's pursuit of Retained Causes of Action for the benefit of the Debtor's creditors.

The Plan provides that all recoveries made from Retained Causes of Action, including any settlement thereof, effected prior to the Effective Date, will be allocated solely (i.e., 100%) to payment of Allowed General Unsecured Claims. Currently, the Plan does not provide for the Debtor's or any third party's release of the Debtor's current and former directors & officers (the "Ds&Os"). However, the Debtor's discussion with counsel for certain Ds&Os is ongoing as of the date hereof. To the extent that the Debtor is able to reach a settlement with some or all of such Ds&Os that provides cash consideration to the Estate after solicitation of the Plan and prior to the Effective Date, the Debtor intends to amend the Plan to provide for the Debtor's release of such Ds&Os in exchange for such consideration, which settlement and release will be subject to Bankruptcy Court approval at Confirmation.

The Debtor believes that implementation of the Plan is in the best interests of the Debtor and its creditors and is the best possible alternative to maximize value for Holders of Allowed Claims. There can be no guarantee under either an alternative chapter 11 plan or a chapter 7 liquidation that priority claims, including Priority Wage Claims, will be satisfied or that the Subordinated GCUK Intercompany Loan Claim will be subordinated. Other Claims senior to the General Unsecured Claims may arise and become Allowed Claims or other necessary costs of administering the Estate may arise. In either case, if the payment of such Claims is necessary to achieve confirmation of the Plan, the Creditors' Committee may or may not support the Plan.

Confirmation of the Plan will be considered by the Bankruptcy Court at the Combined Hearing (as defined below). Among other requirements, for the Plan to be confirmed, Class 5 consisting of General Unsecured Claims must accept the Plan. Class 5 has accepted the Plan if holders of General Unsecured Claims that hold at least two-thirds in amount and more than one-half in number of the allowed claims held by creditors of such class (excluding insiders) have accepted or rejected the Plan.

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Case will not be converted to a chapter 7 liquidation. While a liquidation under chapter 7 of the Bankruptcy Code would have the same goal, the Plan provides the best source of recovery for several reasons. First, liquidation under chapter 7 of the Bankruptcy Code would not provide for a timely distribution. Second, the settlements embodied in the Plan provide protections to assist in maximizing value to creditors. Third, distributions would likely be smaller because of the fees and expenses incurred in a liquidation under chapter 7 of the Bankruptcy Code. In that event, the Debtor would incur additional administrative costs including those of a chapter 7 trustee and its professionals. Accordingly, if the Plan is not confirmed, it is likely that creditors will realize lower recoveries on account of their Allowed Claims.

**ACCORDINGLY, THE DEBTOR BELIEVES THAT THE TREATMENT OF HOLDERS OF CLAIMS IN THE IMPAIRED CLASSES ELIGIBLE TO VOTE WILL RECEIVE A GREATER RECOVERY FOR SUCH HOLDERS THAN WOULD BE AVAILABLE IN A CHAPTER 7 LIQUIDATION. ACCORDINGLY, THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTEREST OF HOLDERS OF CLAIMS.**

Thus, for the reasons discussed in this Disclosure Statement, the Debtor urges you to return your Ballot accepting the Plan by the Voting Deadline.

**B.    Summary of the Debtor and this Chapter 11 Case**

(i)    Events Leading to this Chapter 11 Case

The Debtor is a direct, wholly-owned subsidiary of Greensill Capital Management (UK) Limited ("GCMC"), which is a direct wholly-owned subsidiary of Greensill Capital Pty Limited ("Greensill Australia" and, together with its affiliates and subsidiaries other than Finacity, the "Company"). As a Delaware corporation, the Debtor is governed by a board of directors (the "Board"). As of the Petition Date, the Board consisted of two members—Alexander (Lex) D. Greensill ("Mr. Greensill") and Jill Frizzley (the "Independent Director"). The Independent Director was appointed by resolution dated March 20, 2021 to review actions related to the Debtor's wind up of its operations and the Chapter 11 Case.

Historically, the Debtor served as the base for the Company's sales force in the United States and the Americas and employed more than 70 employees across 13 states as of January 1, 2021. The Debtor's employees sold the Company's products and services to clients and investors in the United States and the Americas and all revenue arising therefrom went directly to Greensill Capital (UK) Limited ("GCUK"). The Debtor paid ordinary course wages and benefits obligations to its employees pursuant

to the Services Agreement (as defined below).  In addition, prior to the Petition Date, in order to satisfy obligations in the ordinary course, such as payroll and lease obligations, the Debtor borrowed from GCUK pursuant to a Call Account Loan Agreement, dated January 1, 2019 (as may be amended, modified, and/or supplemented from time to time, the "GCUK Intercompany Loan").[3]

In early 2021, the Company experienced severe financial distress as a result of a series of factors.  These included a combination of (among other things): (a) the expiry of a key insurance policy of GCUK, which resulted in the loss of significant insurance cover for the Company's newly originated assets; (b) the withdrawal of substantial financial support from certain of the Company's key creditors; and (c) pressure on and from key investors of the Company to reduce the Company's exposure onto the GFG Alliance group.  These events together precipitated the cessation of GCUK operations and left the Company in a position of increased financial instability.

By order of the English High Court dated March 8, 2021, Christine Laverty, Trevor O'Sullivan and William Stagg each of Grant Thornton UK LLP were appointed as administrators of both GCUK and GCMC (the "UK Administrators").  Subsequently on March 8, 2021, the directors of Greensill Australia resolved to appoint Matthew Byrnes, Philip Wilson and Michael McCann, each of Grant Thornton Australia Limited, as administrators of Greensill Australia pursuant to s.436A Corporations Act.

(ii)    The Chapter 11 Case

On the Petition Date of March 25, 2021, the Debtor commenced this Chapter 11 Case by filing a petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.  The Debtor continues to operate its business and manage its properties as debtor and debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this Chapter 11 Case.

On April 7, 2021, the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors [Docket No. 42] (the "Creditors' Committee").  On April 9, 2021, the U.S. Trustee filed a notice amending the Creditors' Committee [Docket No. 47], and on April 19, 2021, the U.S. Trustee filed a second notice further amending the Creditors' Committee [Docket No. 60], and a third notice on May 5, 2021 [Docket No. 88].

Pursuant to an order entered by the Bankruptcy Court on March 31, 2021 [Docket No. 30], the Debtor rejected the non-residential real property lease with Sage

---

[3]    GCUK has asserted that the balance due under the GCUK Intercompany Loan was approximately $53 million as of the Petition Date, which amount is being settled pursuant to the Global Settlement. In addition, the Debtor was funded pursuant to capital contributions that totaled approximately $12.5 million.

Realty Corporation ("Sage") for its corporate headquarters, and on or about March 31, 2021, the Debtor vacated the premises and surrendered possession to Sage.

(iii)    The DIP Financing

On the Petition Date, the Debtor filed a motion [Docket No. 7] (the "DIP Motion") for approval of a senior secured postpetition financing facility from the Peter Greensill Family Trust (the "DIP Lender")[4] that provided for a total commitment of $2.0 million, of which $700,000 was available on an interim basis (the "DIP Financing").  The DIP Financing was secured by a first-priority lien and security interest on substantially all of the Debtor's unencumbered assets, including the Finacity Equity, but excluding claims and causes of action under chapter 5 of the Bankruptcy Code (the "DIP Liens").

On April 6, 2021, the Bankruptcy Court approved a modified DIP Financing on an interim basis [Docket No. 38] (the "Interim DIP Order").[5]  Following entry of the Interim DIP order, the Debtor drew $300,000 under the DIP Financing, of which $250,000 was funded directly into a professional fee escrow for the benefit of Estate Professionals (the "Professional Fee DIP Escrow Account").  During the Chapter 11 Case, the Debtor did not use any funds in the Professional Fee DIP Escrow Account due to concerns that the Debtor would not be able to repay such funds if a sale of the Finacity Equity was not consummated.  As of the date hereof, the balance in the Professional Fee DIP Escrow Account is approximately $250,000 and will be used to pay Estate Professionals pursuant to the Interim Compensation Order (as defined below).

At the closing of the Finacity Sale, the Debtor used a portion of the Sale Proceeds to repay the outstanding balance under the DIP Financing of approximately $325,000 (which amount includes principal, interest, and fees accrued thereon in accordance with the Interim DIP Order) and satisfied and retired the DIP Financing in full.

(iv)    The Finacity Sale

The Debtor filed the Chapter 11 Case in part to pursue the sale (the "Finacity Sale") of the Debtor's 100% ownership interest in Finacity Corporation (the "Finacity Equity") pursuant to an orderly marketing and auction process overseen by the Court (the "Sale Process").  On April 6, 2021, the Bankruptcy Court entered an order [Docket No. 37] (the "Bidding Procedures Order") that (a) approved the dates, deadlines, and procedures for conducting the Sale Process, including scheduling an auction if one or more Qualified Bids (as defined in the Bidding Procedures Order)

---

[4]    The DIP Lender is an affiliate of Mr. Greensill.

[5]    Following multiple adjournments of the hearing to consider approval of the DIP Financing on a final basis (the "Final DIP Hearing"), the Debtor adjourned the Final DIP Hearing indefinitely.  The Debtor does not intend to seek approval of the DIP Financing on a final basis.

were received in addition to the initial "stalking horse" bid (the "Stalking Horse Bid")
submitted by Adrian Katz, Dana Katz, and the Katz Family Trust (collectively, the
"Katz Parties"), and (b) established the Stalking Horse Bid as the initial bid for the
Finacity Equity.

On April 30, 2021, the Creditors' Committee filed its *Expedited Motion to
Extend Sale Process and Preliminary Objection to Debtor's Sale Order* [Docket No. 81] (the
"Preliminary Objection"). The Preliminary Objection alleged that Finacity management
had been willfully interfering with the Sale Process such that viable potential bidders
were purposefully turned away from, or improperly disincentivized from pursuing, the
purchase of the Finacity Equity.

The Debtor and the Creditors' Committee engaged in limited discovery
concerning the issues raised by the Preliminary Objection. Following numerous
extensions of the dates and deadlines for the Sale Process, on July 8, 2021, the Debtor
selected the bid submitted by White Oak Global Advisors, LLC (the "Purchaser") as the
highest and best bid for the Finacity Equity and designated the Purchaser as the
"Successful Bidder" (as defined in the Bidding Procedures Order). On July 22, 2021, the
Creditors' Committee filed its *Limited Objection and Reservation of Rights* [Docket No.
197], which reiterated the Creditors' Committee's concerns with the Sale Process as
raised in the Preliminary Objection and raised new concerns about the Debtor's
allowance of time for potential bidders to reach agreed resolutions with the Katz Parties
on terms of employment. More specifically, the Creditors' Committee alleged that the
Debtor had improvidently chosen to declare the auction as being completed without
allowing for the selection of a back-up bidder or the occurrence of a competitive
bidding process with a partially non-contingent bid. The Creditors' Committee and the
Debtor ultimately resolved the concerns raised by the Creditors' Committee through the
terms of the Global Settlement and the settlement terms contained in the Finacity Sale
Documents. Pursuant to the Finacity Sale Documents, the Debtor shall abide by the
Finacity Sale Reserve Obligations with respect to the Katz Parties, Finacity, and the
Purchaser, whereby the Debtor and/or the Liquidation Trustee, as applicable, shall
hold in reserve such proceeds of the 2019 Acquisition Causes of Action related to the
Finacity Sale Indemnity Obligations and hold such amounts in trust solely on account
of such Finacity Sale Indemnity Obligations until the Finacity Sale Superpriority Claim
and Katz Superpriority Claim (each as defined In the Finacity Sale Order) are asserted
and satisfied in full. The Finacity Sale Indemnity Obligations relate to certain of
Finacity's obligations pursuant to a guarantee provided by Finacity in connection with
the 2019 Acquisition of Finacity by the Debtor.

By order dated August 18, 2021 [Docket No. 236] (the "Sale Order"), the
Bankruptcy Court approved the Debtor's sale of the Finacity Equity to the Purchaser
pursuant to the Stock Sale and Purchase Agreement, a copy of which was attached as
Exhibit A to the Sale Order (the "Purchase Agreement") and the related Settlement
Agreement, a copy of which was attached as Exhibit B to the Sale Order (the
"Settlement Agreement"). The Finacity Sale closed on ~~August [__],~~ September 21, 2021.

The sale of the Finacity Equity to the Purchaser provided for
(a) $7 million in cash consideration for the Debtor, (b) a settlement and mutual release
of claims by and between the Debtor, the Katz Parties, Finacity, and certain other

Greensill entities, and (c) the retention of potential claims and causes of action belonging to the Estate against certain former shareholders of Finacity arising from the 2019 Acquisition and other Retained Causes of Action.

(v)    The Debtor's Employees

Following the UK Administrators' move towards liquidating the Company, on March 17, 2021, the Debtor terminated substantially all of its employees in the United States other than certain corporate office and field employees (the "Remaining Employees") necessary to (a) administer this Chapter 11 Case, pursue the Finacity Sale, and wind up the Estate, and (b) assist the UK Administrators with the process of maximizing recoveries for the creditors with respect to transactions with counterparties located in the United States for the benefit of the Company.

The Debtor's ordinary course payroll, wages, and benefits obligations to the Remaining Employees are paid for by GCUK pursuant to a services agreement (as amended and restated on June 11, 2021 and as may be further amended, restated, modified, and/or supplemented from time to time, the "Services Agreement").  The Services Agreement does not provide for GCUK's payment of vacation time accrued prior to March 17, 2021, or "notice" pay as may be set forth in each Remaining Employee's individuallieu of notice in cases where notice of termination does not meet the minimum requirements of an employment agreement with the Debtor.[6]  To mitigate potential uncovered costs under the Services Agreement and in recognition of the expected timeline for the conclusion of the bankruptcy process for the Debtor, on July 31, 2021, the Debtor notified nearly all of its Remaining Employees that October 31, 2021 would be their final day of employment.[7]

If the Plan is confirmed and the Effective Date occurs, the Debtor's employees that were terminated prior to the Petition Date will receive a check in the amount of their outstanding wages, benefits and other employee obligations up to an amount not to exceed the $13,650 priority cap in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code (set forth in the Plan as "Class 4 – Priority Wage Claims").[8]  Pursuant to the Global Settlement, GCUK agreed to make reasonable good faith efforts to transition employees employed by the Debtor as of the date of the Global Settlement to independent contractors of GCUK pursuant to agreements to be entered into directly between such employee(s) and GCUK.  In connection with their entry into such agreements, GCUK is required to request that each relevant remaining employee enter

---

[6]    "Notice" pay refers to certain provisions in such employment agreements that require some period of prior notice before the Debtor may terminate the employee's term of service.  Most employees of the Debtor have a three-month notice pay provision.

[7]    The Debtor did not send termination notices to one employee which does not have notice pay and the CRO (as defined below).

[8]    Debtor's employees that were employed after the Petition Date received payment of the priority portion of their March prepetition wage claims pursuant to an order of the Bankruptcy Court entered on March 27, 2021 [Docket No. 14].

into a separate release agreement pursuant to which such employee releases all claims against the Debtor.

(vi)    The Debtor's Professionals and CRO

The Debtor's restructuring is led by Matthew Tocks, the Debtor's Chief Restructuring Officer (the "CRO") who was appointed by the Board in April 2021. The CRO's compensation is set forth in an engagement agreement, which was approved by the Bankruptcy Court on June 29, 2021 [Docket No. 163] (the "CRO Order"). Pursuant to the CRO Order, the CRO will receive payment of the Sale Incentive Fee (as defined in the CRO Order) on the Effective Date.

Pursuant to orders of the Bankruptcy Court, the Debtor and the Creditors' Committee have retained certain professionals pursuant to sections 327 and 328 of the Bankruptcy Code (collectively, the "Estate Professionals").") [Docket Nos. 112, 121, 164, 165]. The Debtor's professionals are: (a) Togut, Segal & Segal LLP, as bankruptcy counsel; (b) Mayer Brown LLP, as special corporate counsel; and (c) GLC Advisors & Co., LLC and GLCA Securities, LLC, as financial advisor and investment banker. The Creditors' Committee's counsel is Arent Fox LLP.

Pursuant to the Court's *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals*, entered on May 21, 2021 [Docket No. 113] (the "Interim Compensation Order"), the Debtor is authorized to pay certain of the Estate Professionals' fees and expenses during the Chapter 11 Case. Following the closing of the Finacity Sale, the Debtor intends to continue paying Estate Professionals in accordance with the Interim Compensation Order from a combination of cash on hand and the balance in the Professional Fee DIP Escrow Account. Allowance of Estate Professionals' fees and expenses on a final basis will be considered by the Bankruptcy Court after the Effective Date (to the extent not determined prior to such date) pursuant to the procedures set forth in the Plan and in accordance with the Interim Compensation Order and such amounts will be paid, to the extent allowed, following the Effective Date from the Professional Fee Escrow Account established under the Plan and funded on the Effective Date.

(vii)    Summary of the Debtor's Assets and Liabilities

The Debtor has no positive net income and no secured debt. The Debtor's significant assets consist of (a) approximately $314260,000 in cash on hand (as of July 31, 2021),[9] (b) an approximately $1.4 million in face value intercompany receivable owed by Greensill Australia, (c) certain art pieces previously displayed at the Debtor's former corporate headquarters in New York, and (d) Estate Claims, including potential claims and causes of action, including causes of action arising under chapter 5 of the Bankruptcy Code.

On April 9, 2021, the Debtor filed its schedules of assets and liabilities and statement of financial affairs [Docket Nos. 43, 44] (the "Schedules and Statements") and

---

[9]    *See* JulyAugust *Monthly Operating Report*, filed on August 16September 17, 2021 [Docket No. 230269].

on June 8, 2021, the Debtor filed amendments to its Schedules and Statements [Docket Nos. 133, 134]. By order dated April 26, 2021 [Docket No. 73], the Bankruptcy Court established June 14, 2021 at 5:00 p.m. (prevailing Eastern Time) as the general bar date (the "General Bar Date") and September 21, 2021 at 5:00 p.m. (prevailing Eastern Time) as the governmental bar date (the "Governmental Bar Date").

As of the date hereof, approximately 6466 proofs of claim have been filed, of which 59 were filed by the General Bar Date. The Debtor estimates that Allowed General Unsecured Claims will total approximately $5 million to $7 million.

As part of the Global Settlement, subject to the occurrence of the Effective Date, GCUK has agreed that proof of claim number 49 asserting amounts owed under the GCUK Intercompany Loan in the amount of approximately $53 million will be (a) allowed in the amount of $52,840,506.80 and (b) subordinated to Allowed General Unsecured Claims (the "GCUK Subordinated Intercompany Loan Claim") such that the GCUK Subordinated Intercompany Loan Claim will be entitled to receive 20% of the Liquidation Trust Net Recovery until Allowed General Unsecured Claims are paid in full (with such unsubordinated claims to receive the other 80% of the Liquidation Trust Net Recovery) and then 100% of the Liquidation Trust Net Recovery thereafter until the GCUK Subordinated Intercompany Loan Claim is paid in full. GCUK's proof of claim number 48, which was amended and superseded by proof of claim number 49, will be withdrawn with prejudice. GCUK's proof of claim number 50, which asserts amounts against the Debtor based on a letter of credit held by Citibank and debited against GCUK in connection with the Debtor's lease of its former headquarters, is Allowed in the amount of $526,000.00 as a General Unsecured Claim. In turn, GCUK's proof of claim number 59, which asserts amounts against the Debtor that GCUK may be required to pay to the Debtor's landlord, Sage, is withdrawn with prejudice. As part of the Global Settlement, the Debtor will also transfer all of its right, title, and interest in certain of its intellectual property to GCUK pursuant to the GCUK Intellectual Property Assignment Agreement, which will be described in more detail in the Plan Supplement.

(viii)    Next Steps

By order of the Bankruptcy Court dated August 17, 2021 [Docket No. 234], the Debtor has the exclusive right to propose a chapter 11 plan and solicit votes with respect thereto until October 21, 2021 and December 20, 2021, respectively. In accordance with the framework set forth in the Addendum to the Sale Order, a copy of which is attached as Exhibit C to the Sale Order (referred to in the Plan and herein as the "Global Settlement") and following extensive good faith and arm's-length negotiations with the Creditors' Committee, and the GCUK/GCMC Parties the Debtor has proposed this Plan, which it believes is in the best interests of the estate, creditors, and other stakeholders.

If the Plan is not confirmed, there is a risk that the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code and/or that distributions to creditors will be less than that proposed under the Plan. In addition, distributions will likely be delayed and there is no guarantee that any distributions will be made at all.

### C.    Summary of the Plan

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN PROVISIONS OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (A COPY OF WHICH IS ATTACHED HERETO AS **APPENDIX A**). IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL.

(i)    Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Finacity Sale Order Superpriority Claims, Administrative Claims, U.S. Trustee Fees, Professional Fee Claims, and Priority Tax Claims are not classified and not entitled to vote on the Plan.

(b)    Finacity Sale Order Superpriority Claims

As of the Effective Date, the Finacity Sale Order Superpriority Claims are contingent obligations of the Debtor and the Liquidation Trust, as applicable, and shall be satisfied in accordance with paragraph 4 of the Sale Order. For the avoidance of doubt, the Finacity Sale Order Superpriority Claims shall not be cancelled and discharged absent satisfaction of the Finacity Sale Indemnity Obligations and the Finacity Sale Reserve Obligations, which the Liquidation Trust may satisfy at any time in accordance with the Finacity Sale Documents, and upon such satisfaction, any Finacity Sale Reserve Obligations or Finacity Sale Order Superpriority Claims with respect to such satisfied Finacity Sale Indemnity Obligation shall be immediately satisfied, terminated, discharged, and expunged without further order of the Court.

(c)    Administrative Claims

On or as soon as reasonably practicable on the earlier of (a) the Effective Date, or (b) the first Business Day after the date that is thirty (30) calendar days after the date on which an Allowed Administrative Claim becomes Allowed or payable under any agreement relatingrelated thereto, or (c) unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtor or the Liquidation Trustee, as applicable, each Holder of suchan Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, and release, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim.

All requests for payment of Administrative Claims, other than: (i) Professional Fee Claims; and (ii) Administrative Claims that have been Allowed on or before the Effective Date **must be in writing and filed with the Bankruptcy Court and served on the Debtor, the Liquidation Trustee, the Creditors' Committee and the U.S. Trustee so as to be received by 5:00 p.m. prevailing Eastern Time on the date that is thirty (30) days after the service of notice of occurrence of the Effective Date (the "Administrative Claims Bar Date").** Such request for payment must include at a minimum: (i) the name of the holder of the asserted Administrative Claim; (ii) the amount of the Administrative Claim; (iii) the basis of the Administrative Claim; and (iv) supporting documentation for the Administrative Claim. **FAILURE TO FILE AND**

SERVE SUCH PROOF OF ADMINISTRATIVE CLAIM TIMELY AND PROPERLY
SHALL RESULT IN THE ADMINISTRATIVE CLAIM BEING FOREVER BARRED
AND RELEASED AND THE HOLDER THEREOF SHALL BE ENJOINED FROM
COMMENCING OR CONTINUING ANY ACTION, EMPLOYMENT OR PROCESS
OR ACT TO COLLECT, OFFSET, OR RECOVER SUCH ADMINISTRATIVE
CLAIM.

(d)    U.S. Trustee Fees

On the Effective Date, the Debtor shall pay (a) all accrued and outstanding
U.S. Trustee Fees, if any, and (b) fund the Professional Fee Escrow with the Debtor's
good faith estimate of the U.S. Trustee Fees anticipated to be incurred through and
including the Effective Date.  Following the Effective Date, the Debtor shall remain
obligated to pay quarterly fees to the U.S. Trustee, if any, in accordance with Section
11.3.

(e)    Professional Fee Claims

To the extent not filed prior to the Effective Date, Estate Professionals
shall submit final fee applications seeking approval of all Professional Fee Claims by
the Bankruptcy Court no later than thirty (30) days after the Effective Date.  These
applications remain subject to Bankruptcy Court approval under the standards
established by the Bankruptcy Code, including the requirements of sections 327, 328,
330, 331, 363, 503(b), and 1103 of the Bankruptcy Code, as applicable.

On the Effective Date, the Debtor will establish and fund the Professional
Fee Escrow with cash equal to the Professional Fee Escrow Amount minus amounts
required to fund the Liquidation Trust Minimum Cash Amount of $250,000.

(f)    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim
agrees to less favorable treatment, in full and final satisfaction, compromise, settlement,
and release of, and in exchange for, each Allowed Priority Tax Claim, each Holder of
such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth
in section 1129(a)(9)(C) of the Bankruptcy Code.

(ii)    Classification and Treatment of Claims and Interests

The only classes entitled to vote on the Plan are General Unsecured
Claims (Class 5) and the Subordinated GCUK Intercompany Loan Claim (Class 6).  All
other classes are unimpaired under the Plan, which means such classes are deemed to
have accepted the Plan.  The proposed distributions to each class of Claims and
Interests are set forth in Section 3.3 of the Plan.

The following table summarizes the classification and treatment of all
Claims against and Interests in the Debtor.

| Class and Estimated Amount | Summary of Treatment | Estimated Recovery | Entitled to Vote |
|---|---|---|---|
| **Secured Tax Claims (Class 1)** <br><br> **($0)** | Except to the extent that a Holder of an Allowed Secured Tax Claims agrees to different, less favorable treatment, each Holder of an Allowed Secured Tax Claim will receive, in full and final satisfaction of such Claim, Cash in an amount equal to the Allowed amount of such Claim on the earlier of (x) the Effective Date and (y) as soon as practicable after its Allowed Secured Tax Claim becomes Allowed Secured Tax Claim becomes Allowed. | **100.0%** <br><br> **Unimpaired** | **No – Deemed to Accept** |
| **Other Secured Claims (Class 2)** <br><br> **($0)** | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to different, less favorable treatment, each Holder of an Allowed Other Secured Claim will receive, in full and final satisfaction of such Claim, Cash in an amount equal to the Allowed amount of such Claim on the earlier of (x) the Effective Date and (y) as soon as practicable after its Other Secured Claim becomes Allowed. | **100%** <br><br> **Unimpaired** | **No – Deemed to Accept** |
| **Other Priority Claims (Class 3)** <br><br> **($0)** | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a different, less favorable treatment, each Holder of an Allowed Other Priority Claim will receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Holder's Allowed Other Priority Claim on the earlier of (x) the Effective Date and (y) as soon as practicable after its Other Priority Claim becomes Allowed. | **100%** <br><br> **Unimpaired** | **No – Deemed to Accept** |
| **Priority Wage Claims (Class 4)** <br><br> **($830,000)** | Except to the extent that a Holder of an Allowed Priority Wage Claim agrees to different, less favorable treatment, each Holder of an Allowed Priority Wage Claim will receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Holder's Allowed Priority Wage Claim on the Effective Date. | **100%** <br><br> **Unimpaired** | **No – Deemed to Accept** |

| Class and Estimated Amount | Summary of Treatment | Estimated Recovery | Entitled to Vote |
|---|---|---|---|
| **General Unsecured Claims (Class 5)** ($5 million – $7 million) | Subject to the terms herein and Section 5.6 of the Plan, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full satisfaction, settlement and release of and in exchange for all such Allowed Claims, Holders of Allowed General Unsecured Claims shall receive such Holder's Pro Rata share of the Liquidation Trust GUC Interests and as a beneficiary of the Liquidation Trust shall receive, on a Distribution Date, their Pro Rata share of net Cash derived from the Liquidation Trust Net Recovery available for Distribution on each such Distribution Date as provided under the Plan and the Liquidation Trust Agreement. | 0% -- 100% **Impaired** | **Yes** |
| **Subordinated GCUK Intercompany Loan Claim (Class 6** ($52,840,506.80) | Pursuant to the Global Settlement, as the sole Holder of the Subordinated GCUK Intercompany Loan Claim, GCUK shall receive, in full and final satisfaction of such Claim, the Liquidation Trust GCUK Interests and as a beneficiary of the Liquidation Trust shall receive, on a Distribution Date, its share of net Cash derived from the Liquidation Trust Net Recovery available for Distribution on each such Distribution Date as provided under the Plan and the Liquidation Trust Agreement. | 0% -- 100% **Impaired** | **Yes** |
| **GCUS Interests (Class 6)** **N/A** | Pursuant to the Global Settlement, as the sole Holder of the Interests, (a) GCMC shall retain its Interests and (b) receive the Liquidation Trust GCMC Interests. | N/A Unimpaired | **No – Deemed to Accept** |

(iii)    Other Miscellaneous Plan Provisions

The Plan contains various provisions relating to

- the winddown and governance of the Debtor after the Effective Date (*see* Article V);

- the creation, funding, and operation of the Liquidation Trust and related matters (*see* Article V);

- procedures for making distributions from the Debtor and/or the Liquidation Trust, as applicable, and the rights and powers of any Disbursing Agents (*see* Article VI);

- procedures for the reconciliation of Claims and Proofs of Claim and related matters, such as objections and estimation for any Disputed Claims (*see* Article VII);

- the treatment of Executory Contracts and Unexpired Leases (*see* Article VIII); and

- the effect of Confirmation (including the Releases and Third Party Releases (as explained in greater detail below)), the Bankruptcy Court's retention of jurisdiction with respect to certain matters, and miscellaneous other implementation and effectuating provisions (*see* Articles X, XI & XII).

(iv)    The Global Settlement

The provisions of the Plan incorporate the Global Settlement among the Creditors' Committee, and the GCUK/GCMC Parties.  At the Confirmation Hearing, the Debtor will request that the Bankruptcy Court approve the Plan and the integrated Global Settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

When evaluating plan settlements pursuant to section 1123 of the Bankruptcy Code, courts in the Second Circuit typically consider the standards used to evaluate settlements under Bankruptcy Rule 9019—i.e., the settlement must be "fair and equitable" and in the best interests of the estate.  *See In re Best Prods. Co., Inc.* 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) ("[W]hether the claim is compromised as part of the plan or pursuant to a separate motion, the standards for approval of the compromise are the same.  The settlement must be 'fair and equitable,' . . . and be in the best interest of the estate.") (internal citation omitted).  In determining whether a settlement is fair and equitable and in the best interest of the estate, courts in the Second Circuit apply seven interrelated factors:

(1) the balance between the litigation's possibility of success and the settlement's future benefits; the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty of collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining.

*In re Iridium Operating LLC,* 478 F.3d 452, 462 (2d Cir. 2007) (internal quotation marks committed).  The benchmark is whether or not, based on the Court's canvassing of the issues (as opposed to a "mini-trial" of the merits underlying each dispute), the terms of the propsed compromise "fall[] below the lowest point in the range of reasonableness." *In re NII Holdings, Inc.* 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015).

The court looks to whether the settlement as a whole is reasonable (*see NII Holdings,* 536 B.R. at 105) and in light of the general public policy favoring settlements (*In re Hibbard Brown & Co.,* 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998)).  As a general matter, settlements and compromises are favored in bankruptcy "as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate."  *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012) (internal citations and quotations omitted).

Upon the occurrence of the Effective Date, in exchange for (a) GCUK's voluntary and consensual subordination of its claims arising under the GCUK Intercompany Loan which have been asserted as General Unsecured Claims in the amount of approximately $53 million, (b) the GCUK Claim Contribution, (c) GCUK's, GCMC's and the UK Administrators' continued support for the Debtor prior to and during the Chapter 11 Case (including pursuant to the GCUK Services Agreement) and the Plan, and (d) other valuable consideration provided under the Global Settlement, GCUK, GCMC, and the UK Administrators shall receive, as applicable, (1) allowance of the GCUK L/C Claim as Class 5 Allowed General Unsecured Claim in the amount set forth in herein, (2) the Liquidation Trust GCUK Interests and Liquidation Trust GCMC Interests on account of the Subordinated GCUK Intercompany Loan Claim and Interests, respectively, (3) the Debtor's transfer and assignment of the GCUK Intellectual Property pursuant to the GCUK Intellectual Property Assignment Agreement, and (4) the Releases and Third Party Releases as provided in Sections 10.2 of the Plan.

Absent the Global Settlement, the Subordinated GCUK Intercompany Loan Claim may substantially reduce the recoveries to Holders of Allowed General Unsecured Claims, and the Debtor and the Creditors' Committee would likely seek nonconsensual recharacterization or subordination of such claims arising under the GCUK Intercompany Loan, litigation in relation to which will be costly and has an uncertain outcome.

(v)    Releases of Causes of Action

(a)    Releases by the Debtor

The Plan provides for certain releases by the Debtor.  The Debtor, its Estate, the Liquidation Trustee, and any other person or Entity seeking to exercise the rights of the Estate shall release all liabilities against the GCUK / GCMC Parties.

The Plan currently does not provide for the Debtor's release of Ds&Os.  To the extent that the Debtor is able to reach a settlement with some or all of its Ds&Os that provides cash consideration to the Estate, the Debtor intends to amend the Plan to provide for the Debtor's release of such Ds&Os in exchange for such consideration, which settlement and release will be subject to Bankruptcy Court approval at Confirmation.

With respect to these Debtor releases, Section 10.2(a) of the Plan provides as follows:

> **Without limiting any other applicable provisions of, or releases contained in, the Plan or the Finacity Sale Order and Finacity Sale Documents, pursuant to section 1123(b) of the Bankruptcy Code and subject to the satisfaction of the GCUK / GCMC Release Requirements, as of the Effective Date, the Debtor, its Estate, the Liquidation Trustee, and any other Person or Entity seeking to exercise the rights of the Estate, to the extent permitted by applicable law, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, and waived any and all Causes of Action, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise that such Person or Entity seeking to exercise the rights of the Estate has, had, or may have against any GCUK / GCMC Parties based on or relating to the Debtor, the Estate, the Chapter 11 Case, any prepetition financing arrangements, the Debtor's financial statements, the debtor-in-possession financing, the sale or transfer of any and all assets of the Debtor (including the Finacity Sale), the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation, or consummation of the Plan, the Plan Supplement and Exhibits, the Disclosure Statement, any amendments thereof or supplements thereto, or any other transactions in connection with this Chapter 11 Case or any contract, instrument, release, or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any other obligation arising under the Plan or the obligations assumed hereunder (including any claim based on theories of alleged negligence, misrepresentation, non-disclosure, or breach of fiduciary duty). Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release:  (i) any post-Effective Date obligations of any Person or Entity under the Plan, the Finacity Sale Order, or the Finacity Sale Documents, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (ii) the liability of any GCUK / GCMC Party that would otherwise result from any act or omission of such GCUK / GCMC Party to the extent that such act or omission is determined by a Final Order to have constituted gross negligence or willful misconduct (including fraud).**

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the foregoing release by the Debtor pursuant to Bankruptcy Rule 9019, and further, shall constitute the Bankruptcy Court's finding that the release is: (1) essential to the Confirmation of the Plan; (2) an exercise of the Debtor's business judgment; (3) in exchange for the good and valuable consideration and substantial contributions provided by the GCUK / GCMC Parties; (4) a good-faith settlement and compromise of the Claims and Causes of Action released by such release; (5) in the best interests of the Debtor and all Holders of Claims and Interests; (6) fair, equitable, and reasonable; (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the foregoing releases by the Debtor.

(b)    Releases by the Releasing Parties (Third Party Release)

The Plan also provides for releases by third parties. The Releasing Parties include, collectively, the following Entities solely to the extent acting in their respective capacities as such: (a) any Holder of a Claim entitled to vote on the Plan that opts in to the Third Party Release on its Ballot; and (b) any Holder of a Claim entitled to vote on the Plan that does not opt in to the Third Party Release on its Ballot as may be approved by the Bankruptcy Court to the maximum extent permitted by law; *provided, however,* none of GCMC, GCUK, the UK Administrators, Greensill Australia, or the Australia Liquidators is or shall be deemed a "Releasing Party" hereunder.

When evaluating third party releases under chapter 11 plans in the Second Circuit, courts consider the following factors: (a) whether the released claims are "channeled" to a settlement fund rather than extinguished; (b) the debtor's estate will receive "substantial consideration"; (c) the released claims would indirectly impact the reorganization by way of indemnity or contribution; (d) the plan provides for full payment of the enjoined claims; and (e) the third party consents. *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005) (citations omitted).

Holders of General Unsecured Claims may affirmatively consent to the Third Party Release by indicating their desire to do so by following the procedures set forth on their Ballot(s) and selecting the "opt in" box. In addition, as part of the Global Settlement, the Debtor has agreed to request—and the Creditors' Committee has agreed not to object to—that the Bankruptcy Court approve the Third Party Release on a nonconsensual basis for all Holders of General Unsecured Claims that do not affirmatively opt in to the release. Based on the standards identified above, the Debtor believes that GCUK/GCMC Parties have provided substantial consideration to the Debtor and its Estate as explained in above. If approved by the Bankruptcy Court, such

Third Party Release will be binding on Holders of General Unsecured Claims even if
they do not affirmatively opt in to such release.[10]

With respect to these Third Party Releases, Section 10.2(b) of the Plan
provides as follows:

> **To the greatest extent permissible and without limiting
> any other applicable provisions of, or releases contained
> in, the Plan, and subject to the satisfaction of the GCUK /
> GCMC Release Requirements, as of the Effective Date, in
> consideration for the obligations of the Debtor under the
> Plan, and the consideration and other waivers, contracts,
> instruments, releases, agreements, or documents to be
> entered into or delivered in connection with the Plan, each
> Releasing Party shall be deemed to have conclusively,
> absolutely, unconditionally, irrevocably, and forever
> released, and waived any and all Causes of Action,
> whether known or unknown, foreseen or unforeseen,
> existing or hereinafter arising, in law, equity, or otherwise,
> that such Releasing Party has, had, or may have against
> any GCUK / GCMC Party based on or relating to the
> Debtor, the Estate, the Chapter 11 Case, any prepetition
> financing arrangements, the Debtor's financial statements,
> the debtor in possession financing, the sale or transfer of
> any and all assets of the Debtor (including the Finacity
> Sale), the negotiation, consideration, formulation,
> preparation, dissemination, implementation,
> Confirmation, or consummation of the Plan, the Plan
> Supplement and Exhibits, the Disclosure Statement, any
> amendments thereof, or supplements thereto, or any other
> transaction in connection with this Chapter 11 Case or any
> contract, instrument, release, or other agreement or
> document created or entered into or any other act taken or
> omitted to be taken in connection therewith or in
> connection with any other obligations arising under the
> Plan and the obligations assumed hereunder (including
> any claim based on theories of alleged negligence,
> misrepresentation, non-disclosure, or breach of fiduciary
> duty).  Notwithstanding anything to the contrary in the
> foregoing, the releases set forth above do not release:  (i)
> any post-Effective Date obligations of any Person or Entity
> under the Plan, the Finacity Sale Order, or the Finacity Sale
> Documents, or any document, instrument, or agreement
> (including those set forth in the Plan Supplement)
> executed to implement the Plan; or (ii) the liability of any**

---

[10] Approval of the Third Party Release on a nonconsensual basis is not a condition precedent to the
Effective Date of the Plan.

**GCUK / GCMC Party that would otherwise result from any act or omission of such GCUK / GCMC Party to the extent that such act or omission is determined by a Final Order to have constituted gross negligence or willful misconduct (including fraud).**

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third Party Release is: (1) essential to the Confirmation of the Plan; (2) given in exchange for the good and valuable consideration and substantial contributions provided by the GCUK / GCMC Parties; (3) a good-faith settlement and compromise of the Claims released by the Third-Party Release; (4) in the best interests of the Debtor and its Estates; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; (7) consensual as to the Holders of Claims that opt in to the Third Party Release on their Ballots; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third Party Release.

Note: the above provisions describe the releases the Debtor will seek at confirmation. This language has not been considered or approved by the Bankruptcy Court and remains subject to consideration at the Combined Hearing (as defined below).

(c)    Exculpation

The Plan also provides for customary exculpation provisions. The Exculpated Parties include the following parties in their respective capacities as such: (a) the Debtor; (b) the Creditors' Committee and its members (each in their capacities as such), and (c) with respect to each of the foregoing persons in clauses (a) through (c), each of their Related Parties.

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, EFFECTIVE AS OF THE EFFECTIVE DATE, TO THE EXTENT PERMITTED UNDER SECTION 1125(e) OF THE BANKRUPTCY CODE AND PROFESSIONAL RULES OF CONDUCT, THE EXCULPATED PARTIES SHALL NOT HAVE OR INCUR ANY LIABILITY FOR ANY ACT OR OMISSION TAKEN OR NOT TAKEN BETWEEN THE PETITION DATE AND THE EFFECTIVE DATE IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF THE CHAPTER 11 CASE, THE NEGOTIATION AND FILING OF THE DISCLOSURE STATEMENT, THE PLAN OR ANY DOCUMENT IMPLEMENTING THE PLAN, THE LIQUIDATION TRUST AGREEMENT, THE PLAN SUPPLEMENT, THE FILING OF THE CHAPTER 11 CASE, THE SETTLEMENT OF CLAIMS OR RENEGOTIATION OF EXECUTORY CONTRACTS AND UNEXPIRED**

**LEASES, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN, OR THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, EXCEPT FOR ACTS OR OMISSIONS THAT ARE DETERMINED BY A FINAL ORDER TO BE THE RESULT OF GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (INCLUDING FRAUD) OR ANY OBLIGATIONS THAT THEY HAVE UNDER OR IN CONNECTION WITH THE PLAN OR THE TRANSACTIONS CONTEMPLATED IN THE PLAN, AND IN ALL RESPECTS SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND OBLIGATIONS UNDER THE PLAN.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any of the Exculpated Parties' post-Effective Date obligations under the Plan, the Finacity Sale Order, or the Finacity Sale Documents, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

(d)    No Discharge

Because the Debtor is liquidating, it is not entitled to a discharge of obligations pursuant to section 1141 of the Bankruptcy Code with regard to any Holders of Claims or Interests other than the Releasing Parties.

**D.    Solicitation Procedures and Solicitation Package**

The Debtor is causing "Solicitation Packages" to be distributed to holders of claims entitled to vote on the Plan.  Such Solicitation Packages include:

(i)    a cover sheet from the Debtor describing the contents of such Solicitation Package;

(ii)    a letter from the Creditors' Committee requesting that you vote in favor of and support the Plan;

(iii)    a notice of the combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan (the "Combined Hearing Notice");

(iv)    this Disclosure Statement with the Plan annexed thereto;

(v)    the second amended order of the Bankruptcy Court, entered on September [3],21, 2021 [Docket No. [___]]271] (the "Solicitation Procedures Order"), excluding the exhibits attached thereto, approving the procedures for soliciting votes with respect to the Plan and dates and deadlines related to the Bankruptcy Court's approval of the Plan (referred to as "Confirmation");

(vi)    a personalized ballot to cast a vote on the Plan (each, a "Ballot"); and

(vii)     any supplemental solicitation materials the Debtor may file with the Bankruptcy Court.[11]

Holders of claims and interests not entitled to vote on the Plan will receive only the Combined Hearing Notice, a notice of such holder's non-voting status (the "Notice of Non-Voting Status"), and any supplemental materials the Debtor may file with the Bankruptcy Court.[12]

Copies of this Disclosure Statement, the Plan, all appendices and exhibits attached thereto and hereto, and all other pleadings filed and orders entered in the Chapter 11 Case can be obtained by (a) accessing the Bankruptcy Court's website by visiting www.nysb.uscourts.gov for a fee (note that a PACER password is required), (b) visiting the Chapter 11 Case website at https://cases.stretto.com/greensill (the "Case Website"), or (c) by contacting the Office of the Clerk of the Bankruptcy Court.

**E.     Voting Procedures and Voting Deadline**

The rules, requirements, and procedures regarding the submission of your Ballot is set forth in the Solicitation Procedures Order and the Ballot and is summarized below for your convenience.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of (i.e., to accept) or against the Plan (i.e., to reject) on the Ballot. **To be counted, your Ballot must be duly completed, executed, and actually received by 5:00 p.m. (prevailing Eastern Time) on October 115, 2021 (the "Voting Deadline"). Ballots may either be delivered (a) electronically to the following email address: greensillballots@teamtogut.com or (b) by paper copy to the Debtor's counsel at the following address: Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, New York 10119, Attn: Kyle J. Ortiz, Esq., Bryan M. Kotliar, Esq., and John C. Gallego.**

BALLOTS MUST BE DELIVERED BY MAIL, COURIER, OR DELIVERY SERVICES OR ELECTRONICALLY BY EMAIL.  FACSIMILE BALLOTS WILL NOT BE ACCEPTED.  ANY COMPLETED BALLOTS THAT DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT CONTAIN BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED.

Ballots not timely submitted by the Voting Deadline (or such other deadline as ordered by the Bankruptcy Court or agreed to by the Debtor, in its sole discretion) may be considered invalid.

If you have any questions about how to vote, the Solicitation Package you receive, or the amount of your claim, or if you wish to receive additional copies of the

---

[11]  Instructions on how to vote is included with the Solicitation Package and is described below.

[12]  Holders of claims and interests in the non-voting classes may request a paper copy of this Disclosure Statement by contacting the Voting Agent (as defined below).

Plan, this Disclosure Statement, or any exhibits or appendices thereto or hereto, please contact:

| | |
|---|---|
| Email: | greensillballots@teamtogut.com |
| Phone: | (212) 594-5000 (US TOLL FREE) |

## F.    Opting In to Third Party Releases

The Plan contains a series of releases that are part of the overall settlement of various potential claims and causes of action and issues impacting the Debtor, its Estate and this Chapter 11 Case.  In that respect, parties should be aware that, if the Plan is confirmed and the Effective Date occurs certain parties will be granting releases and certain parties will be giving releases as set forth in Section 10.2 of the Plan and as further described in Part C of this Disclosure Statement.

In the Ballot provided to holders of General Unsecured Claims entitled to vote on the Plan, such holders may affirmatively "opt in" to providing a Third Party Release to the GCUK/GCMC Parties and all of their potential rights and claims against the GCUK/GCMC Parties as set forth in the Third Party Releases.  If you wish to indicate your consent and approval to such releases and affirmatively provide a Third Party Release to the GCUK/GCMC Parties, please do so by checking the "opt in" box on your Ballot and returning such Ballot in accordance with the Voting Procedures.

As indicated above, even if a holder of a General Unsecured Claim does not affirmatively opt in to the Third Party Release, the Debtor will request at the Confirmation Hearing that the Bankruptcy Court approve such Third Party Release on a nonconsensual basis.

## G.    Combined Hearing and Deadline for Objections to Confirmation

The Debtor intends to seek the Bankruptcy Court's Confirmation of the Plan.  The Bankruptcy Court has scheduled a combined hearing to consider the adequacy of this Disclosure Statement and Confirmation of the Plan for **102:00 ap.m. (prevailing Eastern Time) on October 1426, 2021 (the "Combined Hearing")**.[13]  The Debtor may adjourn the Combined Hearing by filing a notice on the docket of the Chapter 11 Case or by announcing an adjournment on the record of a hearing or status conference held with the Bankruptcy Court.

Any objections to Confirmation of the Plan must be filed with the Bankruptcy Court and served on the parties indicated in the box immediately below by no later than

---

[13]  In light of the COVID-19 pandemic, the Combined Hearing will only be conducted telephonically via Court-Solutions LLC at www.court-solutions.com.  Instructions to register for Court Solutions LLC are attached to General Order M-453.

**4:00 p.m. (prevailing Eastern Time) on October 1~~1~~19, 2021 (the "Objection Deadline").**
Unless an objection to Confirmation is timely filed and served, such objection may not
be considered by the Bankruptcy Court at the Combined Hearing.  Such objection must
be filed with the Bankruptcy Court and served so that it is **actually received** by the
Bankruptcy Court and the following persons by no later than the Objection Deadline:

| | |
|---|---|
| Counsel for the Debtor | Togut, Segal & Segal LLP<br>One Penn Plaza, Suite 3335<br>New York, New York 10119<br><br>Attn:  Kyle J. Ortiz, Esq.<br>(kortiz@teamtogut.com) and Bryan M.<br>Kotliar Esq. (bkotliar@teamtogut.com) |
| Counsel for the Creditors' Committee | Arent Fox LLP<br>1301 Avenue of the Americas, Floor 42<br>New York, NY 10019<br><br>Attn:  George P. Angelich, Esq.<br>(george.angelich@arentfox.com)<br><br>- and-<br><br>Arent Fox LLP<br>The Prudential Tower<br>800 Boylston Street, Floor 32<br>Boston, MA 02199<br><br>Attn:  Justin A. Kesselman, Esq.<br>(justin.kesselman@arentfox.com) |
| Counsel for the Administrators of GCUK and GCMC | Allen & Overy LLP<br>1221 Avenue of the Americas<br>New York, NY 10020<br><br>Attn:  Daniel Guyder, Esq.<br>(Daniel.guyder@allenovery.com) and<br>Joseph Badtke-Berkow (joseph.badtke-berkow@allenovery.com) |
| The U.S. Trustee | Susan Arbeit<br>Trial Attorney<br>Office of the United States Trustee<br>201 Varick Street, Suite 1006<br>New York, NY 10014 |

## II.      RISK FACTORS TO BE CONSIDERED

Parties in interest should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement and the Plan and their respective exhibits and appendices before deciding whether to vote to accept or to reject the Plan.  This information, however, does not describe the only risks involved in connection with the Plan and its implementation.

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof unless otherwise specified herein, and the delivery of this Disclosure Statement after that date, does not imply that there has been no change in the information set forth herein since that date.  The Debtor ~~have~~has no duty to update this Disclosure Statement except as may be required by applicable law.

The Debtor's advisors have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement.  Although the Debtor's advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

The contents of this Disclosure Statement should <u>not</u> be construed as legal, business, or tax advice.  Each Holder of a Claim or Interest should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement is not legal advice.  This Disclosure Statement may not be relied upon for any purpose other than to determine whether to vote to accept the Plan.

Nothing contained in the Plan will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtor or on holders of claims or interests.

## A.      No Assurance of Ultimate Recoveries

There can be no assurances of the actual recoveries to Holders of Allowed Claims and Interests.  The ultimate recoveries obtained by the Liquidation Trustee on account of Retained Causes of Action are uncertain due to the risk of success on the merits and the potential difficulties of collection and enforcement of any judgments.

## B.      Risk of Delayed Effective Date

There can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.  If the Plan is not consummated, there can be no assurance that the Chapter 11 Case would not be converted to a chapter 7 liquidation case or that any new chapter 11 plan would be as favorable to holders of claims as the current Plan or include a subordination of the Subordinated GCUK Intercompany Loan Claims.  ~~Either~~Any outcome <u>other than the Plan</u> may materially reduce distributions to holders of allowed claims and interests.

Although in the process of winding down, the Debtor continues to incur administrative costs.  Any material delay in confirming the Plan may result in insufficient funds to consummate the Plan.

## C.    Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular claim or cause of action or projected objection to a particular claim or interest is, or is not, identified in this Disclosure Statement.  The Debtor may seek to investigate, file, and prosecute claims and interests and may object to claims or interests after Confirmation or the Effective Date irrespective of whether this Disclosure Statement identifies such claims or interests or objections to such Claims or Interests.

[Concludes on following page]

## CONCLUSION AND RECOMMENDATION

The Debtor believes that confirmation and implementation of the Plan is preferable to any other alternative.  The Debtor urges all Holders of Impaired Claims entitled to vote to accept the Plan in accordance with the instructions provided herein and in the Solicitation Packages.

Dated: ~~August 27~~September 24, 2021
       New York, New York

GREENSILL CAPITAL INC.

By:     /s/ ~~Draft~~Matthew Tocks
        Name:  Matthew Tocks
        Title:    Chief Restructuring Officer

ALBERT TOGUT
KYLE J. ORTIZ
BRYAN M. KOTLIAR
AMANDA C. GLAUBACH
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000

*Attorneys for the Debtor and Debtor in Possession*

## **APPENDIX A**

Chapter 11 Plan of Liquidation of Greensill Capital Inc.

[to be attached separately]